1  **HUESTON HENNIGAN LLP**
   John C. Hueston, State Bar No. 164921
2  jhueston@hueston.com
   Moez M. Kaba, State Bar No. 257456
3  mkaba@hueston.com
   Yahor Fursevich, State Bar No. 300520
4  yfursevich@hueston.com
   523 West 6th Street, Suite 400
5  Los Angeles, CA 90014
   Telephone:     (213) 788-4340
6  Facsimile:     (888) 775-0898

7

8

9                    **UNITED STATES DISTRICT COURT**

10                  **NORTHERN DISTRICT OF CALIFORNIA**

11                        **SAN JOSE DIVISION**

12  PALANTIR TECHNOLOGIES INC., a          Case No. 5:19-cv-06879-BLF
    Delaware corporation,
13                                          **FOURTH AMENDED COMPLAINT FOR:**
                Plaintiff,
14                                          (1) Civil RICO, 18 U.S.C § 1962
         vs.                                (2) Breach of Contract
15                                          (3) Violation of Cal. Civ. Code § 3426 et seq.
    MARC L. ABRAMOWITZ, in his individual
16  capacity and as trustee of the MARC
    ABRAMOWITZ CHARITABLE TRUST NO.         **DEMAND FOR JURY TRIAL**
17  2, KT4 PARTNERS LLC, a Delaware limited
    liability company, and DOES 1 through 50,
18  inclusive,

19              Defendant.

20

21

22

23

24

25

26

27

28

Plaintiff Palantir Technologies Inc. ("Palantir") hereby brings this Fourth Amended Complaint against Marc L. Abramowitz ("Abramowitz"), both in his individual capacity and as trustee of the Marc Abramowitz Charitable Trust No. 2 (the "Trust"), KT4 Partners LLC ("KT4"), and Does 1 through 50 (collectively with Abramowitz, KT4, and the Trust, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     Palantir, founded in 2003, is a renowned data analytics company whose revolutionary products have transformed how organizations use and interact with data.  With Palantir's technology, organizations can analyze large repositories of dispersed data, uncover correlations between seemingly unrelated pieces of information, and collaborate on key insights with others in a secure manner.  These capabilities are so transformative that the world's most sophisticated and critical institutions rely on Palantir's products to enhance their day-to-day operations.  Various governmental agencies, for example, use Palantir's technology to fight terrorism, drug cartels, and organized crime.  And numerous private organizations—including the top financial institutions, manufacturing and pharmaceutical companies, and airlines—employ Palantir's products to solve the most pressing problems facing their businesses.  The widespread success of Palantir's technology has cemented the company's place at the top of the highly competitive data analytics industry.

2.     To preserve its competitive advantage, Palantir has placed great emphasis on maintaining the secrecy of its proprietary information.  Palantir's technology has been internally developed through the ingenuity and hard work of hundreds of employees and required hundreds of millions of dollars in investments since the company's founding.  Public disclosure of Palantir's proprietary information could thus inflict significant harm on Palantir by enabling its competitors to profit from its inventions.  For this reason, Palantir's trade secrets constitute some of the company's most valuable assets.

3.     Abramowitz is a private investor who holds degrees in management and law.  He has no technical or engineering background.  In 2005, Abramowitz was introduced to Palantir when the company was still up-and-coming and largely unknown.  Although Abramowitz had no experience in data analytics or understanding of Palantir's products and business, he became interested in

1   Palantir after learning that its technology had counter-terrorism applications.  Abramowitz thus

2   became an early investor in the company through KT4 and the Trust—two entities Abramowitz

3   controls and uses to make investments and hold interests in companies with new or emerging

4   technologies.

5         4.     Leveraging his investment in Palantir, Abramowitz positioned himself as a trusted

6   advisor, agent, and fiduciary to the company.  He worked on, or purported to work on, numerous

7   projects on behalf of the company, representing that he sought to help Palantir expand its operations.

8   Believing Abramowitz's representations that he was interested only in advancing and benefitting

9   Palantir, its employees, and its mission, Palantir allowed Abramowitz to visit Palantir's offices on

10  numerous occasions and engage in regular discussions with Palantir employees about some of the

11  company's most sensitive business strategies and trade secrets.  Those discussions were highly

12  confidential, and Palantir expected Abramowitz to maintain them as such in light of his fiduciary

13  relationship with the company, written confidentiality agreements, communications with the

14  company, and course of conduct between the parties.  Indeed, Abramowitz understood from his

15  numerous discussions with Palantir's CEO that Abramowitz's conversations with Palantir employees

16  and the information Abramowitz learned from Palantir must be maintained confidential.

17        5.     By the early 2010s, Palantir had grown into one of the most valuable private

18  technology companies in the world and was expanding its business and operations into various new

19  industries.  Having already gained Palantir's trust as an advisor, agent, and fiduciary of the company,

20  Abramowitz learned about Palantir's business and expansion plans into the healthcare, cyber, and

21  natural resources exploration markets.  Recognizing just how profitable it would be to dominate those

22  markets, Abramowitz embarked on an intentional and calculated scheme to misappropriate and profit

23  off of Palantir's technology for the benefit of himself, KT4, and the Trust (the "Abramowitz

24  Enterprise").  This scheme spanned multiple years and proceeded in several phases.

25        6.     *First*, in at least 2012, 2013, and 2014, Abramowitz engaged in discussions with

26  Palantir employees, including by email, by telephone, and in person, concerning Palantir's latest

27  projects in the healthcare, cyber, and natural resources exploration markets.  In the course of those

28  discussions, Abramowitz claimed that he sought to help Palantir develop and expand its business in

those markets.  Trusting Abramowitz's representations, and believing that Abramowitz was acting for the exclusive benefit of the company, Palantir shared with him confidential and proprietary information about its technology, products, and business plans.  As Abramowitz's subsequent conduct made clear, however, Abramowitz did not intend to use the information Palantir shared with him to benefit Palantir but only to benefit himself and the Abramowitz Enterprise.

7.    *Second*, in late 2014, 2015, and 2018, after acquiring Palantir's trade secrets, Abramowitz filed a total of 14 patent applications, both domestically and internationally, disclosing and seeking to patent Palantir's confidential and proprietary information for the use and benefit of the Abramowitz Enterprise.  The applications falsely list Abramowitz—who is a professional investor with no technical or engineering background[1]—as the **sole** inventor of systems, methods, and concepts concerning data analytics in the healthcare, cyber, and natural resources sectors.  The applications attributed exclusively to Abramowitz inexplicably contain, among other things, detailed charts and diagrams describing the inventions, but make no mention of Palantir or any of its employees.  The nature of the inventions makes clear they could not have been created by a professional financial investor like Abramowitz.

8.    *Third*, in September and October 2014, Abramowitz continued his use of the wires to conceal and further perpetuate the fraudulent activities of the Abramowitz Enterprise.  When Palantir heard that Abramowitz had filed or was preparing to file a patent application relating to a technology in the cyber sector, Abramowitz falsely claimed that he prepared the application for Palantir's benefit and that the application concerned "his" idea.  Abramowitz, however, neither provided a copy of the application to Palantir or disclosed the existence of numerous other applications that sought to patent Palantir's proprietary inventions.  Had Abramowitz told Palantir the truth, Palantir would have taken

---

[1] As his own counsel described him in this action, Abramowitz is an "investor [who has] invested in several different companies, including in the tech space."  In response to the Court's question of whether Mr. Abramowitz has "a financial background or a technical background," Mr. Abramowitz's counsel responded, "[a] financial background in investing."

1  action to prevent the publication of those applications and the trade secrets contained therein.  But

2  due to Abramowitz's cover-up, Palantir did not discover what claimed inventions Abramowitz

3  sought to patent until after certain of his applications became public in mid-2016.

4      9.    *Finally*, starting in 2014 and continuing at least through 2018, Abramowitz worked

5  to establish businesses based on Palantir's technologies he sought to patent.  Abramowitz did so for

6  his own benefit, as well as for the benefit of KT4 and the Trust, which likely held or were intended

7  to hold the interests in those businesses.

8      10.    Through these egregious actions, and those described herein, Defendants violated

9  federal and California law and breached agreements with and legal obligations to Palantir.  Palantir

10 now seeks damages for Defendants' wrongful actions, as well as injunctive relief to prevent further

11 irreparable harm from Defendants' misappropriation of Palantir's trade secrets.  Without this relief,

12 Palantir will continue to suffer competitive harm.

13                    **JURISDICTION AND VENUE**

14     11.    On October 22, 2019, pursuant to 28 U.S.C. §§ 1331, 1441(a) and 1446,

15 Defendants filed their Notice of Removal transferring this case from the Superior Court of

16 California for the County of Santa Clara to the United States District Court for the Northern

17 District of California.

18     12.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331

19 as the action raises questions of federal law under the Racketeer Influenced and Corrupt

20 Organizations Act ("RICO"), 18 U.S.C.§ 1962.  This Court also has supplemental jurisdiction

21 over Palantir's claims arising under state law pursuant to 28 U.S.C. § 1367, as those claims are

22 part of the same case or controversy.

23     13.    This Court has personal jurisdiction over each Defendant.  Palantir is informed

24 and believes and on that basis alleges that defendant Marc L. Abramowitz is an individual

25 residing in San Francisco, California.  Palantir is informed and believes and on that basis alleges

26 that Abramowitz is the trustee of the Marc Abramowitz Charitable Trust No. 2.  Abramowitz's

27 wrongful actions occurred in, were targeted to, and caused damage in, California.  Palantir is

28 informed and believes and on that basis alleges that defendant KT4's principal place of business

in San Francisco, California.  KT4 does business in California and has committed acts that subject it to the jurisdiction of this Court.  Upon information and belief, Abramowitz is the managing member of KT4 and controls and directs the activities of KT4.  The wrongful actions of KT4 occurred in, were targeted to, and caused damage in, California.

14.     Palantir is ignorant of the true names of Does 1 through 50 and such names are fictitious.  Such defendants are legally responsible for the events and happenings described herein and for the damages proximately caused thereby.  Once Palantir learns of the true names of Does 1 through 50, Palantir will amend the complaint to include the real name(s) of such party or parties.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District.  Further, venue is proper in this District pursuant to 28 U.S.C. § 1441(a) because this District embraces the Superior Court of California, Santa Clara County, where this action was originally filed.

**FACTUAL BACKGROUND**

I.     **Palantir Earns Its Status at the Top of the Data Analytics Industry Through Cutting-Edge Innovation**

16.     Since its founding in 2003, Palantir has become a global leader in the data analytics industry though groundbreaking technological innovation.  Like many industry leaders, Palantir achieved its success by tackling what had seemed to be an insurmountable problem.  As Palantir recognized, organizations around the world in different industries deal with massive amounts of data that is stored in separate and disconnected locations with varying levels of security and access requirements.  Without some way to integrate, organize, and manage that data, organizations are unable to use it to its full potential in their day-to-day operations.  This underutilization of available information leads to inefficiency, lower productivity, and diminished returns.

17.     To address this problem, Palantir created what would quickly become some of the most revolutionary products in the data analytics industry: software platforms capable of integrating and categorizing large amounts of scattered data into a single, coherent information system that ordinary people can use and analyze.  Palantir's platforms and related products operate by integrating

data from distinct sources, organizing it into meaningful categories of information (such as people, places, and events), and then helping users interact with that information in a secure, productive, and collaborative manner.  For example, through Palantir's platforms, analysts can search all their data sources at once, uncover hidden connections between seemingly unrelated pieces of information, and share insights with other individuals who have access to the platforms.  Such features do not simply enhance the capabilities of organizations using Palantir's technology; they entirely transform how those organizations operate.

18.     Today, Palantir's products are deployed at numerous governmental, commercial, and non-profit institutions to solve some of the world's most pressing problems.  For instance, organizations use Palantir software to respond to natural disasters, to optimize food assistance to those most in need around the globe, and to find missing and exploited children.  And since its inception, Palantir has been partnering with various governmental agencies to help fight terrorism, drug cartels, and organized crime by locating leads in large repositories of electronic data.  Through these and many other applications of Palantir's technology, Palantir's technology has demonstrably changed the way organizations use and interact with data.

19.     Palantir's success could not have been possible without its extensive investments in research and development.  Since its launch, Palantir has spent hundreds of millions of dollars creating new products, adapting existing products to new applications, and expanding its business into new markets and industries.  This heavy emphasis on innovation and development has placed Palantir at a level above its competitors by enabling it to adapt to the demands of its customers and improve its data integration, management, and analytical products and services beyond what was thought possible.

20.     Because Palantir's technology and business plans are critical to preserving its hard-earned competitive advantage, Palantir employs numerous security measures to protect its proprietary information.  Among other things, Palantir restricts access to its sensitive internal information to employees who have appropriate authorization and require the information to perform their job duties.  Palantir also monitors its network systems for potential security risks and protects them from unauthorized access through such measures as intrusion detection systems, anti-malware

software, network firewalls, whole disk encryption of employee computers, and complex password and two-factor authentication requirements.

21.     In addition to securing its networks, Palantir restricts physical access to its facilities. Palantir employees must use electronic badges to get inside Palantir's offices, and only a small subset of employees may access sensitive areas, such as those containing network servers and security equipment.  Outside visitors to Palantir must be invited to Palantir's facilities, sign in and wear visitor badges, and be escorted at all times.  Multiple security guards ensure compliance with these requirements and otherwise protect Palantir from unauthorized intruders.

22.     Palantir also takes significant measures to ensure that those who come into contact with its confidential business information and trade secrets do not disclose them to other individuals. Among other things, Palantir requires its employees with access to proprietary information to sign confidentiality agreements; conducts pre-employment background checks for all new employees; and provides mandatory legal training covering confidentiality, information and data security, and compliance.  Palantir considers these and other security measures paramount to maintaining its competitive edge.

23.     Palantir has employed all of the methods described above to maintain the confidentiality of the trade secrets and other confidential information at issue in this action.

## II.     Abramowitz Gains Palantir's Trust as a Company Advisor and Fiduciary

24.     Abramowitz is a private investor who made most of his fortune in the real estate and buyout businesses.  In 2005, Abramowitz learned about the then up-and-coming Palantir and its mission to create data analytics tools capable of solving the most pervasive problems organizations face.  Although Abramowitz had no experience in data analytics, and had no understanding of Palantir's products and business, he became interested in Palantir after learning that its technology had counter-terrorism applications.  Abramowitz thus decided to become an early investor in the company and purchased some $100,000 of Palantir shares through KT4 and the Trust.

25.     KT4 is a Delaware limited liability company that Abramowitz manages. Abramowitz's wholly owned company, Kadima, Inc., has a 49% ownership interest in KT4, and the remaining 51% is owned by a handful of family trusts, including the Trust.  Since its formation in

2002, Abramowitz has used KT4 as the entity by which he holds interests in various new or emerging technology companies.  In addition to managing KT4, Abramowitz also administers the Trust for the benefit of his family members.  As the Trust's trustee and settlor, Abramowitz makes investments on behalf of the Trust and manages the Trust's assets.  Abramowitz does not appear to personally hold significant interests in his investments in technology companies.  Instead, he makes the investments through KT4 and the family trusts, like he did when investing in Palantir.  Each of KT4 and the Trust is a separate legal entity.

26.     After investing in Palantir, Abramowitz fostered close relationships with Palantir's executives and claimed to have an interest in working on behalf of Palantir to help the company succeed.  He presented himself as a trustworthy advisor who could use his connections to secure new lines of business for Palantir, find clients for Palantir's products, and otherwise help develop Palantir's nascent operations.  Because Abramowitz made clear that he sought to act solely in Palantir's best interests, Palantir placed its trust and confidence in him.  Having accepted this position of trust, Abramowitz far exceeded the role of a traditional investor and became Palantir's agent, advisor, and fiduciary.  KT4's and the Trust's investments in the company further assured Palantir that Abramowitz would not betray Palantir's trust and would instead work together with Palantir executives and employees to benefit the company.

27.     By 2012, or seven years after KT4's and the Trust's initial investments in Palantir, Palantir was already well into the process of establishing itself as an industry leader in data analytics and one of the most valuable technology companies in the world.  Its long list of clients included federal military and intelligence agencies, state police departments, the world's largest financial and insurance institutions, and prominent pharmaceutical companies.  As Palantir's agent, advisor, and fiduciary, Abramowitz was actively involved in Palantir's day-to-day activities, frequently discussed Palantir's business with company executives, worked or purported to work on various projects on behalf of Palantir, and purported to seek guidance from Palantir in connection with his work for the company.  For example:

- Starting in late 2012, Abramowitz purported to work for Palantir's benefit and subject to Palantir's control on an opportunity for Palantir in the healthcare and

FOURTH AMENDED COMPLAINT

pharmaceutical sectors with several potential business partners.  In connection with this work, Abramowitz communicated with Palantir executives and employees on a regular basis.

- In February 2013, Abramowitz discussed with Palantir employees the possibility of bringing in a pharmaceutical company as a potential client for Palantir, and offered to work on pitching Palantir's products to the potential client on Palantir's behalf.

- In June 2013, Abramowitz, acting ostensibly on behalf of Palantir, connected a Palantir employee with a potential business partner whom Abramowitz described as "the largest aggregator of medical data and pharma consultant in the world." Abramowitz wrote that "our product" could be "incredibly useful" to this potential business partner and thus presented an opportunity for Palantir.

- Starting in January 2014, and continuing through November 2014, Abramowitz purported to work on behalf of Palantir and with Palantir employees and executives on a potential business deal with a company that sought to conduct business with Palantir in the healthcare sector.

- In May 2014, Abramowitz accompanied a Palantir employee on a business trip to Israel, representing that he would help identify potential business opportunities for the company.  After that trip, Abramowitz continued to purport to act on Palantir's behalf and for Palantir's benefit to develop opportunities and growth for Palantir's business in connection with potential Israeli business partners.

- Starting in June 2014, Abramowitz purported to work on behalf of Palantir to help it expand its operations in the cyber insurance sector.  Abramowitz represented himself as acting for Palantir's benefit and as Palantir's agent.

28.    The instances described above are only examples of the many instances in which Abramowitz presented himself as, and accepted the obligations of, Palantir's agent, advisor, and fiduciary, who purported to act on behalf of Palantir, with Palantir's best interests in mind, and subject to Palantir's direction and control.  Indeed, between 2010 and 2015, Abramowitz visited Palantir's offices on some 60 occasions, held numerous off-site meetings with Palantir's executives

and employees, and even requested a permanent office of his own at Palantir's facilities in Palo Alto. In light of this special relationship of trust and confidence, Palantir's executives and employees alike accepted Abramowitz as a member of the Palantir team and as Palantir's advisor, agent, and fiduciary.  As described below, however, Abramowitz used his special relationship of trust and confidence with Palantir to gain access to the company's confidential and proprietary information and eventually abscond with the company's trade secrets.

29.     During his interactions with Palantir, Abramowitz was often privy to sensitive and confidential information about Palantir's technology, business plans, and clients.  Palantir permitted Abramowitz to access such information only because Abramowitz held himself out as an agent, advisor, and fiduciary of the company, and did so with the mutual understanding that Abramowitz would keep any Palantir discussions confidential and use it for the sole benefit of Palantir in connection with his work for the company.  On many occasions, for example, Palantir's CEO told Abramowitz that the information he obtained from Palantir must remain confidential.  Abramowitz understood this obligation and accepted that his relationship of trust and confidence with Palantir required him to use the business and proprietary information he obtained from the company and its employees only for Palantir's benefit.  Given KT4's and the Trust's investments in Palantir, Palantir trusted Abramowitz's representations that he sought only to benefit Palantir (and thus increase the value of KT4's and the Trust's investments).

30.     Abramowitz also signed confidentiality agreements requiring him to safeguard Palantir's confidential and proprietary information.

31.     On August 14, 2012,  Abramowitz, in his capacity as the trustee of the Trust, electronically executed and transmitted a Preferred Stock Transfer Agreement (the "2012 Transfer Agreement").  That agreement memorializes confidentiality obligations of both the Trust and all "Covered Persons," including affiliates (like KT4) and directors and agents (like Abramowitz). Section 7 of the 2012 Transfer Agreement states, in relevant part, as follows:

> Each of Purchaser and Seller [including the Trust] agrees to, and agrees to cause its
>
> respective Covered Persons to, keep confidential and refrain from using or disclosing
>
> all agreements, documents and other information regarding the Company or its

FOURTH AMENDED COMPLAINT

securityholders provided or made available to Purchaser or Seller [including the Trust] either (a) in connection with the exploration, negotiation, execution, and closing of this Agreement or (b) in its capacity as a stockholder of the Company following the date of this Agreement . . . . Each of Purchaser and Seller is responsible hereunder and shall be liable for any breaches of this Section 7 and any disclosure or misuse of any information or documents described in this section by its respective Covered Persons.

32.     On July 12, 2014, Abramowitz also electronically executed a Non-Disclosure Agreement (the "NDA") that obligates Abramowitz to "hold all Proprietary Information in strict confidence and . . . not use (except as expressly authorized by Palantir) or disclose any Proprietary Information for any purpose." The NDA defines "Proprietary Information" as "non-public business, technical or other information, materials and/or ideas of Palantir [including] anything you learn or discover as a result of exposure to or analysis of any Proprietary Information."

33.     On June 17, 2015, Abramowitz, in his capacity as the managing member of KT4, electronically transmitted a Preferred Stock Transfer Agreement (the "2015 Transfer Agreement"). That agreement memorializes confidentiality obligations of both KT4 and all "Covered Persons," including affiliates (like Trust) and members and agents (like Abramowitz). Section 7 of the 2015 Transfer Agreement states, in relevant part, as follows:

Each of Purchaser and Seller [including KT4] agrees to, and agrees to cause its respective Covered Persons to, keep confidential and refrain from using or disclosing all agreements, documents and other information regarding the Company or its securityholders provided or made available to Purchaser or Seller [including KT4] either (a) in connection with the exploration, negotiation, execution, and closing of this Agreement or (b) in its capacity as a stockholder of the Company following the date of this Agreement . . . . Each of Purchaser and Seller is responsible hereunder and shall be liable for any breaches of this Section 7 and any disclosure or misuse of any information or documents described in this section by its respective Covered Persons.

34.     As Palantir's agent, advisor, and fiduciary who was intimately familiar with Palantir's business, Abramowitz knew that his confidentiality obligations—memorialized in confidentiality agreements, communications, and course of conduct among the parties—were critical to preserving Palantir's position as a market leader in the highly competitive data analytics industry.   He understood that in order for Palantir to maintain its competitive edge, it had to ensure that its employees and advisors, after gaining insider knowledge of Palantir's confidential information, would not misappropriate that information for their own benefit or disclose it to the public. Nonetheless, despite being well aware of his obligations, Abramowitz breached them in a flagrant attempt to benefit himself, KT4, and the Trust at the expense of the company (and its employees and other shareholders) that placed its trust and confidence in him.

**B.      Having Gained Palantir's Trust, Abramowitz Devises a Scheme to Steal Palantir's Trade Secrets for the Benefit of the Abramowitz Enterprise**

35.     As Palantir grew in size and stature, and became what *Forbes Magazine* has described as one of "Silicon Valley's most valuable private technology companies," it developed plans to enter several new industries that presented valuable opportunities for the company and its data analytics products.  As relevant to this action, by the early 2010s, Palantir was expanding its technology to target: (i) clinical drug trials and health insurance (the "Healthcare Technology"); (ii) cyber insurance and cyber security (the "Cyber Technology"); and (iii) natural resources exploration and management (the "Natural Resources Technology").  Palantir spent millions of dollars, and its employees spent countless hours, developing this technology and corresponding business plans.

36.     Abramowitz learned about Palantir's intended expansion of its operations into the new markets described above through his work with Palantir and interactions with Palantir's executives and employees.  Recognizing just how profitable it would be to dominate those markets, Abramowitz embarked on an intentional and calculated scheme to misappropriate and profit off of Palantir's Healthcare, Cyber, and Natural Resources Technologies for the benefit of himself and the Abramowitz Enterprise (including KT4 and the Trust).

37.     This scheme spanned multiple years and consisted of at least three parts.  First, in 2012, 2013, and 2014, Abramowitz engaged in discussions with Palantir employees concerning

- 13 -

Palantir's latest projects in the healthcare, cyber, and natural resources exploration sectors, representing to be Palantir's trusted agent, advisor, and fiduciary.  By doing so, Abramowitz gained access to Palantir's confidential and proprietary information concerning the Healthcare, Cyber, and Natural Resources Technologies.  Then, in 2014, 2015, and 2018, Abramowitz filed a total of 14 domestic and international patent applications to patent Palantir's confidential and proprietary information, falsely claiming Palantir's technologies as his own.  Finally, starting in 2014 and continuing at least through 2018, Abramowitz took steps to launch competing businesses to derive profit from Palantir's trade secrets and inventions.

38.     When executing this scheme, Abramowitz acted not only in his personal capacity, but also on behalf of the Abramowitz Enterprise as a whole, including KT4 and the Trust.  As described above, Abramowitz has used KT4 and the Trust to hold ownership interests in various technology companies (including Palantir).  For this reason, Abramowitz has likely either transferred or intended to transfer his interests in the businesses he launched or intended to launch based on Palantir's confidential and proprietary technology to KT4 and the Trust.

**1.     Abramowitz Uses False Pretenses to Gain Access to Palantir's Confidential and Proprietary Information**

39.     At least in 2012, 2013, and 2014, Abramowitz engaged in numerous discussions with Palantir employees concerning the Healthcare, Cyber, and Natural Resources Technologies.  In the course of those discussions, Abramowitz learned confidential and proprietary information about those Technologies, as well as Palantir's business plans and clients.  Although Abramowitz claimed that his purpose and goal was to help Palantir develop its business, those representations were false.  In truth, Abramowitz intended to betray Palantir's trust and confidence by seeking to patent Palantir's proprietary information and to establish or attempt to establish competing businesses for the benefit of the Abramowitz Enterprise.

40.     The Healthcare Technology.  In 2010, Palantir began developing plans to expand its leading, innovative technology to the healthcare sector.  Through extensive research and development, Palantir identified two areas in the healthcare sector that could be significantly advanced through the use of Palantir's data analytics products: clinical drug trials and health

insurance.  As to clinical trials, Palantir recognized that by integrating, organizing, and analyzing data from various health sources, it could increase the pace of new drug approvals by quickly determining individuals' suitability for participation in clinical drug trials, identifying the best locations for those trials, and monitoring the trials in real time.  Similarly, with respect to health insurance, Palantir determined that its technology could be applied to better price insurance policies by more accurately analyzing monetary risks for health insurance companies, identifying patterns and instances of healthcare fraud, and otherwise mitigating unnecessary costs.

41.     By late 2012, Abramowitz had already begun accessing information about Palantir's business plans in the healthcare sector.  In December 2012, for example, Abramowitz met with Palantir engineers at University of California, San Francisco, to learn more about Palantir's healthcare developments.  Recognizing how profitable Palantir's Healthcare Technology could be, Abramowitz set out to obtain as much information as he could concerning the technology and Palantir's business plans.  Abramowitz accomplished this task by representing to Palantir's executives and employees that he intended to use the information he was provided for Palantir's benefit.

42.     In January 2013, Abramowitz expressed his interest in the Healthcare Technology to Palantir's CEO and requested via email to arrange a private meeting between Abramowitz and Palantir engineers to go over Palantir's Healthcare Technology.  Because Abramowitz had represented that he sought to advance Palantir's interests and help Palantir develop its healthcare business, Palantir and Abramowitz arranged for Abramowitz to meet with Palantir's engineers, Lauren Chaparro and Casey Ketterling, at the company's offices to discuss Palantir's healthcare products.  During that meeting, which occurred in February 2013, Abramowitz obtained confidential and proprietary information concerning the Healthcare Technology.  Importantly, Abramowitz fraudulently reiterated to Ms. Chaparro and Mr. Ketterling that he wished to help Palantir with its efforts to develop its healthcare business and even offered to work with Palantir on a pitch for a potential client.  Abramowitz's statements and conduct reassured Palantir that Abramowitz would keep the information provided to him confidential and use it only for the exclusive benefit of Palantir.

43.    Abramowitz continued to reaffirm his purported desire and intent to help Palantir expand its business in the healthcare sector in the months following his February 2013 meeting with Palantir engineers.  Trusting Abramowitz's representations that he sought information about the Healthcare Technology for the purpose of helping Palantir, Ms. Chaparro kept Abramowitz updated, including by meeting with him in person in April 2013, for example, on Palantir's healthcare work and the Healthcare Technology.

44.    As it later became apparent, Abramowitz was not seeking information about Palantir's Healthcare Technology for the purpose of helping Palantir develop its business in the new healthcare market, and his representations to that effect were false.  In truth, once Abramowitz realized the potential of the Healthcare Technology and while he was discussing the Healthcare Technology with Palantir throughout 2013, he had already begun making plans to misappropriate Palantir's proprietary information and to establish a business of his own to benefit himself, KT4, and the Trust.

45.    As Palantir's Healthcare Technology became more developed and applied to specific projects and clients, Abramowitz continued his attempts to learn Palantir's confidential and proprietary information under false and fraudulent pretenses.  In January 2014, Abramowitz reached out to Palantir via email concerning a potential opportunity with a business partner who expressed an interest in Palantir's Healthcare Technology.  Over the next ten months, Palantir employees, including members of the Palantir healthcare team, communicated regularly with Abramowitz concerning this business opportunity and set up in-person and telephonic meetings, including by email, at least in February 2014, April 2014, June 2014, August 2014, and September 2014. Abramowitz once again falsely represented that his purpose and intent was to help Palantir expand its business by establishing a joint venture with the business partner.  Abramowitz even represented that he sought to help Palantir run that joint venture.

46.    Relying on Abramowitz's representations, Palantir continued sharing confidential and proprietary information with him concerning the Healthcare Technology.  For example, in June 2014, Abramowitz and Ms. Chaparro set up, via email, a meeting in Palo Alto for "Palantir briefing" about its work in the healthcare sector.  Expecting that Abramowitz, as the company's agent, advisor, and

fiduciary, had only Palantir's best interests in mind, Palantir freely discussed with Abramowitz its latest work and developments in the healthcare sector.

47.     Abramowitz's subsequent conduct indicates, however, that he never intended to keep the information Palantir shared with him confidential or use it for Palantir's benefit. At the same time as Abramowitz was purporting to act on behalf of Palantir, including in connection with the potential business deal discussed above, Abramowitz was preparing to file patent applications to patent the concepts and methods concerning Palantir's Healthcare Technology.

48.     For example, as negotiations with the potential business partner were developing in mid and late 2014, Palantir and Abramowitz drafted an agreement that promised compensation to Abramowitz if the deal were to successfully close. Palantir sent this draft agreement to Abramowitz on October 14, 2014. But some two weeks later, on October 29, 2014, without Palantir's consent or knowledge, Abramowitz filed an application with the USPTO disclosing the proprietary information Palantir had shared with him concerning the Healthcare Technology, claiming those inventions as his own, and seeking to obtain patents that would exclude Palantir from the very market Abramowitz purported to help Palantir develop. Although Abramowitz appears to have been preparing this application while discussing Palantir's technology and business plans with Palantir, at no point, during any of the meetings and communications outlined above, did Abramowitz disclose that his intent was to patent the concepts and methods concerning Palantir's Healthcare Technology.

49.     The Cyber Technology. In 2013, Palantir was developing systems and methods for companies to better defend themselves against cyber attacks. After devoting substantial resources to this project, Palantir created a viable way for organizations to share data through Palantir's platform and cooperate with one another to detect and eliminate potential cybersecurity threats. In conjunction with this project, Palantir developed technologies and business plans for improving cyber insurance by quantifying and monitoring the risk of cyber attacks, thus enabling insurers to price cyber insurance premiums.

50.     In the course of performing work for Palantir, Abramowitz learned about Palantir's business plans in the cyber sector and represented to Palantir that he sought to help it expand its operations in this new market. For example, in April 2014, Abramowitz introduced via email

Palantir's executives, including Palantir's CEO and Mr. Hood, to an investor with connections to a potential client for Palantir's cyber security products.  Abramowitz indicated in the email that his intent was to secure this "opportunity" for Palantir and to help Palantir "touch whole digits of GDP that reflect [the potential client's] sales."  Through his statements and conduct, Abramowitz continued to reassure Palantir that he had the company's best interests in mind and, as Palantir's agent, advisor, and fiduciary, sought to help Palantir expand its operations.

51.      These assurances were false.  Abramowitz's plan was not to help Palantir but to obtain confidential and proprietary information about the Cyber Technology to benefit himself and the Abramowitz Enterprise.  Having defrauded Palantir into believing that he sought only to further Palantir's interests, Abramowitz requested additional information about Palantir's cyber work from Kevin Kawasaki in mid-2014, representing, once again, that his intent was to help Palantir.  Mr. Kawasaki then arranged for Abramowitz to speak with another Palantir executive, Shyam Sankar, who, in June 2014, sent Abramowitz an email outlining Palantir's cyber work.  Purporting to act in Palantir's best interests, and for the purpose of securing new opportunities for Palantir, Abramowitz arranged, via email, an in-person meeting with Mr. Sankar at Palantir's offices the next day to discuss the subject further.  During that meeting, Abramowitz learned confidential and proprietary information about the Cyber Technology.  Palantir provided this information to Abramowitz with the understanding and expectation that he would use it solely for Palantir's benefit and would not disclose it to any third parties without Palantir's permission.

52.      Indeed, Abramowitz represented to Mr. Sankar in June 2014 that he was interested in in setting up a Palantir cyber insurance subsidiary that he would run based on the confidential and proprietary information Palantir had disclosed to him.  For the next weeks and months, Abramowitz purported to work on behalf of Palantir to expand its cyber business and continued to assure Palantir that he was acting solely in the company's interests.  For example, in September 2014, Abramowitz introduced Palantir executives Mr. Hood and Tyler Scriven via email to a potential partner in the cyber business for the purported purpose of helping Palantir develop its cyber operations.  Abramowitz's statements and conduct served as yet another confirmation to Palantir that Abramowitz was supposedly acting for the benefit of Palantir.

53.     Abramowitz's representations and statements that he sought to use the information Palantir had disclosed to him for Palantir's benefit were false.  In truth, Abramowitz sought to benefit only himself and the Abramowitz Enterprise by setting up a company of his own using the confidential and proprietary information Palantir had revealed to him.  At the same time as Abramowitz was purporting to work on Palantir's behalf in the summer and fall of 2014, he was preparing to patent, without Palantir's knowledge or consent, Palantir's proprietary information concerning the Cyber Technology.  After doing so, as described further below, Abramowitz set up a cyber insurance company with the apparent intent to compete against Palantir and exclude it from this valuable market.  At no point during any of the meetings or discussions with Palantir did Abramowitz disclose his true intentions.

54.     The Natural Resources Technology.  In 2013 and 2014, Palantir was developing plans to expand its business and technology into the natural resources exploration sector.  As Palantir recognized, companies involved in the exploration, production, and management of natural resources operate in an environment filled with scattered and disparate types of data.  Palantir discovered that by integrating and organizing all that data, it could provide key insights to these companies, including, for instance, the likelihood of finding oil or gas at a particular site.  To capitalize on this discovery, Palantir developed the Natural Resources Technology.

55.     Just as he did with the Healthcare and Cyber Technologies, Abramowitz learned about the Natural Resources Technology in the course of performing work for Palantir.  He took a great interest in Palantir's ideas and began inquiring about the functionality and features of the technology while claiming that he wanted to help Palantir develop its business in the oil-and-gas market.  Trusting Abramowitz, Palantir shared with him its confidential and proprietary information related to the Natural Resources Technology.

56.     In March 2014, for instance, Abramowitz met with Mr. Kawasaki in Dallas, Texas and discussed Palantir's work and plans in the oil-and-gas sector.  Later the same month, Abramowitz emailed Palantir's CEO, Mr. Kawasaki, and Mr. Hood about a possible business connection to help Palantir in the "oil and gas exploration and production business which we talked about in Dallas."  This conduct continued to reassure Palantir that Abramowitz was acting for Palantir's exclusive

benefit and that he would not disclose or use the confidential and proprietary information concerning the Natural Resources Technology Palantir was sharing with him without Palantir's authorization.

57. As with the Healthcare and Cyber Technologies, however, Abramowitz did not intend to use the information he accessed about the Natural Resources Technology for Palantir's benefit. Instead, soon after obtaining that information, Abramowitz began preparing, without Palantir's knowledge or consent, a patent application to patent the concepts, methods, and ideas Palantir had shared with him. At no point during any discussions with Palantir did Abramowitz disclose that his true intentions were to claim Palantir's trade secrets and inventions for himself.

## C. Abramowitz Lies In Patent Applications So He Can Patent Palantir's Technology

58. Having used false pretenses to learn Palantir's sensitive trade secret information throughout 2012, 2013, and 2014, Abramowitz began filing domestic and international patent applications via online portals to patent the technologies Palantir developed and disclosed to Abramowitz in confidence. Those patent applications—which were published in mid-2016 and are publicly available—were the foundation for the businesses Abramowitz has launched or attempted to launch for the benefit of the Abramowitz Enterprise:

- On October 21, 2014, Abramowitz filed with the USPTO Application No. 62/066,716, seeking to patent systems, methods, and design concepts related to the Cyber Technology;

- On October 29, 2014, Abramowitz filed with the USPTO Application No. 62/072,368 seeking to patent systems, methods, and concepts related to the Healthcare Technology;

- On December 1, 2014, Abramowitz filed with the USPTO Application No. 62/086,125, seeking to patent systems, methods, and concepts related to the Healthcare Technology;

- On December 19, 2014, Abramowitz filed with the USPTO Application No. 62/094,888, seeking to patent systems, methods, and concepts related to the Natural Resources Technology;

- On October 20, 2015, Abramowitz filed with the USPTO Application No. 14/918,398, seeking to patent systems, methods, and design concepts related to the Cyber Technology;

- On October 20, 2015, Abramowitz filed the international Application No. WO 2016/064919 A1, which had the effect of generating Application No. EP 15851807.6, seeking to patent systems, methods, and design concepts related to the Cyber Technology;

- On October 21, 2015, Abramowitz filed with the USPTO Application No. 14/919,506, seeking to patent systems, methods, and design concepts related to the Cyber Technology;

- On October 21, 2015, Abramowitz filed the international Application No. WO 2016/065049 A1, which had the effect of generating Application No. EP 15852487.6 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Cyber Technology;

- On October 29, 2015, Abramowitz filed with the USPTO Application No. 14/926,343, seeking to patent systems, methods, and design concepts related to the Healthcare Technology;

- On October 29, 2015, Abramowitz filed the international Application No. 2016/069857 A1, which had the effect of generating Application No. EP 15854898.2 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Healthcare Technology;

- On October 29, 2015, Abramowitz filed with the USPTO Application No. 14/926,408, seeking to patent systems, methods, and design concepts related to the Healthcare Technology; and

- On October 29, 2015, Abramowitz filed the international Application No. WO 2016/069861 A1, which had the effect of generating Application No. EP 15854273.8 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Healthcare Technology;

- On December 18, 2015, Abramowitz filed with the USPTO Application No. 14/975,373, seeking to patent systems, methods, and design concepts related to the Natural Resources Technology.

59.     Although each of these patent applications discloses in detail the trade secret information Palantir shared with Abramowitz, the applications falsely identify Abramowitz as the sole inventor of the technologies, without so much as mentioning Palantir.  Such misrepresentations are particularly egregious given that Abramowitz has no technical background at all, let alone in something like data analytics or such industries as cyber security, cyber insurance, or natural resources exploration.  Indeed, the patent applications discuss and describe technical matters that Abramowitz could not have known without obtaining information about them from Palantir.

60.     For example, Abramowitz's Application No. 14/919,506, which seeks to patent certain inventions related to the Cyber Technology, describes one of its key claimed inventions, in relevant part, as:

A central monitoring station of a monitoring system for detecting and handling

cyberattacks to client systems with a management system that manages a

- 21 -

consortium of monitoring systems, comprising: a network interface configured to receive and transmit information using a computer network; and a processor and a memory comprising processor executable instructions upon execution by the processor, configuring a plurality of components of the central monitoring station to detect and respond to cyberattacks to client systems, the plurality of components including [a list of five technical components].

61.     Other technical inventions described in the applications include, (i) "A computer implemented method of managing a consortium of monitoring systems which detect and handle cyberattacks"; (ii) a method of "generating a profile in electronic format for the requesting monitoring system, wherein the profile includes information on computing and human resources associated with the monitoring system"; and (iii) "a computer program product embodied on one or more non-transitory computer readable media."

62.     The application also includes multiple technical diagrams to explain the claimed inventions, such as the following:



*FIG. 1*

FOURTH AMENDED COMPLAINT



**FIG. 10**

63.     The nature of the information set forth in the patent applications shows that Abramowitz could not have conceived of the inventions he falsely claimed as his own.  Rather, Abramowitz based those applications on the confidential and proprietary information Palantir had disclosed to him in confidence.  These actions were particularly egregious given that Abramowitz promised Palantir in the July 2014 NDA—which he signed only three months before filing his first patent application—that he would keep Palantir's proprietary information in strict confidence.  Given that Abramowitz began developing the applications at the time of or shortly after signing the NDA, it is clear that he never intended to comply with his contractual promises.

64.     As Abramowitz was preparing and starting to file the patent applications, he took steps to cover up his misconduct by making further misrepresentations to Palantir.  In September 2014, Palantir learned that Abramowitz had either filed or was preparing to file a patent application

relating to cyber insurance. A Palantir employee, Ryan Taylor, reached out to Abramowitz via email and set up an in-person meeting. At that meeting, Abramowitz falsely stated that he prepared the patent application for Palantir's benefit. After Palantir asked to see the application, Abramowitz declined to provide it, telling Mr. Hood in an October 2014 email that doing so may prevent the patent from being granted and that he would check with his lawyers to determine whether a copy of the application could be provided pursuant to a non-disclosure agreement. Abramowitz also claimed that the application related to "his" "insurance idea." Ultimately, Abramowitz never provided a copy of the application to Palantir nor disclosed that he was planning to file other applications concerning Palantir's Healthcare, Cyber, and Natural Resources Technologies.

65.     Had Abramowitz told Palantir the truth and disclosed that he had prepared other patent applications seeking to patent Palantir's technology, Palantir would have taken action to prevent the publication of those applications and the trade secrets contained therein. But due to Abramowitz's cover-up, Palantir did not discover the information Abramowitz sought to patent until after his applications became public in mid-2016.

**D.     Abramowitz Takes Steps to Launch Competing Businesses and Continues His Fraudulent Conduct**

66.     After Abramowitz filed the patent applications, he began taking steps toward his ultimate goal of establishing competing businesses based on Palantir's own technology to benefit himself, KT4, and the Trust. The first business Abramowitz sought to establish was a cyber insurance business based on the confidential information Abramowitz obtained from Palantir concerning its Cyber Technology.

67.     In 2014 and 2015, Abramowitz filed trademark applications for the mark "Shire" and "Gray Swan," both domestically and internationally, for use in connection with the "underwriting and administration of cyber liability insurance; underwriting and administration of cyber security insurance; insurance brokerage in the field of cyber liability and cyber security insurance." Abramowitz also registered four Internet domains containing the mark "Shire" and the words "cyber," "risk," and/or "cyberinsurance" in their names. Abramowitz apparently hoped that clients

would associate "Shire" with "Palantir," given that both names are derived from the popular series of books and films *The Lord of the Rings*.

68.     Then, in July 2015, Abramowitz created a Delaware limited liability company called "Gray Swan LLC" with the apparent intent to compete with Palantir in the cyber insurance sector using the technology Abramowitz misappropriated.  Although information concerning the extent and nature of Gray Swan's commercial activities is in Defendants' possession and not available to Palantir, Gray Swan appears to have existed as a company at least until July 2018, when its registration was cancelled due to failure to pay tax.  Because the cyber insurance business Abramowitz sought to establish was based on Palantir's confidential and proprietary information, Abramowitz likely disclosed that information to his partners, investors, and associates in the process of establishing that business.

69.     Importantly, the fraudulent activities of the Abramowitz Enterprise have not ceased and are ongoing even to this day.  In as recently as November 2018, Abramowitz filed yet another patent application with the USPTO (No. 16/200349) seeking to patent systems, concepts, and methods relating to the Healthcare Technology that Palantir had disclosed to him in confidence.  That application was published in July 2019, and like all other patent applications Abramowitz filed, it falsely lists Abramowitz as the sole inventor of the claimed technology without any mention of Palantir.  In light of this application, Abramowitz and the Abramowitz Enterprise appear to be engaged in or are gearing up for further commercial activities to profit off of Palantir's proprietary information.

## **HARM TO PALANTIR**

70.     As a result of Defendants' actions, Palantir has suffered significant economic harm. Among other things:

a.     Palantir has spent millions of dollars developing its Healthcare, Cyber, and Natural Resources Technologies.  Defendants' unauthorized publication of Palantir's trade secrets concerning those technologies in the patent applications described above, as well as the disclosure of the trade secrets to third parties, has diminished the economic value of those trade secrets.

b. Palantir has spent significant funds and resources investigating Defendants' misconduct, including funds spent on investigating the patent applications Defendants filed, the businesses Defendants have launched or attempted to launch, and Defendants' disclosure of Palantir's trade secrets to third parties.

c. Due to Defendants' scheme, Palantir has been forced to institute patent proceedings before the USPTO and in Germany to establish that it is the true inventor of the technologies listed in certain patent applications described above. Palantir was also forced to institute a proceeding under 28 U.S.C. § 1782 to obtain discovery for the German action. Palantir has expended significant legal fees in connection with these proceedings.

d. Defendants have usurped Palantir's valuable business opportunities through their commercial activities and any representations to third-party investors, partners, and advisors that Abramowitz is the true inventor of Palantir's technology.

71. As a result of Defendants' actions, Palantir has been and will continue to be injured in an amount to be established according to proof. Moreover, because Defendants' misconduct is still ongoing, Palantir has been and will continue to be injured absent equitable relief.

## FIRST CAUSE OF ACTION

### (Civil RICO 18 U.S.C. § 1962(c) – Against all Defendants)

72. Palantir incorporates by reference the allegations in paragraphs 1 through 71, as though fully set forth herein.

73. Abramowitz, KT4, the Trust, and Does 1–50 are each distinct "persons" as defined in 18 U.S.C. § 1961(3) and together form an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The Abramowitz Enterprise is an "association-in-fact" enterprise that has operated for common and shared purposes, including: (i) obtaining Palantir's proprietary and confidential information under false pretenses and in violation of Palantir's trust and confidence, (ii) using that information to launch or attempt to launch competing businesses, including by filing the patent applications described above; (iii) deriving profits from the activities of the Abramowitz Enterprise, and (iv) concealing the fraudulent nature of the Abramowitz Enterprise's activities. The Abramowitz Enterprise has

operated since at least 2013 and thus has had sufficient longevity to permit Defendants to pursue the enterprise's unlawful purposes.

74.     The Abramowitz Enterprise has functioned as a continuing unit and a relationship has existed between all members of the Abramowitz Enterprise.  As alleged above, KT4 and the Trust, which are controlled and managed by Abramowitz, became early investors in Palantir.  Leveraging that investment, Abramowitz positioned himself as a trusted advisor, agent, and fiduciary to the company; executed confidentiality agreements (on behalf of himself, KT4, and the Trust); accessed Palantir's confidential and proprietary information; and misused that information by disclosing it in patent applications and establishing competing businesses for the benefit of himself, KT4, and the Trust, which likely either hold or were intended to hold the interests in those businesses.

75.     Each member of the Abramowitz Enterprise is distinct from the overall enterprise. Abramowitz is distinct from the Abramowitz Enterprise because he is a natural person who directed and managed the fraudulent activities of the Abramowitz Enterprise, including by leveraging KT4's and the Trust's investments to gain Palantir's trust, accessing Palantir's proprietary and confidential information under false pretenses, and misusing that information for the benefit of the Abramowitz Enterprise.  KT4 and the Trust are also distinct from the Abramowitz Enterprise because they are distinct legal entities, and separate components of the Abramowitz Enterprise, which Abramowitz used to perpetrate the enterprise's fraudulent scheme in the manner described above.

76.     The Abramowitz Enterprise has engaged in a pattern of racketeering activity by committing multiple acts of wire fraud in violation of 18 U.S.C. § 1343 over a multi-year period. Specifically, and as described above and below, the Abramowitz Enterprise has used email, telephone, and interstate wires to facilitate and execute Abramowitz Enterprise's fraudulent scheme. That scheme included the Abramowitz Enterprise making numerous intentional material misrepresentations and omissions, both to Palantir and third parties, for the purpose of defrauding Palantir, including in the following ways:

- In at least 2013 and 2014, Abramowitz falsely and repeatedly represented to Palantir that he sought to help expand Palantir's business in the healthcare, cyber, and natural

resources sectors; that he would use the proprietary information Palantir provided to him for that purpose; and that he would keep that information confidential.

- In at least 2013 and 2014, during the communications, meetings, and discussions with Palantir's employees and executives, Abramowitz failed to disclose his intentions to use the information Palantir provided to him in patent applications and to establish competing businesses.

- In 2014, 2015, and 2018, Abramowitz filed fraudulent patent applications, falsely claiming that he is the sole inventor of Palantir's technologies.

- In September and October 2014, Abramowitz falsely represented to Palantir that he prepared a patent application to patent inventions relating to cyber insurance for Palantir's benefit and that those inventions concerned "his" idea.  Abramowitz also failed to disclose that he had prepared other patent applications to patent Palantir's confidential and proprietary information.

77.     The fraudulent activities of the Abramowitz Enterprise, including the predicate acts of wire fraud, were sufficiently continuous because they occurred over a substantial period of time— at least in 2013, 2014, 2015, and 2018—and have likely occurred in other years in connection with the commercial activities of the Abramowitz Enterprise.  Moreover, given that the Abramowitz Enterprise has continued its illegal activities even after the filing of this action, including by filing a fraudulent patent application in November 2018 and engaging in commercial activities based on Palantir's confidential and proprietary information, there is a significant threat of repetition of illegal acts extending into the future.

78.     As described in paragraph 70, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Palantir substantial injury to business and property, in an amount to be proven at trial, including by diminishing the economic value of Palantir's confidential and proprietary information, forcing Palantir to spend funds and resources investigating Defendants' misconduct, forcing Palantir to spend legal fees to institute patent proceedings to prevent further damage from Defendants' scheme, and usurping Palantir's valuable business opportunities.  Defendants are jointly

and severally liable to Palantir for three times the damages Palantir has suffered under the provisions of 18 U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION

**(Breach of Contract – Against All Defendants)**

79.     Palantir incorporates by reference the allegations in paragraphs 1 through 71, as though fully set forth herein.

80.     The 2012 Transfer Agreement is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  Abramowitz is a "Covered Person," as defined in Section 7 of the 2012 Transfer Agreement. The Trust and Abramowitz breached Section 7 of the 2012 Transfer Agreement, set forth, in relevant part, in paragraph 31, when Defendants disclosed and misused, without Palantir's consent, the confidential information Palantir provided to Abramowitz.

81.     The NDA is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  Abramowitz breached the NDA, as set forth, in relevant part, in paragraph 32, when he disclosed and misused the confidential and proprietary information Palantir provided to him.

82.     The 2015 Transfer Agreement is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  Abramowitz is a "Covered Person," as defined in Section 7 of the 2015 Transfer Agreement.  KT4 and Abramowitz breached Section 7 of the 2015 Transfer Agreement, set forth, in relevant part, in paragraph 33, when Defendants disclosed and misused, without Palantir's consent, the confidential information Palantir provided to Abramowitz.

83.     As a direct and proximate result of Defendants' wrongful conduct, Palantir has been harmed and is being forced to take expensive steps to reduce and mitigate that harm.

84.     In addition to equitable relief, Palantir demands monetary damages, fees and costs, where allowed.

1

**THIRD CAUSE OF ACTION**

2

**(Violation of Cal. Civ. Code § 3426 et seq. – Against All Defendants)**

3       85.     Palantir incorporates by reference the allegations in paragraphs 1 through 70, as

4  though fully set forth herein.

5       86.     Palantir's confidential and proprietary information pertaining to the Healthcare

6  Technology, Cyber Technology, and Natural Resources Exploration Technology, which is described

7  in the operative trade secret disclosure submitted in this action, constitutes protectable trade secrets

8  as set forth in California Civil Code § 3426.1(d) (the "Trade Secrets").

9       87.     Palantir's Trade Secrets derived and still derive independent economic value, actual

10  or potential, from not being generally known to the public or to other persons who can obtain

11  economic value from their disclosure or use as set forth in California Civil Code §3426.1(d)(1).

12       88.     Palantir's Trade Secrets were and are the subject of efforts that are reasonable under

13  the circumstances to maintain their secrecy as set forth in California Civil Code § 3426.1(d)(2).  At

14  all times, Defendants had an obligation to keep Palantir's Trade Secrets confidential, as made clear

15  in the parties' confidentiality agreements, communications, and course of conduct, and by virtue of

16  Abramowitz's status as an agent, advisor, and fiduciary of Palantir.  Palantir did not consent to

17  Defendants' use of the Trade Secrets for any purpose other than for the sole and exclusive benefit of

18  Palantir.

19       89.     Defendants willfully and intentionally misappropriated Palantir's Trade Secrets.

20  Leveraging KT4's and the Trust's investment, Abramowitz obtained Palantir's Trade Secrets under

21  false pretenses and misused those trade secrets by, among other things, disclosing them in patent

22  applications, using them to establish competing businesses, and disclosing them to third parties.

23  Abramowitz acted not only in his personal capacity, but also on behalf KT4 and the Trust, because

24  he has likely either transferred or intended to transfer his interests in the businesses he launched or

25  intended to launch based on Palantir's Trade Secrets to KT4 and the Trust.

26       90.     Palantir is entitled to an injunction against both actual and threatened

27  misappropriation as set forth in California Civil Code § 3426.2(a).

28

- 30 -

91.     Palantir also requests that the court take affirmative acts to protect Palantir's Trade Secrets, as set forth in California Civil Code § 3426.2(c), including: (1) ordering an inspection of Defendants' computer(s), USB drives, email accounts, cloud storage accounts and other sources and equipment by a forensics expert to determine the extent to which Palantir's Trade Secrets were wrongfully taken and/or disseminated to others, and to ensure that no Trade Secrets belonging to Palantir remain saved on those systems; and (2) issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of Palantir's Trade Secrets and prohibiting Defendants from continuing his unlawful actions.

92.     In addition to equitable relief, Palantir demands monetary damages, fees, and costs, where allowed.

93.     Defendants' conduct as alleged herein was willful, malicious and wanton, and undertaken for the purpose of injuring or causing injury to Palantir.  Palantir seeks exemplary and punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Palantir respectfully requests the following relief:

1.     Judgment in favor of Palantir and against all Defendants on all of Palantir's claims asserted in the Complaint;

2.     For a preliminary injunction and permanent injunction restraining Defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them from:

   a.     perpetuating the wrongful acts and conduct as set forth above;

   b.     continuing to pursue Defendants' domestic patent applications set forth above;

   c.     directly or indirectly retaining, using or disclosing Palantir's trade secret, confidential and/or proprietary information, and derivatives thereof;

   d.     destroying any property, emails, documents or materials that are relevant or potentially relevant to this action;

   e.     moving or transferring outside the United States Palantir's property, emails, documents or  materials that are relevant or potentially relevant to this action;

FOURTH AMENDED COMPLAINT

3.      For an Order directing Defendants to transfer to Palantir any and all domestic patent rights, including pending domestic patent applications and any granted patents, relating to the Healthcare Technology, the Cyber Technology, and the Natural Resources Technology.

4.      For an Order requiring that Palantir's confidential, proprietary and trade secret information be returned to Palantir;

5.      For an Order requiring all Defendants to divulge the identity of the individuals, groups and companies to whom they have disclosed Palantir's confidential, proprietary and trade secret information;

6.      For an Order requiring all Defendants to account for and pay to Palantir all ill-gotten gains, profits, and savings obtained or derived from their improper conduct;

7.      For damages, unjust enrichment, and/or reasonable royalties in amounts to be proven at trial;

8.      For treble damages under 18 U.S.C. § 1964(c);

9.      For an Order awarding Palantir punitive and/or exemplary damages in a sum to be determined at trial, on the basis of Defendants' willful, deliberate, and malicious tortious conduct;

10.     For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of herein;

11.     For prejudgment interest;

12.     For an Order awarding Palantir attorney's fees and all costs of suit incurred herein; and

13.     For such other and further relief as Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

FOURTH AMENDED COMPLAINT

1  Dated: March 16, 2020                                    HUESTON HENNIGAN LLP

2

3                                                           By: _____

4                                                               Moez M. Kaba
                                                                Attorneys for Plaintiff
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED COMPLAINT