1  **HUESTON HENNIGAN LLP**
   John C. Hueston, State Bar No. 164921
2  jhueston@hueston.com
   Moez M. Kaba, State Bar No. 257456
3  mkaba@hueston.com
   Yahor Fursevich, State Bar No. 300520
4  yfursevich@hueston.com
   523 West 6th Street, Suite 400
5  Los Angeles, CA 90014
   Telephone:      (213) 788-4340
6  Facsimile:      (888) 775-0898

7  Attorneys for Plaintiff
   Palantir Technologies Inc.

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                  **SAN JOSE DIVISION**

12  PALANTIR TECHNOLOGIES INC., a          Case No. 5:19-cv-06879-BLF
    Delaware corporation,
13                                         **FIFTH AMENDED COMPLAINT FOR:**
                   Plaintiff,
14                                         (1) Civil RICO, 18 U.S.C § 1962
           vs.                             (2) Breach of Contract
15                                         (3) Violation of Cal. Civ. Code § 3426 et seq.
    MARC L. ABRAMOWITZ, in his individual
16  capacity and as trustee of the MARC
    ABRAMOWITZ CHARITABLE TRUST NO.         **DEMAND FOR JURY TRIAL**
17  2, KT4 PARTNERS LLC, a Delaware limited
    liability company, and DOES 1 through 50,
18  inclusive,

19                 Defendant.

20

21

22

23

24

25

26

27

28

Plaintiff Palantir Technologies Inc. ("Palantir") hereby brings this Fifth Amended Complaint against Marc L. Abramowitz ("Abramowitz"), both in his individual capacity and as trustee of the Marc Abramowitz Charitable Trust No. 2 (the "Trust"), KT4 Partners LLC ("KT4"), and Does 1 through 50 (collectively with Abramowitz, KT4, and the Trust, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      Palantir, founded in 2003, is a renowned data analytics company whose revolutionary products have transformed how organizations use and interact with data.  With Palantir's technology, organizations can analyze large repositories of dispersed data, uncover correlations between seemingly unrelated pieces of information, and collaborate on key insights with others in a secure manner.  These capabilities are so transformative that the world's most sophisticated and critical institutions rely on Palantir's products to enhance their day-to-day operations.  Various governmental agencies, for example, use Palantir's technology to fight terrorism, drug cartels, and organized crime. And numerous private organizations—including the top financial institutions, manufacturing and pharmaceutical companies, and airlines—employ Palantir's products to solve the most pressing problems facing their businesses.  The widespread success of Palantir's technology has cemented the company's place at the top of the highly competitive data analytics industry.

2.      To preserve its competitive advantage, Palantir has placed great emphasis on maintaining the secrecy of its proprietary information.  Palantir's technology has been internally developed through the ingenuity and hard work of hundreds of employees and required hundreds of millions of dollars in investments since the company's founding.  Public disclosure of Palantir's proprietary information could thus inflict significant harm on Palantir by enabling its competitors to profit from its inventions.  For this reason, Palantir's trade secrets constitute some of the company's most valuable assets.

3.      Abramowitz is a private investor who holds degrees in management and law.  He has no technical or engineering background.  In 2005, Abramowitz was introduced to Palantir when the company was still up-and-coming and largely unknown.  Although Abramowitz had no experience in data analytics or understanding of Palantir's products and business, he became interested in Palantir after learning that its technology had counter-terrorism applications.  Abramowitz thus

became an early investor in the company through KT4 and the Trust—two entities Abramowitz controls and uses to make investments and hold interests in companies with new or emerging technologies.

4.    Leveraging his investment in Palantir, Abramowitz positioned himself as a trusted advisor, agent, and fiduciary to the company.  He worked on, or purported to work on, numerous projects on behalf of the company, representing that he sought to help Palantir expand its operations. Believing Abramowitz's representations that he was interested only in advancing and benefitting Palantir, its employees, and its mission, Palantir allowed Abramowitz to visit Palantir's offices on numerous occasions and engage in regular discussions with Palantir employees about some of the company's most sensitive business strategies and trade secrets.  Those discussions were highly confidential, and Palantir expected Abramowitz to maintain them as such in light of his fiduciary relationship with the company, written confidentiality agreements, communications with the company, and course of conduct between the parties.  Indeed, Abramowitz expressly and repeatedly agreed to keep this information confidential in, for example, numerous conversations with Palantir's CEO.

5.    By the early 2010s, Palantir had grown into one of the most valuable private technology companies in the world and was expanding its business and operations into various new industries.  Having already gained Palantir's trust as an advisor, agent, and fiduciary of the company, Abramowitz learned about Palantir's business and expansion plans into the healthcare, cyber, and natural resources exploration markets.  Recognizing just how profitable it would be to dominate those markets, Abramowitz embarked on an intentional and calculated scheme to misappropriate and profit off of Palantir's technology for the benefit of himself, KT4, and the Trust (the "Abramowitz Enterprise").  This scheme spanned multiple years and proceeded in several phases.

6.    *First*, in at least 2012, 2013, and 2014, Abramowitz engaged in discussions with Palantir employees, including by email, by telephone, and in person, concerning Palantir's latest projects in the healthcare, cyber, and natural resources exploration markets.  In the course of those discussions, Abramowitz claimed that he sought to help Palantir develop and expand its business in those markets.  Trusting Abramowitz's representations, and believing that Abramowitz was acting

1   for the exclusive benefit of the company, Palantir spent time and resources sharing confidential and

2   proprietary information about its technology, products, and business plans with Abramowitz and

3   enabling Abramowitz to speak to potential and prospective clients on behalf of Palantir.   As

4   Abramowitz's subsequent conduct made clear, however, Abramowitz's representations were false

5   when made.  He did not intend to use the information Palantir shared with him to benefit Palantir but

6   only to benefit himself and the Abramowitz Enterprise.

7        7.    *Second*, in late 2014, 2015, and 2018, after acquiring Palantir's trade secrets,

8   Abramowitz filed a total of 14 patent applications, both domestically and internationally, disclosing

9   and seeking to patent Palantir's confidential and proprietary information for the use and benefit of

10   the Abramowitz Enterprise.  The applications falsely list Abramowitz—who is a professional

11   investor with no technical or engineering background[1]—as the **sole** inventor of systems, methods,

12   and concepts concerning data analytics in the healthcare, cyber, and natural resources sectors.  The

13   applications attributed exclusively to Abramowitz inexplicably contain, among other things, detailed

14   charts and diagrams describing the inventions, but make no mention of Palantir or any of its

15   employees.   The nature of the inventions makes clear they could not have been created by a

16   professional financial investor like Abramowitz.

17        8.    *Third*, in September and October 2014, Abramowitz continued his use of the wires to

18   conceal and further perpetuate the fraudulent activities of the Abramowitz Enterprise.  When Palantir

19   heard that Abramowitz had filed or was preparing to file a patent application relating to a technology

20   in the cyber sector, Abramowitz refused to provide Palantir with a copy of that application or disclose

21   to Palantir what information or inventions he sought to patent.   Instead, Abramowitz falsely

22   represented that the cyber insurance application concerned "his" idea, all the while claiming that he

23

24   [1] As his own counsel described him in this action, Abramowitz is an "investor [who has] invested

25   in several different companies, including in the tech space."  In response to the Court's question of

26   whether Mr. Abramowitz has "a financial background or a technical background," Mr.

27   Abramowitz's counsel responded, "[a] financial background in investing."

28

FIFTH AMENDED COMPLAINT

1   had Palantir's best interests in mind.  Abramowitz also failed to disclose to Palantir that he had filed

2   numerous other applications seeking to patent Palantir's technology in other sectors.   Had

3   Abramowitz told Palantir the truth, Palantir would have taken action to prevent the publication of

4   those applications and the trade secrets contained therein.  But due to Abramowitz's cover-up,

5   Palantir did not discover what claimed inventions Abramowitz sought to patent until after certain of

6   his applications became public in mid-2016.

7        9.     *Finally*, starting in 2014 and continuing at least through 2018, Abramowitz worked

8   to establish businesses based on Palantir's technologies he sought to patent.  Abramowitz did so for

9   his own benefit, as well as for the benefit of KT4 and the Trust, which were the entities Abramowitz

10  used to hold his interests in technology companies.  In the process, Abramowitz appears to have

11  disclosed Palantir's trade secrets to Palantir's competitors and interfered with Palantir's business

12  opportunities.

13       10.    Through these egregious actions, and those described herein, Defendants violated

14  federal and California law and breached agreements with and legal obligations to Palantir.  Palantir

15  now seeks damages for Defendants' wrongful actions, as well as injunctive relief to prevent further

16  irreparable harm from Defendants' misappropriation of Palantir's trade secrets.  Without this relief,

17  Palantir will continue to suffer competitive harm.

18                              **JURISDICTION AND VENUE**

19       11.    On October 22, 2019, pursuant to 28 U.S.C. §§ 1331, 1441(a) and 1446,

20  Defendants filed their Notice of Removal transferring this case from the Superior Court of

21  California for the County of Santa Clara to the United States District Court for the Northern

22  District of California.

23       12.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331

24  as the action raises questions of federal law under the Racketeer Influenced and Corrupt

25  Organizations Act ("RICO"), 18 U.S.C.§ 1962.  This Court also has supplemental jurisdiction

26  over Palantir's claims arising under state law pursuant to 28 U.S.C. § 1367, as those claims are

27  part of the same case or controversy.

28

13.     This Court has personal jurisdiction over each Defendant.  Palantir is informed and believes and on that basis alleges that defendant Marc L. Abramowitz is an individual residing in San Francisco, California.  Palantir is informed and believes and on that basis alleges that Abramowitz is the trustee of the Marc Abramowitz Charitable Trust No. 2.  Abramowitz's wrongful actions occurred in, were targeted to, and caused damage in, California.  Palantir is informed and believes and on that basis alleges that defendant KT4's principal place of business in San Francisco, California.  KT4 does business in California and has committed acts that subject it to the jurisdiction of this Court.  Upon information and belief, Abramowitz is the managing member of KT4 and controls and directs the activities of KT4.  The wrongful actions of KT4 occurred in, were targeted to, and caused damage in, California.

14.     Palantir is ignorant of the true names of Does 1 through 50 and such names are fictitious.  Such defendants are legally responsible for the events and happenings described herein and for the damages proximately caused thereby.  Once Palantir learns of the true names of Does 1 through 50, Palantir will amend the complaint to include the real name(s) of such party or parties.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District.  Further, venue is proper in this District pursuant to 28 U.S.C. § 1441(a) because this District embraces the Superior Court of California, Santa Clara County, where this action was originally filed.

**FACTUAL BACKGROUND**

**I.      Palantir Earns Its Status at the Top of the Data Analytics Industry Through Cutting-Edge Innovation**

16.     Since its founding in 2003, Palantir has become a global leader in the data analytics industry though groundbreaking technological innovation.  Like many industry leaders, Palantir achieved its success by tackling what had seemed to be an insurmountable problem.  As Palantir recognized, organizations around the world in different industries deal with massive amounts of data that is stored in separate and disconnected locations with varying levels of security and access requirements.  Without some way to integrate, organize, and manage that data, organizations are

1  unable to use it to its full potential in their day-to-day operations.  This underutilization of available

2  information leads to inefficiency, lower productivity, and diminished returns.

3       17.     To address this problem, Palantir created what would quickly become some of the

4  most revolutionary products in the data analytics industry: software platforms capable of integrating

5  and categorizing large amounts of scattered data into a single, coherent information system that

6  ordinary people can use and analyze.  Palantir's platforms and related products operate by integrating

7  data from distinct sources, organizing it into meaningful categories of information (such as people,

8  places, and events), and then helping users interact with that information in a secure, productive, and

9  collaborative manner.  For example, through Palantir's platforms, analysts can search all their data

10  sources at once, uncover hidden connections between seemingly unrelated pieces of information, and

11  share insights with other individuals who have access to the platforms.  Such features do not simply

12  enhance the capabilities of organizations using Palantir's technology; they entirely transform how

13  those organizations operate.

14       18.     Today, Palantir's products are deployed at numerous governmental, commercial, and

15  non-profit institutions to solve some of the world's most pressing problems.  For instance,

16  organizations use Palantir software to respond to natural disasters, to optimize food assistance to

17  those most in need around the globe, and to find missing and exploited children.  And since its

18  inception, Palantir has been partnering with various governmental agencies to help fight terrorism,

19  drug cartels, and organized crime by locating leads in large repositories of electronic data.  Through

20  these and many other applications of Palantir's technology, Palantir's technology has demonstrably

21  changed the way organizations use and interact with data.

22       19.     Palantir's success could not have been possible without its extensive investments in

23  research and development.  Since its launch, Palantir has spent hundreds of millions of dollars

24  creating new products, adapting existing products to new applications, and expanding its business

25  into new markets and industries.  This heavy emphasis on innovation and development has placed

26  Palantir at a level above its competitors by enabling it to adapt to the demands of its customers and

27  improve its data integration, management, and analytical products and services beyond what was

28  thought possible.

FIFTH AMENDED COMPLAINT

20.     Because Palantir's technology and business plans are critical to preserving its hard-earned competitive advantage, Palantir employs numerous security measures to protect its proprietary information.   Among other things, Palantir restricts access to its sensitive internal information to employees who have appropriate authorization and require the information to perform their job duties.   Palantir also monitors its network systems for potential security risks and protects them from unauthorized access through such measures as intrusion detection systems, anti-malware software, network firewalls, whole disk encryption of employee computers, and complex password and two-factor authentication requirements.

21.     In addition to securing its networks, Palantir restricts physical access to its facilities. Palantir employees must use electronic badges to get inside Palantir's offices, and only a small subset of employees may access sensitive areas, such as those containing network servers and security equipment.   Outside visitors to Palantir must be invited to Palantir's facilities, sign in and wear visitor badges, and be escorted at all times.   Multiple security guards ensure compliance with these requirements and otherwise protect Palantir from unauthorized intruders.

22.     Palantir also takes significant measures to ensure that those who come into contact with its confidential business information and trade secrets do not disclose them to other individuals. Among other things, Palantir requires its employees with access to proprietary information to sign confidentiality agreements; conducts pre-employment background checks for all new employees; and provides mandatory legal training covering confidentiality, information and data security, and compliance.   Palantir considers these and other security measures paramount to maintaining its competitive edge.

23.     Palantir has employed all of the methods described above to maintain the confidentiality of the trade secrets and other confidential information at issue in this action.

## II.     Abramowitz Gains Palantir's Trust as a Company Advisor and Fiduciary

24.     Abramowitz is a private investor who made most of his fortune in the real estate and buyout businesses.   Abramowitz met Alex Karp, Palantir's CEO, when Dr. Karp worked for the Institute for Jewish and Community Research, in which Abramowitz served as a board member. They reunited in 2005, when Abramowitz learned about Dr. Karp's new venture, the then up-and-

coming Palantir and its mission to create data analytics tools capable of solving the most pervasive problems organizations face.  Although Abramowitz had no experience in data analytics, and had no understanding of Palantir's products and business, he became interested in Palantir after learning that its technology had counter-terrorism applications.  Abramowitz thus decided to become an early investor in the company and purchased some $100,000 of Palantir shares through KT4 and the Trust.  From that point, Abramowitz began fostering a close relationship with Dr. Karp personally and the Palantir organization as a whole.

25.     KT4 is a Delaware limited liability company that Abramowitz manages.  Abramowitz's wholly owned company, Kadima, Inc., has a 49% ownership interest in KT4, and the remaining 51% appear to be owned by the Trust and another family trust, established for Abramowitz's family members.  Since its formation in 2002, Abramowitz has used KT4 as the entity by which he holds interests in various new or emerging technology companies.  In addition to managing KT4, Abramowitz also administers the Trust for the benefit of his family members.  As the Trust's trustee and settlor, Abramowitz makes investments on behalf of the Trust and manages the Trust's assets.  Abramowitz does not appear to personally hold significant interests in his investments in technology companies.  Instead, he makes the investments through KT4 and his two active family trusts, like he did when investing in Palantir.  Each of KT4 and the Trust is a separate legal entity.

26.     After investing in Palantir through KT4 and the Trust, Abramowitz began to leverage that investment to gain insider access to Palantir and its executives.  He parlayed his personal connections into professional capital, claiming that he would work on behalf of Palantir to help the company expand and succeed.  On multiple occasions, Abramowitz purported to disavow any personal interest when purporting to act for Palantir, leading Palantir to trust his representations that he was working as Palantir's trusted advisor and agent.  Trusting Abramowitz, Dr. Karp and others gave him access to Palantir's confidential business information, products, and trade secrets and in order to empower Abramowitz's purported efforts to help the company.  Abramowitz began presenting himself as Palantir's "strategic advisor" to potential business partners or clients; was involved in business pitch meetings; requested briefings on Palantir operations and product lines;

1   and was in frequent communication with Dr. Karp and the Palantir team.  Having accepted this

2   position of trust, Abramowitz far exceeded the role of a traditional investor and assumed a role of

3   Palantir's agent and fiduciary who enjoyed a relationship of trust and confidence with the company.

4   KT4's and the Trust's investments assured Palantir that Abramowitz would not betray Palantir's trust

5   and would instead work together with Palantir executives and employees to benefit the company.

6       **A. Abramowitz's Agency Relationship with Palantir**

7       27.    On numerous occasions and in business development situations, Palantir gave

8   Abramowitz actual authority to act on its behalf.  By 2012, or seven years after KT4's and the Trust's

9   initial investments in Palantir, Palantir was already well into the process of establishing itself as an

10  industry leader in data analytics and one of the most valuable technology companies in the world.

11  Its long list of clients included federal military and intelligence agencies, state police departments,

12  the world's largest financial and insurance institutions, and prominent pharmaceutical companies.

13  Abramowitz was actively involved in Palantir's day-to-day activities—and frequently discussed

14  Palantir's business with company executives.  As a result of those discussions, Palantir executives

15  and employees regularly authorized Abramowitz to work on various projects on behalf of Palantir,

16  and Abramowitz submitted to their supervision and control in connection with those projects,

17  frequently purporting to seek guidance from Palantir.

18      28.    Palantir manifested assent that Abramowitz act on its behalf and subject to its control,

19  and Abramowitz similarly manifested assent to so act on numerous occasions.  For example:

20      •   Starting in late 2012, Palantir gave authority to Abramowitz in the healthcare and

21          pharmaceutical sectors to interact with several potential business partners.  In

22          connection with this work, Abramowitz communicated with Palantir executives and

23          employees on a regular basis and under their direct supervision.  Abramowitz even

24          sought "guidance" and input from Palantir executives and employees with respect to

25          this project, including on how Palantir wished him to proceed in communicating with

26          potential business partners on Palantir's behalf and deciding which partnerships

27          Abramowitz should pursue on Palantir's behalf.  For example, in an email from

28          January 2013, Abramowitz requested advice from Dr. Karp on this initiative for

FIFTH AMENDED COMPLAINT

Palantir's benefit.  These communications make clear that Abramowitz was subject to (and agreed to be subject to) Palantir's supervision and control in his role as Palantir's agent.

- In February 2013, Abramowitz discussed with Palantir employees the possibility of bringing in a pharmaceutical company as a potential client for Palantir and offered to work on pitching Palantir's products to the potential client on Palantir's behalf. Palantir executives assented to Abramowitz operating in such a manner, and Abramowitz similarly agreed to be subject to Palantir's direction while working on this project.  For example, Palantir employees sent Abramowitz a pitch document for him to use to spearhead an introduction.

- In June 2013, Abramowitz, acting ostensibly on behalf of Palantir, connected a Palantir employee with a potential business partner whom Abramowitz described as "the largest aggregator of medical data and pharma consultant in the world." Abramowitz wrote that "our product" could be "incredibly useful" to this potential business partner and thus presented it as an opportunity for the company. Abramowitz's actions with respect to this opportunity made clear to the potential business partner that Abramowitz was a part of Palantir, ostensibly working on Palantir's behalf, at Palantir's request, to promote Palantir's products.

- Starting in January 2014, and continuing through November 2014, Palantir authorized Abramowitz to work on its behalf (and directly with Palantir employees) on a potential business deal with a company that sought to conduct business with Palantir in the healthcare sector.  Abramowitz assented to being subject to Palantir's direction and control as Palantir's agent in connection with this opportunity for Palantir to pursue.  For example, in June 2014, one Palantir executive reached out to Abramowitz, asking, "Are we going to get this done…?"  To which, Abramowitz responded, "I'm doing my side now."

- In May 2014, Palantir asked Abramowitz to accompany a Palantir employee on a business trip to Israel.  Palantir asked Abramowitz to assist Palantir in making

FIFTH AMENDED COMPLAINT

introductions to Israeli companies and to help Palantir identify potential business opportunities for the company.  Abramowitz agreed and, acting on Palantir's behalf and at under the direction of Palantir's employee, organized and attended several meetings with Israeli companies that Palantir was interested in.  During those meetings, Abramowitz advocated for deals and potential partnerships on Palantir's behalf.  After that trip, Palantir provided Abramowitz with the authority to act on its behalf to further develop opportunities in connection with potential Israeli business partners, including binding Palantir to reimburse the costs and expenses of those partners if they met with Palantir.  Shortly after this trip, for example, the CEO for one of these organizations reached out to Palantir to set up a follow up meeting, copying Abramowitz and expressly thanking him "for making this happen."

- In September 2014, Dr. Karp instructed Palantir employees to introduce Abramowitz to potential investors and business partners—on official Palantir business—in light of Abramowitz's undertaking to further Palantir's interests by expanding Palantir's operations in the healthcare sector.

- Starting in April 2014, Abramowitz purported to work on behalf of Palantir to help it expand its operations in the cyber sector.  In particular, Abramowitz claimed that he could introduce Palantir to a potential client through an intermediary, telling Palantir employees that the opportunity was "big and should be ours."  Although Abramowitz presented himself as acting exclusively for Palantir's benefit, and not in his personal interest, it would later become apparent that he was secretly working to obtain valuable confidential information about Palantir's technology and business plans to set up a competing cyber business of his own.

29.     In light of his fiduciary relationship with Palantir, Abramowitz repeatedly described himself as Palantir's advisor and agent to third parties.  On one occasion, for example, Abramowitz reached out to a potential business partner in the healthcare space, introducing himself as Palantir's "***strategic advisor*** in the business development function."  He then sent this potential partner information about Palantir's products and invited to meet him with Palantir engineers.  Abramowitz

- 12 -

would forward these communications to Palantir executives, who knew of and assented to Abramowitz making these representations to third parties because they justifiably viewed Abramowitz (as he viewed himself) to be Palantir's agent and fiduciary. Indeed, communications demonstrate that, at times, Dr. Karp directed Abramowitz to "pursue directly" opportunities on behalf of Palantir and subject to Palantir's control—opportunities which would typically be the responsibility of Palantir employees—and to work on the company's behalf "in the first instance." Palantir even authorized Abramowitz to represent to third parties that Palantir would cover their costs and expenses if they agreed to meet with Palantir regarding various business opportunities. Abramowitz's representations to that effect were legally binding on Palantir and further indicated to third parties that Abramowitz was acting as Palantir's agent and on Palantir's behalf.

30. On many other occasions, Abramowitz acted as Palantir's authorized spokesperson in connection with potential business deals. For example, in April 2014, Abramowitz stated to a potential business partner: "[T]here is a strong desire to move forward and a willingness to seriously consider a unique relationship with [your third party]. . . . Palantir wants to start with a smaller focused project with [your third party] to be sure there is a good long term marriage there." This email included high-level Palantir executives, including Dr. Karp, as recipients, thus indicating that Abramowitz was speaking on behalf and with the express authority of Palantir.

31. The instances described above are only examples of the many occasions in which Abramowitz presented himself as, and accepted the obligations of, Palantir's agent, advisor, and fiduciary, who purported to act on behalf of Palantir, with Palantir's best interests in mind, and subject to Palantir's direction and control. Indeed, between 2010 and 2015, Abramowitz visited and used Palantir's offices on some 60 occasions, held numerous off-site meetings with Palantir's executives and employees, and even requested a permanent office of his own at Palantir's facilities in Palo Alto. In light of this agency relationship, Palantir's executives and employees alike accepted Abramowitz as a member of the Palantir team and as Palantir's advisor and fiduciary.

32. As an agent of Palantir, Abramowitz was obligated to act diligently and faithfully in performance of his duties on behalf of Palantir. That obligation included keeping all proprietary information he obtained from Palantir strictly confidential. The agency relationship also created a

duty to disclose any material information that would affect and/or be adverse to Palantir or contrary to its interests. As described further below, Abramowitz breached this duty by failing to disclose his intent to misuse the proprietary information that Palantir had shared with him.

**B.   Abramowitz's Confidential Relationship of Trust and Confidence with Palantir**

33.   Because of Abramowitz's promises to secure new lines of business for Palantir, find clients for Palantir's products, and otherwise help develop Palantir's nascent operations, Palantir invited Abramowitz into its inner circle and relaxed its ordinary care and vigilance with respect to outsiders precisely because Abramowitz held himself out to Palantir and others to be acting as an insider for the benefit of Palantir. Abramowitz's conduct and representations led to him gaining unique access to Palantir's proprietary information. Both Palantir and Abramowitz had a mutual understanding that he would keep such information confidential and use it for the sole benefit of Palantir in connection with his work for the company. During numerous conversations, for example, Dr. Karp told Abramowitz that he must keep any proprietary information Palantir shared with him confidential. Abramowitz expressly and repeatedly agreed to this obligation, representing to Dr. Karp that he would keep Palantir's business and proprietary information confidential. Abramowitz even expressed to Dr. Karp how important he thought it was to protect Palantir's intellectual property when expanding into new markets and developing new lines of businesses.

34.   Abramowitz also signed several confidentiality agreements requiring him, KT4, and the Trust to safeguard Palantir's confidential and proprietary information.

35.   On August 14, 2012, Abramowitz, in his capacity as the trustee of the Trust, electronically executed and transmitted a Preferred Stock Transfer Agreement (the "2012 Transfer Agreement"). That agreement memorializes confidentiality obligations of both the Trust and all "Covered Persons," including affiliates (like KT4) and directors and agents (like Abramowitz). Section 7 of the 2012 Transfer Agreement states, in relevant part, as follows:

> Each of Purchaser and Seller [including the Trust] agrees to, and agrees to cause its
>
> respective Covered Persons to, keep confidential and refrain from using or disclosing
>
> all agreements, documents and other information regarding the Company or its
>
> securityholders provided or made available to Purchaser or Seller [including the

Trust] either (a) in connection with the exploration, negotiation, execution, and closing of this Agreement or (b) in its capacity as a stockholder of the Company following the date of this Agreement . . . . Each of Purchaser and Seller is responsible hereunder and shall be liable for any breaches of this Section 7 and any disclosure or misuse of any information or documents described in this section by its respective Covered Persons.

36.     On July 12, 2014, Abramowitz also electronically executed a Non-Disclosure Agreement (the "NDA") that obligates Abramowitz to "hold all Proprietary Information in strict confidence and . . . not use (except as expressly authorized by Palantir) or disclose any Proprietary Information for any purpose." The NDA defines "Proprietary Information" as "non-public business, technical or other information, materials and/or ideas of Palantir [including] anything you learn or discover as a result of exposure to or analysis of any Proprietary Information."

37.     On June 17, 2015, Abramowitz, in his capacity as the managing member of KT4, electronically transmitted a Preferred Stock Transfer Agreement (the "2015 Transfer Agreement"). That agreement memorializes confidentiality obligations of both KT4 and all "Covered Persons," including affiliates (like Trust) and members and agents (like Abramowitz). Section 7 of the 2015 Transfer Agreement states, in relevant part, as follows:

Each of Purchaser and Seller [including KT4] agrees to, and agrees to cause its respective Covered Persons to, keep confidential and refrain from using or disclosing all agreements, documents and other information regarding the Company or its securityholders provided or made available to Purchaser or Seller [including KT4] either (a) in connection with the exploration, negotiation, execution, and closing of this Agreement or (b) in its capacity as a stockholder of the Company following the date of this Agreement . . . . Each of Purchaser and Seller is responsible hereunder and shall be liable for any breaches of this Section 7 and any disclosure or misuse of any information or documents described in this section by its respective Covered Persons.

- 15 -

FIFTH AMENDED COMPLAINT

38.     Abramowitz   knew   that   his   confidentiality   obligations—memorialized   in confidentiality agreements, communications, and course of conduct among the parties—were critical to preserving Palantir's position as a market leader in the highly competitive data analytics industry. He acted as if he took seriously those obligations and that he understood that in order for Palantir to maintain its competitive edge, it had to ensure that its employees and advisors, after gaining insider knowledge of Palantir's confidential information, would not misappropriate that information for their own benefit.   Abramowitz   developed   a   relationship   of   trust   and   confidence   with   Palantir—a relationship that allowed him to obtain access to Palantir's business and proprietary information that only an insider and trusted advisor would get.  Unbeknownst to Palantir, however, Abramowitz soon devised a scheme to betray Palantir's trust and misappropriate its valuable trade secrets to benefit himself, KT4, and the Trust.

**C.  Having Gained Palantir's Trust, Abramowitz Devises a Scheme to Steal Palantir's Trade Secrets for the Benefit of the Abramowitz Enterprise**

39.     As Palantir grew in size and stature, and became what *Forbes Magazine* has described as one of "Silicon Valley's most valuable private technology companies," it developed plans to enter several new industries that presented valuable opportunities for the company and its data analytics products.  As relevant to this action, by the early 2010s, Palantir was expanding its technology to target: (i) clinical drug trials and health insurance (the "Healthcare Technology"); (ii) cyber insurance and cyber security (the "Cyber Technology"); and (iii) natural resources exploration and management (the "Natural Resources Technology").  Palantir spent millions of dollars, and its employees spent countless hours, developing this technology and corresponding business plans.

40.     Abramowitz learned about Palantir's intended expansion of its operations into the new markets described above through his work with Palantir and interactions with Palantir's executives and employees.  Recognizing just how profitable it would be to dominate those markets, Abramowitz embarked on an intentional and calculated scheme to misappropriate and profit off of Palantir's Healthcare, Cyber, and Natural Resources Technologies for the benefit of himself and the Abramowitz Enterprise (including KT4 and the Trust).

41.     This scheme spanned multiple years and consisted of at least three parts:

- 16 -

42.     First, in 2012, 2013, and 2014, Abramowitz engaged in discussions with Palantir employees concerning Palantir's latest projects in the healthcare, cyber, and natural resources exploration sectors, Palantir's business plans and actual and potential clients in those sectors, and Palantir's data integration technology.   By developing professional relationships with Palantir executives and purporting to work on Palantir's behalf, Abramowitz gained access to, and induced Palantir's divulgement of, confidential and proprietary information concerning the Healthcare, Cyber, and Natural Resources Technologies, Palantir's business plans and clients, and the company's actual and anticipated projects.   Abramowitz was expressly acting in a fiduciary capacity for Palantir, supposedly providing it with truthful information and candid recommendations in order to guide and influence Palantir's decision-making.   Having become determined to use those technologies to establish competing businesses of his own, Abramowitz also used Palantir's resources to investigate the markets and identify potential clients in the healthcare, cyber, and natural resources exploration sectors, all the while purporting to work for Palantir's benefit.

43.     Second, in 2014, 2015, and 2018, Abramowitz secretly filed a total of 14 domestic and international patent applications based on the very same confidential and proprietary information that Palantir had disclosed to him in confidence about its Healthcare, Cyber, and Natural Resources Technologies.   Despite lacking any technical knowledge or experience in data analytics, Abramowitz falsely claimed himself to be the sole inventor of Palantir's concepts, methods, and technologies.   Abramowitz continues to pursue a subset of those applications to this day.

44.     Third, having used Palantir's resources to investigate the markets for Palantir's products while claiming that he was acting for Palantir's benefit, and having obtained valuable business and proprietary information from Palantir, Abramowitz took steps to launch competing businesses starting in 2014 and continuing at least through 2018.   Importantly, Abramowitz acted not only in his personal capacity, but also on behalf of the Abramowitz Enterprise as a whole, including KT4 and the Trust.   As described above, Abramowitz has used KT4 and the Trust to hold ownership interests in the technology companies he invested in so that Abramowitz's family members could obtain financial benefit from his work.   Thus, when Abramowitz worked to establish businesses

- 17 -

1    based on Palantir's confidential and proprietary information, he did so on behalf of KT4 and the

2    Trust, and not merely to benefit himself.

3    **D.    Abramowitz Uses False Pretenses to Gain Access to Palantir's Confidential and**

4    **Proprietary Information**

5          45.    At least in 2012, 2013, and 2014, Abramowitz engaged in numerous discussions with

6    Palantir employees concerning the Healthcare, Cyber, and Natural Resources Technologies.  In the

7    course of those discussions, Abramowitz learned confidential and proprietary information about

8    those Technologies, as well as Palantir's business plans and actual or potential clients in the

9    healthcare, cyber, and natural resources sector.

10         46.    Although Abramowitz purported to act for and in the interest of Palantir, he was

11   secretly advancing his own interests and those of the Abramowitz Enterprise.   Specifically,

12   Abramowitz repeatedly and falsely represented to Palantir executives and employees that he wished

13   to obtain proprietary information concerning the Healthcare, Cyber, and Natural Resources

14   Technologies in his unique fiduciary capacity as someone acting to provide guidance for Palantir, so

15   that he could help Palantir expand its operations in those new markets.  He then used Palantir's

16   resources to investigate those markets, all the while claiming that he was doing so on behalf of

17   Palantir.  These representations occurred over the course of several years, as demonstrated more fully

18   below, and took place in business meetings at Palantir's offices, in personal conversations with

19   Palantir employees and executives, and over phone or email.  These representations were false and

20   fraudulent when made because, in truth, Abramowitz wanted to obtain Palantir's information and

21   investigate the promising new markets for data analytics for the purpose of establishing his own

22   ventures to compete with Palantir.

23         47.    The Healthcare Technology.  In 2010, Palantir began developing plans to expand its

24   leading, innovative technology to the healthcare sector.    Through extensive research and

25   development, Palantir identified two areas in the healthcare sector that could be significantly

26   advanced through the use of Palantir's data analytics products: clinical drug trials and health

27   insurance.  As to clinical trials, Palantir recognized that by integrating, organizing, and analyzing

28   data from various health sources, it could increase the pace of new drug approvals by quickly

determining individuals' suitability for participation in clinical drug trials, identifying the best locations for those trials, and monitoring the trials in real time.  Similarly, with respect to health insurance, Palantir determined that its technology could be applied to better price insurance policies by more accurately analyzing monetary risks for health insurance companies, identifying patterns and instances of healthcare fraud, and otherwise mitigating unnecessary costs.

48.    In as early as 2012, Abramowitz was already obtaining information about Palantir's healthcare business. In December 2012, for example, Abramowitz attended a presentation regarding Palantir's data analytics capabilities in the healthcare sector at University of California, San Francisco.  Recognizing how profitable Palantir's Healthcare Technology could be, Abramowitz set out to obtain as much information as he could concerning the Healthcare Technology and Palantir's business plans so that he could set up businesses of his own to compete with Palantir.  All the while, in order to induce Palantir to let down its guard, Abramowitz represented to Palantir's executives and employees that he intended to use the information he was provided exclusively for Palantir's benefit in his capacity as a trusted advisor who was seeking to help Palantir expand its operations. Abramowitz knew that his statements were false, but he had to hide his true intentions to gain access to the information concerning the Healthcare Technology.

49.    In January 2013, Abramowitz expressed his interest in the Healthcare Technology to Dr. Karp in a meeting at Palantir's offices in Palo Alto.  Abramowitz represented to Dr. Karp that he wanted to learn this information to help Palantir grow its healthcare business and get new clients for Palantir's healthcare products.  A few days later, Abramowitz followed-up by email to ask Dr. Karp to arrange an in-depth overview of that technology for Abramowitz.  Believing that Abramowitz sought to advance Palantir's interests, Dr. Karp arranged for Abramowitz to meet with Palantir's engineers, Lauren Chaparro and Casey Ketterling, at the company's Palo Alto offices to discuss Palantir's healthcare products, business plans, and potential clients.  Palantir spent significant resources and time educating Abramowitz about the Healthcare Technology and Palantir's products, including through demonstrations and presentations, solely so that he could use that information to help Palantir develop new clients.

FIFTH AMENDED COMPLAINT

50.     During the meeting with Ms. Chaparro and Mr. Ketterling, which occurred on February 20, 2013 at Palantir's Palo Alto offices, Abramowitz obtained confidential and proprietary information concerning the Healthcare Technology.  Importantly, Abramowitz falsely reiterated to Ms. Chaparro and Mr. Ketterling during the February 20 meeting that he wished to learn this information to help Palantir with its efforts to obtain new clients for Palantir's healthcare products.  Abramowitz also represented that he wanted to help Palantir pitch those products to potential companies, including an Israeli pharmaceutical company.  These statements and affirmations persuaded Palantir to share its confidential and proprietary information about the Healthcare Technology with Abramowitz, who held himself out as acting in a fiduciary capacity for the benefit of guiding and influencing the company's decision-making.

51.     In the months following his February 2013 meeting with Palantir engineers, Abramowitz continued to represent to Palantir that his purported desire and intent in learning information about Palantir's Healthcare Technology and healthcare business was to help Palantir expand its operations in the healthcare sector.  In a follow up email on February 20, 2013, Abramowitz wrote to Ms. Chaparro and Mr. Ketterling stating that he now had "a much deeper understanding of what Palantir can do [in the healthcare sector]" and claiming that he wanted to "mov[e] [Palantir's healthcare business] forward together."  In March 2013, Abramowitz reiterated to Palantir executive Gavin Hood in an email that he wanted to continue to "engage" with Palantir's healthcare team to create and secure healthcare opportunities for Palantir.  Similarly, in May 2013, Abramowitz emailed Ms. Chaparro expressing his intent to "make progress" in the healthcare space and his continued interest "to learn from your work in the R and D."

52.     Trusting Abramowitz's representations that he sought information about the Healthcare Technology for the purpose of helping Palantir, Palantir spent resources keeping Abramowitz updated on its healthcare work and facilitating his purported objective of serving Palantir in a trusted agency role and getting new clients for Palantir's healthcare products.  For example, Palantir prepared a presentation for a potential pharmaceutical company that Abramowitz had offered to pitch (which, to Palantir's knowledge, he never did).  Ms. Chaparro also kept

Abramowitz updated on Palantir's healthcare work and business plans concerning the Healthcare Technology, including by meeting with him in person in early April 2013.

53.     As it later became apparent, however, Abramowitz was not seeking information about Palantir's Healthcare Technology and healthcare business for the purpose of providing impartial and accurate guidance to Palantir and helping Palantir develop its operations in the new healthcare market, and his representations to that effect described above were false when made.  In truth, once Abramowitz realized the potential of the Healthcare Technology and while he was discussing the Healthcare Technology with Palantir throughout 2013, he had already begun making plans to misappropriate Palantir's proprietary information and to establish a business of his own to benefit himself, KT4, and the Trust.  Specifically, starting in early 2013, Abramowitz became fixated on using Palantir's Healthcare Technology in a healthcare venture with various business partners Abramowitz knew.  When Palantir declined to pursue the idea, Abramowitz appears to have decided to pursue this venture on his own using the information he learned about Palantir's Healthcare Technology and healthcare data analytics market without Palantir's knowledge or consent.  When Palantir was using its resources to educate Abramowitz about its Healthcare Technology to enable him to get Palantir new clients—as Abramowitz was repeatedly representing to Palantir throughout 2013—his true intentions were to commercialize Palantir's proprietary information for the benefit of the Abramowitz Enterprise.

54.     Throughout 2014, as Palantir's Healthcare Technology became more developed and applied to specific projects and clients, Abramowitz continued his attempts to learn Palantir's confidential and proprietary information under false and fraudulent pretenses.  To do so, Abramowitz continued to pretend that he had only Palantir's best interests in mind and wished to help the company succeed in the healthcare sector.  In January 2014, Abramowitz reached out to Palantir via email concerning a potential opportunity with a business partner who expressed an interest in Palantir's Healthcare Technology.  Over the next ten months, Palantir employees, including members of the Palantir healthcare team, communicated regularly with Abramowitz concerning this business opportunity and set up in-person and telephonic meetings, including by email, at least in February 2014, April 2014, June 2014, August 2014, and September 2014.  During those meetings,

1  Abramowitz once again falsely represented that his purpose and intent was to help Palantir expand

2  its business by establishing a joint venture with the business partner.  Abramowitz even represented

3  that he sought to help Palantir run that joint venture.

4        55.    Relying on Abramowitz's representations and trusting his intentions, Palantir

5  continued using its resources to share confidential and proprietary information concerning the

6  Healthcare Technology with Abramowitz.  For example, in June 2014, Abramowitz and Ms.

7  Chaparro set up, via email, a meeting in Palo Alto for "Palantir briefing" about its work in the

8  healthcare sector.  Expecting that Abramowitz, as the company's agent, advisor, and fiduciary, would

9  use that information to develop Palantir's business, including in connection with the opportunity

10  described above, Ms. Chaparro (with Palantir's authorization) freely discussed with Abramowitz its

11  latest work and developments in the healthcare sector.

12        56.    Abramowitz's subsequent conduct makes clear that his statements to Palantir

13  concerning his intent to use Palantir's proprietary information in a fiduciary capacity to influence

14  Palantir's decisions and to help Palantir succeed were false when made.  At the same time as

15  Abramowitz was purporting to act on behalf of Palantir, including in connection with the potential

16  business deal discussed above, Abramowitz was preparing to file patent applications to patent the

17  concepts and methods concerning Palantir's Healthcare Technology for the sole benefit of himself,

18  KT4, and the Trust.  His continued affirmations of his intentions to move Palantir's healthcare

19  business "forward together" were therefore false because, in truth, Abramowitz wanted to patent that

20  technology for himself and then use it to establish competing businesses with Palantir.

21        57.    For example, on October 18, 2014, Abramowitz emailed a Palantir executive to

22  reaffirm his commitment to helping Palantir's healthcare business grow and to express his

23  "profound" belief in the value of Palantir's potential partnership described above.  Abramowitz

24  further stated that this is "just the beginning and first of many deals and customers" for Palantir's

25  healthcare products and Healthcare Technology.  But some *eleven days later*, on October 29, 2014,

26  without Palantir's consent or knowledge, Abramowitz filed an application with the USPTO

27  disclosing the proprietary information Palantir had shared with him concerning the Healthcare

28  Technology, claiming those inventions as his own, and seeking to obtain patents that would exclude

Palantir from the very market Abramowitz was purporting to help Palantir develop (including in his email of October 18, 2014).  Although Abramowitz appears to have been preparing this application while discussing Palantir's technology and business plans with Palantir, at no point, during any of the meetings and communications outlined above, did Abramowitz disclose that his intent was to patent the concepts and methods concerning Palantir's Healthcare Technology.  In fact, he lied about the purpose of his engagement with Palantir's confidential and proprietary information.

58.     <u>The Cyber Technology</u>.  In 2013, Palantir was developing systems and methods for companies to better defend themselves against cyber attacks.  After devoting substantial resources to this project, Palantir created a viable way for organizations to share data through Palantir's platform and cooperate with one another to detect and eliminate potential cybersecurity threats.  In conjunction with this project, Palantir developed technologies and business plans for improving cyber insurance by quantifying and monitoring the risk of cyber attacks, thus enabling insurers to price cyber insurance premiums.

59.     In the course of performing work for Palantir, Abramowitz learned about Palantir's business plans in the cyber sector.  Recognizing the immense potential of the Cyber Technology, Abramowitz set out to learn information about that technology by representing to Palantir that he sought to help it expand its operations in this new market.  For example, in April 2014, Abramowitz introduced via email Palantir's executives, including Dr. Karp, to an investor with connections to a potential client for Palantir's cyber security products.  Abramowitz indicated in the email that his intent was to secure this "opportunity" for Palantir and to help Palantir "touch whole digits of GDP that reflect [the potential client's] sales."  Through his statements and conduct, Abramowitz continued to reassure Palantir that he had the company's best interests in mind and, as Palantir's agent, advisor, and fiduciary, sought to help Palantir expand its operations.

60.     In a purported effort to promote "opportunities" for Cyber Technology, Abramowitz met with Kevin Kawasaki around June 2014 at Palantir's offices.  He represented, once again, that he wished to learn about the Cyber Technology to help Palantir find clients for its cyber products.  Trusting Abramowitz, Mr. Kawasaki then arranged for him to speak with another Palantir executive, Shyam Sankar, who, in June 2014, sent Abramowitz an email outlining Palantir's cyber work.

1  Purporting to act for the purpose of securing new opportunities for Palantir, Abramowitz arranged,
2  via email, an in-person meeting with Mr. Sankar at Palantir's offices the next day to discuss the
3  subject further.  During that meeting, Abramowitz learned confidential and proprietary information
4  about the Cyber Technology.  Palantir provided this information to Abramowitz with the
5  understanding and expectation that he would use it solely for Palantir's benefit and would not
6  disclose it to any third parties without Palantir's permission.

7       61.    Indeed, Abramowitz represented that his sole purpose in learning this information was
8  to benefit Palantir in his fiduciary capacity as Palantir's agent and advisor.  Specifically, Abramowitz
9  said during the June 2014 meeting with Mr. Sankar that he was interested in setting up a Palantir
10 cyber insurance subsidiary that he would run based on the confidential and proprietary information
11 Palantir had disclosed to him.  For the next weeks and months, Abramowitz, purporting to work on
12 behalf of Palantir and using Palantir's resources, investigated the cyber insurance market.  For
13 example, in August and September 2014, Abramowitz met with various potential business partners
14 in the cyber sector by claiming that he was working on Palantir's behalf to seek out cyber insurance
15 opportunities.  Abramowitz also spent the valuable time of Palantir executives discussing and
16 inquiring about Palantir's cyber insurance ideas and potential clients during this time period.  At all
17 times, Abramowitz's statements and conduct served as yet another confirmation to Palantir that
18 Abramowitz was supposedly acting for the benefit of Palantir.

19      62.    But Abramowitz's assurances and representations were false.  Abramowitz's plan was
20 not to help Palantir but to obtain confidential and proprietary information about the Cyber
21 Technology and the cyber insurance market to set up a business for the benefit of the Abramowitz
22 Enterprise.  At the same time as Abramowitz was purporting to work on Palantir's behalf in the
23 summer and fall of 2014, he was preparing to patent, without Palantir's knowledge or consent,
24 Palantir's proprietary information concerning the Cyber Technology in October 2014.  After doing
25 so, as described further below, Abramowitz set up a cyber insurance company with the apparent
26 intent to compete against Palantir and exclude it from this valuable market using the very information
27 he learned from Palantir while purporting to act on Palantir's behalf.  At no point during any of the
28 meetings or discussions with Palantir did Abramowitz disclose his true intentions.

- 24 -

63.  <u>The Natural Resources Technology</u>.  In 2013 and 2014, Palantir was developing plans to expand its business and technology into the natural resources exploration sector.  As Palantir recognized, companies involved in the exploration, production, and management of natural resources operate in an environment filled with scattered and disparate types of data.  Palantir discovered that by integrating and organizing all that data, it could provide key insights to these companies, including, for instance, the likelihood of finding oil or gas at a particular site.  To capitalize on this discovery, Palantir developed the Natural Resources Technology.

64.  Just as he did with the Healthcare and Cyber Technologies, Abramowitz learned about the Natural Resources Technology in the course of performing work for Palantir.  He took a great interest in Palantir's ideas and began inquiring about the functionality and features of the technology while claiming that he wanted to help Palantir develop its business in the oil-and-gas market.  In March 2014, for instance, Abramowitz met with Mr. Kawasaki in Dallas, Texas, and discussed Palantir's Natural Resources Technology and its work and plans in the oil-and-gas sector.  During this conversation, Abramowitz indicated that his purpose for learning about Palantir's Natural Resources Technology was to help Palantir find clients in the oil-and-gas industry who would be interested in using that technology in their business and to provide advice and guidance for Palantir's decision-marking.  Later the same month, Abramowitz emailed Mr. Karp, Mr. Kawasaki, and Gavin Hood about a possible business connection to help Palantir in the "oil and gas exploration and production business which we talked about in Dallas."  This conduct continued to reassure Palantir that Abramowitz was acting for Palantir's exclusive benefit and that he would not disclose or use the confidential and proprietary information concerning the Natural Resources Technology without Palantir's authorization.

65.  But Abramowitz's claims that he wanted to use the Natural Resources Technology to help Palantir develop its natural resources business were false when made.  In truth, Abramowitz wanted to obtain information about the Natural Resources Technology to patent and usurp it for the benefit of the Abramowitz Enterprise.  Indeed, shortly after obtaining this proprietary information, Abramowitz began preparing, without Palantir's knowledge or consent, a patent application to patent the concepts, methods, and ideas concerning the Natural Resources Technology that Palantir had

shared with him.  At no point during any discussions with Palantir did Abramowitz disclose that his true intentions were to claim Palantir's trade secrets and inventions for himself.

**E.    Abramowitz Lies In Patent Applications To Patent Palantir's Technology**

66.    Having used false pretenses to learn Palantir's sensitive trade secret information, Abramowitz began filing domestic and international patent applications via online portals to patent the technologies Palantir developed and disclosed to Abramowitz in confidence.   Those patent applications—which were published in mid-2016 and are publicly available—were the foundation for the businesses Abramowitz has launched or attempted to launch for the benefit of the Abramowitz Enterprise:

- On October 21, 2014, Abramowitz filed with the USPTO Application No. 62/066,716, seeking to patent systems, methods, and design concepts related to Cyber Technology.    Claims 1-4, 8, 10-14, 16-22, 26, 28-30, 32, 34-46—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, and figures—derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraph 60.  These trade secrets are described with particularity in paragraphs 9-17 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 21, 2015, Abramowitz filed with the USPTO Application No. 14/919,506, seeking to patent systems, methods, and design concepts related to the Cyber Technology.  Claims 1-23—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets.   Palantir disclosed those trade secrets to Abramowitz as described in paragraph 60.  These trade secrets are described with particularity in paragraphs 1-8 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 21, 2015, Abramowitz filed the international Application No. WO 2016/065049 A1, which had the effect of generating Application No. EP 15852487.6 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Cyber Technology.   Claims 1-23—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto—derive from and disclose Palantir's trade secrets.   Palantir disclosed those trade secrets to Abramowitz as described in paragraph 60.  These trade secrets are described with particularity in paragraphs 1-8 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 20, 2015, Abramowitz filed with the USPTO Application No. 14/918,398, seeking to patent systems, methods, and design concepts related to the Cyber Technology. Claims 1-4, 8, 10-14, 16-22, 26, 28-30, 32, 34-39, and 40—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets. Palantir disclosed those trade secrets to Abramowitz as described in paragraph 60. These trade secrets are described with particularity in paragraphs 9-17 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

FIFTH AMENDED COMPLAINT

- On October 20, 2015, Abramowitz filed the international Application No. WO 2016/064919 A1, which had the effect of generating Application No. EP 15851807.6, seeking to patent systems, methods, and design concepts related to the Cyber Technology.  Claims 1-4, 8, 10-14, 16-22, 26, 28-30, 32, 34-39, and 40—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraph 60.  These trade secrets are described with particularity in paragraphs 9-17 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 29, 2014, Abramowitz filed with the USPTO Application No. 62/072,368 seeking to patent systems, methods, and concepts related to the Healthcare Technology.  Claims 1 and 2—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, and figures—derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55.  These trade secrets are described with particularity in paragraphs 18, 20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On December 1, 2014, Abramowitz filed with the USPTO Application No. 62/086,125, seeking to patent systems, methods, and concepts related to the Healthcare Technology.  Claims 1-8, 11, 14, 16-19, 21-28, 31, 36-38, 41-49, 52, 55, 57-59, 62, 64-68, and 70-74—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto—derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55.  These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 29, 2015, Abramowitz filed with the USPTO Application No. 14/926,408, seeking to patent systems, methods, and design concepts related to the Healthcare Technology.  Claims 1, 2, 4-9, 11-17 and 19-24—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto—derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55.  These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 29, 2015, Abramowitz filed the international Application No. WO 2016/069861 A1, which had the effect of generating Application No. EP 15854273.8 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Healthcare Technology.  Claims 1, 2, 4-9, 11-17 and 19-24—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55.  These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On November 26, 2018, Abramowitz filed with the USPTO Application No. 16/200,349, seeking to patent systems, methods, and design concepts related to the Healthcare Technology.  Claims 1, 2, 4-9, 11-17 and 19-24—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto—derive from and disclose Palantir's trade secrets.  Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55.

These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 29, 2015, Abramowitz filed with the USPTO Application No. 14/926,343, seeking to patent systems, methods, and design concepts related to the Healthcare Technology. Claims 1-9, 12, 15, 17-20, 22-29, 32, 35, 37-39, 42-49, 52, 55, 57-59, and 62—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto—derive from and disclose Palantir's trade secrets. Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55. These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On October 29, 2015, Abramowitz filed the international Application No. 2016/069857 A1, which had the effect of generating Application No. EP 15854898.2 with the European Patent Office, seeking to patent systems, methods, and design concepts related to the Healthcare Technology. Claims 1-9, 12, 15, 17-20, 22-29, 32, 35, 37-39, 42-49, 52, 55, 57-59, and 62—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets. Palantir disclosed those trade secrets to Abramowitz as described in paragraphs 50, 52, 55. These trade secrets are described with particularity in paragraphs 18-20 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On December 19, 2014, Abramowitz filed with the USPTO Application No. 62/094,888, seeking to patent systems, methods, and concepts related to the Natural Resources Technology. Claims 1-13—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, and figures— derive from and disclose Palantir's trade secrets. Palantir disclosed those trade secrets to Abramowitz as described in paragraph 64. These trade secrets are described with particularity in paragraphs 21-23 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

- On December 18, 2015, Abramowitz filed with the USPTO Application No. 14/975,373, seeking to patent systems, methods, and design concepts related to the Natural Resources Technology. Claims 1-23—and the corresponding abstracts, specifications, embodiments, descriptions, drawings, figures, and amendments thereto— derive from and disclose Palantir's trade secrets. Palantir disclosed those trade secrets to Abramowitz as described in paragraph 64. These trade secrets are described with particularity in paragraphs 21-23 of Palantir's Second Amended Trade Secret Disclosure submitted in this action.

67. Although each of these patent applications discloses in detail the trade secret information Palantir shared with Abramowitz, the applications falsely identify Abramowitz as the sole inventor of the technologies, without so much as mentioning Palantir. Such misrepresentations are particularly egregious given that Abramowitz has no technical background at all, let alone in something like data analytics or such industries as cyber security, cyber insurance, or natural resources exploration. Indeed, the patent applications discuss and describe technical matters that Abramowitz could not have known without obtaining information about them from Palantir.

68.   For example, Abramowitz's Application No. 14/919,506, which seeks to patent certain inventions related to the Cyber Technology, describes one of its key claimed inventions, in relevant part, as:

> A central monitoring station of a monitoring system for detecting and handling cyberattacks to client systems with a management system that manages a consortium of monitoring systems, comprising:  a network interface configured to receive and transmit information using a computer network; and a processor and a memory comprising processor executable instructions upon execution by the processor, configuring a plurality of components of the central monitoring station to detect and respond to cyberattacks to client systems, the plurality of components including [a list of five technical components].

69.   Other technical inventions described in the applications include, (i) "A computer implemented method of managing a consortium of monitoring systems which detect and handle cyberattacks"; (ii) a method of "generating a profile in electronic format for the requesting monitoring system, wherein the profile includes information on computing and human resources associated with the monitoring system"; and (iii) "a computer program product embodied on one or more non-transitory computer readable media."

70.   The application also includes multiple technical diagrams to explain the claimed inventions, such as the following:

FIFTH AMENDED COMPLAINT



*FIG. 1*

*FIG. 10*

FIFTH AMENDED COMPLAINT

71.     The nature of the information set forth in the patent applications shows that Abramowitz could not have conceived of the inventions he falsely claimed as his own. Rather, Abramowitz based those applications on the confidential and proprietary information Palantir had disclosed to him in confidence. These actions were particularly egregious given that Abramowitz promised Palantir in the July 2014 NDA—which he signed only three months before filing his first patent application—that he would keep Palantir's proprietary information in strict confidence. Given that Abramowitz began developing the applications at the time of or shortly after signing the NDA, it is clear that he never intended to comply with his contractual promises.

72.     As Abramowitz was preparing and starting to file the patent applications, he took steps to cover up his misconduct by making further misrepresentations to Palantir. In September 2014, Palantir learned that Abramowitz had either filed or was preparing to file a patent application relating to cyber insurance. Because Palantir did not know what information Abramowitz sought to patent (much less that this information was what Mr. Sankar had conveyed to Abramowitz in June 2014), Palantir executives Ryan Taylor and Mr. Hood asked Abramowitz to provide them with a copy of the application. Abramowitz declined to provide it, telling Mr. Hood in an October 2014 email that doing so may prevent the patent from being granted and that he would check with his lawyers to determine whether a copy of the application could be provided pursuant to a non-disclosure agreement. Abramowitz also falsely claimed in the same email that the application related to "his" "insurance idea," all the while claiming that he continued to have Palantir's best interests in mind. Ultimately, Abramowitz never provided a copy of the application to Palantir nor disclosed what inventions he sought to patent in that application. Abramowitz also failed to disclose that he was planning to file thirteen other applications concerning Palantir's Healthcare, Cyber, and Natural Resources Technologies.

73.     Had Abramowitz told Palantir the truth about his cyber insurance application (i.e., that it was based on the technology and concepts that Palantir had communicated to him) and disclosed that he had prepared other patent applications seeking to patent Palantir's technology, Palantir would have taken action to prevent the publication of those applications and the trade secrets

- 31 -

1   contained therein.  But because Abramowitz did not disclose what information he sought to patent

2   in his cyber insurance application, and because he represented that the application concerned his idea

3   and that he continued to act in Palantir's best interests, Palantir did not discover the information

4   Abramowitz sought to patent until after his applications became public in mid-2016.

5          **F.**      **Abramowitz Takes Steps to Launch Competing Businesses and Continues His**

6                 **Fraudulent Conduct**

7         74.      Having learned about Palantir's business plans, investigated the relevant markets

8   using Palantir's resources, and filed patent applications to patent the propriety information Palantir

9   had shared with him, Abramowitz began taking steps toward his ultimate goal of establishing

10   competing businesses based on Palantir's own technology to benefit himself, KT4, and the Trust.

11   The first business Abramowitz sought to establish was a cyber insurance business based on the

12   confidential information Abramowitz obtained from Palantir concerning its Cyber Technology.

13         75.      In 2014 and 2015, Abramowitz filed trademark applications for the mark "Shire" and

14   "Gray Swan," both domestically and internationally, for use in connection with the "underwriting

15   and administration of cyber liability insurance; underwriting and administration of cyber security

16   insurance; insurance brokerage in the field of cyber liability and cyber security insurance."

17   Abramowitz also registered four Internet domains containing the mark "Shire" and the words

18   "cyber," "risk," and/or "cyberinsurance" in their names.  Abramowitz apparently hoped that clients

19   would associate "Shire" with "Palantir," given that both names are derived from the popular series

20   of books and films *The Lord of the Rings* and that Palantir often uses the term "Shire" in connection

21   with its business.

22         76.      Then, in July 2015, Abramowitz created a Delaware limited liability company called

23   "Gray Swan LLC" with the apparent intent to compete with Palantir in the cyber insurance sector

24   using the technology Abramowitz misappropriated.  Abramowitz created a presentation about Gray

25   Swan for potential investors and partners and then consulted and sought to partner with numerous

26   individuals on this venture, including individuals with whom he communicated and met in the

27   summer and fall of 2014, while claiming that he was working for Palantir.  Abramowitz also

28   discussed Gray Swan and Palantir's trade secrets with Palantir's competitors in the cyber sector.  For

example, Abramowitz discussed his venture with Good Harbor Security Risk Management and, in those discussions, likely disclosed Palantir's trade secret information.  Such disclosures of Palantir's competitive and proprietary information threatened to undermine Palantir's position as a market leader.

77.     Although information concerning the extent and nature of Gray Swan's commercial activities is in Defendants' possession and not available to Palantir, Gray Swan appears to have existed as a company at least until July 2018, when its registration was cancelled due to failure to pay tax.  Because the cyber insurance business Abramowitz sought to establish was based on Palantir's confidential and proprietary information, Abramowitz likely disclosed that information to his partners, investors, and associates in the process of establishing that business.

78.     Importantly, the fraudulent activities of the Abramowitz Enterprise have not ceased and are ongoing even to this day.  In as recently as November 2018, Abramowitz filed yet another patent application with the USPTO (No. 16/200349) seeking to patent systems, concepts, and methods relating to the Healthcare Technology that Palantir had disclosed to him in confidence.  That application was published in July 2019, and like all other patent applications Abramowitz filed, it falsely lists Abramowitz as the sole inventor of the claimed technology without any mention of Palantir.  In light of this application, Abramowitz and the Abramowitz Enterprise appear to be engaged in or are gearing up for further commercial activities to profit off of Palantir's proprietary information.

## HARM TO PALANTIR

79.     As a result of Defendants' actions, Palantir has suffered significant economic harm. Among other things:

a.  Palantir has spent millions of dollars developing its Healthcare, Cyber, and Natural Resources Technologies.  Defendants' unauthorized publication of Palantir's trade secrets concerning those technologies in the patent applications described in paragraph 66, as well as the disclosure of the trade secrets to third parties, has diminished the economic value of those trade secrets.

b. With respect to one of Defendants' applications—USPTO No. 14/919,506—the patent office found that "all claims [in that application] are allowable." As a result, Palantir is informed and believes that the patent office will issue a patent imminently on the inventions described in the application. These inventions are, in actuality, Palantir's trade secrets, which are described with particularity in paragraphs 1-8 of Palantir's Second Amended Trade Secret Disclosure. Once the patent is issued, Palantir will lose the right to make, use, or sell its own technology that Defendants stole, and Defendants will attempt to force Palantir to pay for a license to its own misappropriated technology from Defendants.

c. Palantir has spent significant funds and resources investigating Defendants' misconduct, including funds spent on examining the patent applications Defendants filed, monitoring those patent applications, and investigating the businesses Defendants have launched or attempted to launch.

d. Due to Defendants' scheme, Palantir has been forced to spend millions of dollars instituting and prosecuting patent proceedings before the USPTO and in Germany to establish that it is the true inventor of the technologies listed in certain patent applications described in paragraph 66. Palantir was also forced to institute a proceeding under 28 U.S.C. § 1782 to obtain discovery for the German action. Palantir's expenses in connection with these proceedings were not voluntary but necessary to protect Palantir's intellectual property rights.

e. Defendants' patent applications have precluded Palantir from obtaining its own patents on the inventions described in those applications. As such, Palantir is unable to license and derive reasonable royalties from those inventions, which deprives Palantir of significant financial gain.

f. Defendants exploited for their own benefit Palantir's valuable resources and executive time by making false representations described above. Because Palantir employees and executives trusted Abramowitz's claims that he sought to help expand Palantir's operations in new markets, they dedicated substantial time and

resources educating Abramowitz about Palantir's Healthcare, Cyber, and Natural Resources Technologies; discussing Palantir's potential and actual clients and business plans with Abramowitz; otherwise enabling Abramowitz to represent Palantir in discussions with potential new clients; and allowing Abramowitz to use its office space in connection with his role as Palantir's advisor and fiduciary. Palantir would not have spent these valuable resources but for Abramowitz's false representations. Defendants then used the information they learned as a result of Abramowitz's misuse of Palantir's resources to establish competing businesses, which injured Palantir's business in an amount subject to proof at trial.

g. Defendants' commercial activities, representations to third-party investors, partners, and advisors that Abramowitz is the true inventor of Palantir's technology, and disclosure of Palantir's trade secrets to competitors have damaged Palantir's business opportunities.

80. As a result of Defendants' actions, Palantir has been and will continue to be injured in an amount to be established according to proof. Moreover, because Defendants' misconduct is still ongoing, Palantir has been and will continue to be injured absent equitable relief.

## FIRST CAUSE OF ACTION

### (Civil RICO 18 U.S.C. § 1962(c) – Against all Defendants)

81. Palantir incorporates by reference the allegations in paragraphs 1 through 80, as though fully set forth herein.

82. Abramowitz, KT4, the Trust, and Does 1–50 are each distinct "persons" as defined in 18 U.S.C. § 1961(3) and together form an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The Abramowitz Enterprise is an "association-in-fact" enterprise that has operated for common and shared purposes, including: (i) obtaining Palantir's proprietary and confidential information under false pretenses and in violation of Palantir's trust and confidence, (ii) using that information to launch or attempt to launch competing businesses, including by filing the patent applications described above; (iii) deriving profits from the activities of the Abramowitz Enterprise, and (iv) concealing the fraudulent nature of the Abramowitz Enterprise's activities. The Abramowitz Enterprise has

1    operated since at least 2013 and thus has had sufficient longevity to permit Defendants to pursue the

2    enterprise's unlawful purposes.

3        83.    The Abramowitz Enterprise has functioned as a continuing unit and a relationship has

4    existed between all members of the Abramowitz Enterprise.  As alleged above, KT4 and the Trust,

5    which are controlled and managed by Abramowitz, became early investors in Palantir.  Leveraging

6    that investment, Abramowitz positioned himself as a trusted advisor, agent, and fiduciary to the

7    company; executed confidentiality agreements (on behalf of himself, KT4, and the Trust); accessed

8    Palantir's confidential and proprietary information; and misused that information by disclosing it in

9    patent applications and establishing competing businesses for the benefit of himself, KT4, and the

10   Trust, which likely either hold or were intended to hold the interests in those businesses.

11       84.    Each member of the Abramowitz Enterprise is distinct from the overall enterprise.

12   Abramowitz is distinct from the Abramowitz Enterprise because he is a natural person who directed

13   and managed the fraudulent activities of the Abramowitz Enterprise, including by leveraging KT4's

14   and the Trust's investments to gain Palantir's trust, accessing Palantir's proprietary and confidential

15   information under false pretenses, and misusing that information for the benefit of the Abramowitz

16   Enterprise.  KT4 and the Trust are also distinct from the Abramowitz Enterprise because they are

17   distinct legal entities, and separate components of the Abramowitz Enterprise, which Abramowitz

18   used to perpetrate the enterprise's fraudulent scheme in the manner described above.

19       85.    The Abramowitz Enterprise has engaged in a pattern of racketeering activity by

20   committing multiple acts of wire fraud in violation of 18 U.S.C. § 1343 over a multi-year period.

21   Specifically, and as described above and below, the Abramowitz Enterprise has used email,

22   telephone, and interstate wires to facilitate and execute Abramowitz Enterprise's fraudulent scheme.

23   That scheme included the Abramowitz Enterprise making numerous intentional material

24   misrepresentations and omissions, both to Palantir and third parties, for the purpose of defrauding

25   Palantir, including in the following ways:

26       • In at least 2013 and 2014, Abramowitz falsely and repeatedly represented to Palantir

27         that he sought to help expand Palantir's business in the healthcare, cyber, and natural

28

resources sectors; that he would use the proprietary information Palantir provided to him for that purpose; and that he would keep that information confidential.

- In at least 2013 and 2014, during the communications, meetings, and discussions with Palantir's employees and executives, Abramowitz failed to disclose his intentions to use the information Palantir provided to him in patent applications and to establish competing businesses.

- In 2014, 2015, and 2018, Abramowitz filed fraudulent patent applications, falsely claiming that he is the sole inventor of Palantir's technologies.

- In October 2014, Abramowitz falsely represented to Palantir that the cyber insurance patent application he had prepared concerned "his" idea, as opposed the concepts and methods that Palantir had disclosed to Abramowitz in confidence.  Abramowitz also failed to disclose that he had prepared other patent applications to patent Palantir's confidential and proprietary information.

86.     The fraudulent activities of the Abramowitz Enterprise, including the predicate acts of wire fraud, were sufficiently continuous because they occurred over a substantial period of time— at least in 2013, 2014, 2015, and 2018—and have likely occurred in other years in connection with the commercial activities of the Abramowitz Enterprise.  Moreover, given that the Abramowitz Enterprise has continued its illegal activities even after the filing of this action, including by filing a fraudulent patent application in November 2018 and engaging in commercial activities based on Palantir's confidential and proprietary information, there is a significant threat of repetition of illegal acts extending into the future.

87.     As described in paragraph 79, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Palantir substantial injury to business and property, in an amount to be proven at trial.  Defendants are jointly and severally liable to Palantir for three times the damages Palantir has suffered under the provisions of 18 U.S.C. § 1964(c).

FIFTH AMENDED COMPLAINT

**SECOND CAUSE OF ACTION**

**(Breach of Contract – Against All Defendants)**

88.     Palantir incorporates by reference the allegations in paragraphs 1 through 80, as though fully set forth herein.

89.     The 2012 Transfer Agreement is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  As set forth in paragraph 35, Abramowitz is a "Covered Person" under Section 7 of the 2012 Transfer Agreement.  As described in paragraphs 42, 45, 48–52, 54–57, 59–61, 64, Palantir provided to Abramowitz (who was acting in his personal capacity and on behalf of KT4 and the Trust) confidential information regarding Palantir's latest projects and trade secrets in the healthcare, cyber, and natural resources exploration sectors, Palantir's business plans and actual and potential clients in those sectors, and Palantir's data analytics technology.  Abramowitz and the Trust were obligated to keep this information confidential under Section 7 of the 2012 Transfer Agreement.  The Trust and Abramowitz breached the 2012 Transfer Agreement by, among other things, seeking to patent Palantir's proprietary information in Abramowitz's patent applications and using Palantir's confidential business information to establish competing businesses with Palantir, as alleged in paragraphs 66–67, 74–77.

90.     The NDA is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  As described in paragraphs 42, 45, 48–52, 54–57, 59–61, 64, Palantir provided to Abramowitz confidential and proprietary information regarding Palantir's latest projects and trade secrets in the healthcare, cyber, and natural resources exploration sectors, Palantir's business plans and actual and potential clients in those sectors, and Palantir's data analytics technology.  Abramowitz and the Trust were obligated to keep this information confidential under the NDA because it fell within the definition of "Proprietary Information."  Abramowitz breached the NDA by, among other things, seeking to patent Palantir's proprietary information in Abramowitz's patent applications and using Palantir's confidential business information to establish competing businesses with Palantir, as alleged in paragraphs 66–67, 74–77.

91.     The 2015 Transfer Agreement is a valid contract and all conditions precedent to its enforcement have been performed by Palantir.  As set forth in paragraph 37, Abramowitz is a

- 38 -

"Covered Person" under Section 7 of the 2012 Transfer Agreement.  As described in paragraphs 42, 45, 48–52, 54–57, 59–61, 64, Palantir provided to Abramowitz (who was acting in his personal capacity and on behalf of KT4 and the Trust) confidential information regarding Palantir's latest projects and trade secrets in the healthcare, cyber, and natural resources exploration sectors, Palantir's business plans and actual and potential clients in those sectors, and Palantir's data analytics technology.  Abramowitz and the Trust were obligated to keep this information confidential under Section 7 of the 2012 Transfer Agreement.  The Trust and Abramowitz breached the 2012 Transfer Agreement by, among other things, seeking to patent Palantir's proprietary information in Abramowitz's patent applications and using Palantir's confidential business information to establish competing businesses with Palantir, as alleged in paragraphs 66–67, 74–77.

92.      As a direct and proximate result of Defendants' wrongful conduct, Palantir has been harmed and is being forced to take expensive steps to reduce and mitigate that harm.

93.      In addition to equitable relief, Palantir demands monetary damages, fees and costs, where allowed.

## THIRD CAUSE OF ACTION

### (Violation of Cal. Civ. Code § 3426 et seq. – Against All Defendants)

94.      Palantir incorporates by reference the allegations in paragraphs 1 through 80, as though fully set forth herein.

95.      Palantir's confidential and proprietary information pertaining to the Healthcare Technology, Cyber Technology, and Natural Resources Exploration Technology, which is described in the operative trade secret disclosure submitted in this action, constitutes protectable trade secrets as set forth in California Civil Code § 3426.1(d) (the "Trade Secrets").

96.      Palantir's Trade Secrets derived and still derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use as set forth in California Civil Code §3426.1(d)(1).

97.      Palantir's Trade Secrets were and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy as set forth in California Civil Code § 3426.1(d)(2).  As described in paragraphs 49–50, 52, 55, 60, 64, Palantir provided the Trade Secrets to Defendants in

various meetings with Palantir executives and employees.  At all times, Defendants had an obligation to keep Palantir's Trade Secrets confidential, as made clear in the parties' confidentiality agreements, communications, and course of conduct, and by virtue of Abramowitz's status as an agent, advisor, and fiduciary of Palantir.  Palantir did not consent to Defendants' use of the Trade Secrets for any purpose other than for the sole and exclusive benefit of Palantir.

98.    Defendants willfully and intentionally misappropriated Palantir's Trade Secrets. Leveraging KT4's and the Trust's investment, Abramowitz obtained Palantir's Trade Secrets under false pretenses and misused those trade secrets by, among other things, disclosing them in patent applications, using them to establish competing businesses, and disclosing them to third parties, as alleged in paragraphs 66–67, 74–77.  As described in paragraphs 25 and 44, Abramowitz at all times acted not only in his personal capacity, but also on behalf KT4 and the Trust, in order to set up businesses based on Palantir's trade secrets that would benefit KT4 and the Trust.

99.    Palantir is entitled to an injunction against both actual and threatened misappropriation as set forth in California Civil Code § 3426.2(a).

100.    Palantir also requests that the court take affirmative acts to protect Palantir's Trade Secrets, as set forth in California Civil Code § 3426.2(c), including: (1) ordering an inspection of Defendants' computer(s), USB drives, email accounts, cloud storage accounts and other sources and equipment by a forensics expert to determine the extent to which Palantir's Trade Secrets were wrongfully taken and/or disseminated to others, and to ensure that no Trade Secrets belonging to Palantir remain saved on those systems; and (2) issuing a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of Palantir's Trade Secrets and prohibiting Defendants from continuing his unlawful actions.

101.    In addition to equitable relief, Palantir demands monetary damages, fees, and costs, where allowed.

102.    Defendants' conduct as alleged herein was willful, malicious and wanton, and undertaken for the purpose of injuring or causing injury to Palantir.  Palantir seeks exemplary and punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Palantir respectfully requests the following relief:

1. Judgment in favor of Palantir and against all Defendants on all of Palantir's claims asserted in the Complaint;

2. For a preliminary injunction and permanent injunction restraining Defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them from:

      a. perpetuating the wrongful acts and conduct as set forth above;

      b. continuing to pursue Defendants' domestic patent applications set forth above;

      c. directly or indirectly retaining, using or disclosing Palantir's trade secret, confidential and/or proprietary information, and derivatives thereof;

      d. destroying any property, emails, documents or materials that are relevant or potentially relevant to this action;

      e. moving or transferring outside the United States Palantir's property, emails, documents or  materials that are relevant or potentially relevant to this action;

3. For an Order directing Defendants to transfer to Palantir any and all domestic patent rights, including pending domestic patent applications and any granted patents, relating to the Healthcare Technology, the Cyber Technology, and the Natural Resources Technology.

4. For an Order requiring that Palantir's confidential, proprietary and trade secret information be returned to Palantir;

5. For an Order requiring all Defendants to divulge the identity of the individuals, groups and companies to whom they have disclosed Palantir' s confidential, proprietary and trade secret information;

6. For an Order requiring all Defendants to account for and pay to Palantir all ill-gotten gains, profits, and savings obtained or derived from their improper conduct;

7. For damages, unjust enrichment, and/or reasonable royalties in amounts to be proven at trial;

8. For treble damages under 18 U.S.C. § 1964(c);

FIFTH AMENDED COMPLAINT

1    9.    For an Order awarding Palantir punitive and/or exemplary damages in a sum to be

2 determined at trial, on the basis of Defendants' willful, deliberate, and malicious tortious conduct;

3    10.    For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained

4 by Defendants through the acts complained of herein;

5    11.    For prejudgment interest;

6    12.    For an Order awarding Palantir attorney's fees and all costs of suit incurred herein;

7 and

8    13.    For such other and further relief as Court deems just and proper.

9    <u>**DEMAND FOR JURY TRIAL**</u>

10    Plaintiff hereby demands a trial by jury.

11

12

13

14 Dated: August 12, 2020                                   HUESTON HENNIGAN LLP

15                                                                      By: _____

16                                                                             Moez M. Kaba

17                                                                             Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

FIFTH AMENDED COMPLAINT