# EXHIBIT 1

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. |
| | ) 5:19-CV-06879-BLF |
| MARC L. ABRAMOWITZ, | ) |
| | ) |
| Defendant. | ) |

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF:
ALEXANDER KARP
WEDNESDAY, FEBRUARY 9, 2022
12:00 P.M. EASTERN STANDARD TIME

Reported by: PAULA A. PYBURN
CSR 7304, RPR, CLR

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF ALEXANDER KARP, the witness, taken on behalf of DEFENDANTS, on Wednesday, February 9, 2022, at 12:00 p.m. Eastern Standard Time, before PAULA A. PYBURN, CSR 7304, RPR, CLR.

APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:

FOR PLAINTIFF AND THE WITNESS:

HUESTON HENNIGAN, L.L.P.
BY: JOHN C. HUESTON, ESQ.
BY: YAHOR FURSEVICH, ESQ.
523 West 6th Street
Suite 400
Los Angeles, California 90014
213.788.4340
jhueston@hueston.com
yfursevich@hueston.com

APPEARANCES: (CONTINUED)

FOR DEFENDANTS:

WILLIAMS & CONNOLLY, L.L.P.
BY: BARRY S. SIMON, ESQ.
BY: STEPHEN L. WOHLGEMUTH, ESQ.
725 Twelfth Street, N.W.
Washington, D.C. 20005
202.434.5000
bsimon@wc.com
swohlgemuth@wc.com

ALSO PRESENT:

Kimberlee Decker, Videographer
Neil Martin, Veritext Concierge
Laura Personick, Palantir In-house Counsel
Ryan Taylor, Palantir In-house Counsel

A The exact time period I don't know, but something like from the inception of Palantir informally -- it wasn't -- it just started as something informal and then developed into something that was called "KarpTube." If I had to guess, something like from 2005 to recently, informally, but I don't know.

Q Are the videos from KarpTube --

(Reporter interruption for clarification.)

BY MR. SIMON:

Q Are the videos that were done over KarpTube preserved at the company?

A You're asking me to answer a question that our tech department would deal with. I -- I would assume they are, but I don't know.

Q Okay. While -- prior to the time that you accused Mr. Abramowitz of theft, did you know that he had invested in other technology companies aside from Palantir?

A Well, I met Marc in the context of being an active investor; so I was aware he was investing in companies. I didn't know the specifics.

Q Did you know that he had a lot of contacts with people involved in tech in Israel, for example?

MR. HUESTON: Objection. Vague.

THE WITNESS: I knew Marc was a sophisticated investor. I knew he invested globally. I didn't track the details of where he was investing.

BY MR. SIMON:

Q Okay. Did you ever ask Mr. Abramowitz about any of his business or investment activities outside of Palantir?

A Well, I was very busy directing Marc about what we -- what he should do, how he should work, and how he should protect our crown jewels. And outside of that, it was a broad friendship. I really did not talk to him about his other business interests. I'm sure he mentioned them, but I have no specific recollection. Excuse me.

Q All right. To your knowledge, was there any restriction on Mr. Abramowitz's ability to invest in companies that were actual or potential competitors of Palantir?

A Marc's -- in the context of his role as a trusted advisor and -- and in the context of a friendship and a personal relationship where he asserted that he -- over and over and over and over again that we trust -- could trust him and he would protect our crown jewels, we really were focused on

that.

We were not focused on what -- you know, what he does -- very similar if you're working with somebody and they're asserting what amounts to the obvious, that they will protect your secrets, secrets which became very, very valuable and led to our company being worth billions and billions of dollars, that we assumed he would live up to that.

Q Again, Dr. Karp, my actual question was, to your knowledge, was there any restriction on Mr. Abramowitz's ability to invest in companies that were actual or potential competitors of Palantir?

MR. HUESTON: Objection. Asked and answered. Otherwise calls for a legal conclusion.

You can answer if you can.

THE WITNESS: Marc spent what amounts to thousands of hours explaining how much we could trust him, how aligned he was with us. The normal assumption of that is that he would -- and both moral and legal -- is that he would not be involved in competitive activities.

BY MR. SIMON:

Q To your knowledge, was there any restriction on Mr. Abramowitz's ability to act as an advisor to companies that were actual or potential

competitors of Palantir?

MR. HUESTON: Objection. Vague, and otherwise asked and answered.

THE WITNESS: Yeah. Should I answer or --

BY MR. SIMON:

Q Yes, you can answer.

MR. HUESTON: You can go ahead, if you can.

THE WITNESS: You know, I handed over -- we have a very robust legal department, and my relationship with Marc was based on me directing him and him giving feedback on what he was doing.

The rest of these, you're asking me to ask -- answer essentially legal questions, which I relied on our legal department to handle.

BY MR. SIMON:

Q Did you ever tell Mr. Abramowitz that he couldn't act as an advisor to a company that was an actual or potential competitor of Palantir?

MR. HUESTON: Objection. Vague.

THE WITNESS: I -- Marc -- far from me telling him, Marc told me on innumerable contexts -- if you would like, I could give you some granular context here. We work in a very classified environment.

Marc asserted nearly every time I met him

for the first couple years of him working with us that he would not divulge our trade secrets in any meaningful way.

BY MR. SIMON:

Q So you don't actually remember telling Mr. Abramowitz that he could not act as an advisor to a company that was an actual or potential competitor of Palantir's?

MR. HUESTON: Objection -- objection. Asked and answered. Otherwise vague and calling for a legal conclusion.

BY MR. SIMON:

Q You can answer.

A I remember Marc asserting he would only work at our behest and in our interests. And as a sophisticated investor that he is, he clearly understood what that meant.

The rest, I left -- I left to the legal department, which has done a very solid job in protecting us.

Q To your knowledge, was there any restriction on Mr. Abramowitz's ability to develop business for companies that were actual or potential competitors of Palantir?

MR. HUESTON: Objection. Asked and

behest and preserving our crown jewels and theft.

BY MR. SIMON:

Q Was Mr. Abramowitz entitled to have his own ideas and thoughts?

MR. HUESTON: Objection. Vague.

THE WITNESS: Should I answer that?

MR. HUESTON: If you can.

THE WITNESS: Ideas and thoughts tend to presuppose an understanding of an issue. So is Marc entitled to thoughts and ideas about poetry or politics -- but the ideas and thoughts of Palantir, our crown jewels were ours, and Marc was in no position to divine an understanding of these software issues.

So, if you're trying to ask does he have thoughts or ideas regarding the development of software, enterprise software, the intricacies involved in building it, building a company that he pilfered from us? No.

BY MR. SIMON:

Q Mr. Abramowitz was not an employee of the company; correct?

MR. HUESTON: Objection. Calls for a legal conclusion.

THE WITNESS: Yeah. I don't know the legal

distinction between trusted advisor and employee. I do know that he had fiduciary responsibilities, he was aware of these, and he asserted on innumerable occasion that he understood these and would fulfill them.

BY MR. SIMON:

Q There was no assignment of Mr. Abramowitz's ideas to Palantir; correct?

A You're asking a legal question. He asserted that he had -- so he asserted that he -- he would preserve our crown jewels.

Q Were you aware of any written assignment of Mr. Abramowitz's ideas or his intellectual property to Palantir?

A Well --

MR. HUESTON: Objection. Calls for a legal conclusion and foundation.

THE WITNESS: I'm not a lawyer and a chief legal -- I'm not -- I'm the CEO. I rely on our legal department to do -- take appropriate legal protections for Palantir, and I'm sure they did.

BY MR. SIMON:

Q Did anything require Mr. Abramowitz to bring his ideas to Palantir?

MR. HUESTON: Objection. Vague and

otherwise calls for a legal conclusion and otherwise asked and answered.

THE WITNESS: I don't believe that the term "idea" is appropriate for describing Marc Abramowitz's suggestions. Marc is a sophisticated investor who knows nearly nothing about software.

BY MR. SIMON:

Q It's your understanding that this case is about software?

A It's my understanding this case is about Marc Abramowitz's theft of our crown jewels.

Q Was Mr. Abramowitz required to bring business opportunities to Palantir?

MR. HUESTON: Objection. Calls for a legal conclusion and vague.

THE WITNESS: Mr. Abramowitz's -- Marc's role was to act at our behest based on what we were teaching him about software development, software IP and its implementation, to help us find clients and opportunities.

And he knew that was what he was doing because he asserted it to me and nearly every other person at Palantir over years -- not once, not twice, not over a month, not over two months, but

over a period of time from when he invested to when we -- we had dispositive proof of his theft.

So this is not him asserting it on Monday or Tuesday or once a week over a period of a quarter. This amounts to hundreds and hundreds and hundreds of thousands of times.

BY MR. SIMON:

Q Mr. Abramowitz was an early investor in Palantir; correct?

A Yes, he was. He's one of our earliest.

Q And he was a major investor in Palantir; correct? He had over 5 million shares?

MR. HUESTON: Objection. Vague.

THE WITNESS: I don't know the exact sum, but he was one of our earliest investors.

BY MR. SIMON:

Q And he did invest at a time when Palantir was having difficulty raising money; correct?

MR. HUESTON: Objection. Vague.

THE WITNESS: I wouldn't -- we were an early stage company. Every early stage company is trying to raise money. Our difficulties were potentially not worse than anyone else's.

BY MR. SIMON:

Q You understood that Mr. Abramowitz was

motivated as an early investor to help Palantir grow its business; correct?

A I understood that Marc was a sophisticated investor, and, as a sophisticated investor, he understood how a business works. You invest, hopefully the company does well, and because you're an investor, sometimes you help the company.

Q You did understand that Mr. Abramowitz would try to understand Palantir's capabilities so he could try to develop business for Palantir; correct?

MR. HUESTON: Objection. Vague.

THE WITNESS: We taught as best we could -- because, although Marc is a very sophisticated investor, he's not very sophisticated about software -- to teach him how software would work in a myriad of contexts, including government contexts, corporate contexts, contexts where we hadn't really used the IP, contexts where we hadn't brought IP to new markets. He was very much involved in this.

BY MR. SIMON:

Q Dr. Karp, to your knowledge, was there any written agreement between Palantir and Mr. Abramowitz concerning his business development efforts?

MR. HUESTON: Objection. Foundation. And I'll also object to the extent this may call for attorney-client privileged communications.

THE WITNESS: Yeah. I believe I've answered the question. I'm happy to repeat it.

I -- we're a very sophisticated company. We deal with very difficult-to-understand ideas. It was -- I viewed Marc as a very smart, sophisticated investor that needed -- if I might say -- remedial help on software, and I was very focused on that because I believed he could help us introduce these ideas, partly under the theory that, if he could understand them, he'd explain them well to a layperson, and because we trusted him.

BY MR. SIMON:

Q Was there any oral agreement between Palantir and Mr. Abramowitz concerning his business development efforts?

MR. HUESTON: Objection. Asked and answered. Otherwise vague and calling for a legal conclusion.

THE WITNESS: I don't know the prerequisites that delineate the differentiation between an oral and a written agreement. I'm sure this is something our lawyers know a lot about.

I can only tell you that, on innumerable occasions, Marc asserted to me that he understood the value of our IP. He reaffirmed that he was a sophisticated investor, as was obvious based on his investment in Palantir and just in general his life history. And that he would live up to his role as an advisor and diligently report back to us his activities.

So, if that's an oral agreement, I don't -- that's something the courts will decide. But it was definitely what I viewed as an agreement.

BY MR. SIMON:

Q Was it an exclusive agreement, that Mr. Abramowitz could only develop business for Palantir?

MR. HUESTON: Objection. Calls for a legal conclusion. Otherwise vague. And asked and answered.

THE WITNESS: Marc, as you've established, is a very sophisticated businessperson. So you can't on the one hand establish he's a sophisticated businessperson and then ask questions that presuppose he doesn't understand the basics of business.

Marc asserted over and over again that he

was a trusted advisor. We all knew he was a sophisticated businessperson. If he's a sophisticated businessperson that's asserting this, he clearly understands the difference between outreach and theft.

BY MR. SIMON:

Q What was your understanding about how Mr. Abramowitz was going to try to develop business for Palantir?

MR. HUESTON: Objection. Vague.

THE WITNESS: Could you repeat the question? It's a little garbled.

BY MR. SIMON:

Q What was your understanding of how Mr. Abramowitz was going to try to develop business for Palantir?

A Well, you know, I didn't really need an understanding because Marc was -- was at my behest actively talking to people and reporting back.

So we had meetings -- as an example, meeting -- we had a meeting in Texas on our health care. He was providing -- we were in discussions about how he could develop -- how we could develop our IP. We, together with -- with clients in the context of cyber -- there are a lot of technical

issues under the hood there, both cyber in terms of underwriting and cyber in terms of security. There was the oil and gas context, where we were talking about using early IP developed in PG, our core product, and bringing it to IP. There was underwriting. There was figuring out the cost of patient -- of a customer cost of patients in [redacted] and other places. There was research normalizing data so we could do --

All of these things, by the way, became or are becoming large parts of our business eight, ten years after we discussed them. So they were very, very valuable. And those are things he was -- as a trusted advisor, was intimately involved.

Not just with me, by the way. So it's not just me asserting this. With the people I directed him to in Palantir.

Q Is it your testimony that you actually instructed Mr. Abramowitz as to who he could contact as potential customers?

A It is my testimony that you are -- that Marc understood the difference between being told exactly what to do and stealing our IP.

Marc understood and affirmed to me, and I think everyone at Palantir, that he understood this

difference, and that he --
And, by the way, he understood this, it's quite obvious he had to understood -- -stand this because a lot of the IP we were talking about using in the commercial space was developed at some of the most sensitive clients in the world. For example, the CIA.
So the idea that a sophisticated investor or even a normal human being would not understand how sensitive the blueprints were that we were set- -- we were -- we were showing him doesn't really make sense.
Q You understood that Mr. Abramowitz was going to have to describe Palantir to potential customers; correct?
MR. HUESTON: Objection. Vague.
THE WITNESS: There's a distinction that every sophisticated investor understands between describing something at a level of generality specific enough to engage a client and turning over the crown jewels. The difference between describing to a client what you're doing and thievery of taking that and putting in your own patents.
It is reasonable to presuppose that someone as smart as Marc, as sophisticated as Marc,

understood this distinction. It is totally unreasonable to believe that Marc, with all his intelligence and sophistication, did not understand the distinction implicit in my answer, not implicit in your question.

BY MR. SIMON:

Q Did you actually tell Mr. Abramowitz how he could describe Palantir to potential customers?

A I did describe how he could -- but, by the way, he also repeated back the kind of things he couldn't describe.

You -- Marc is a very sophisticated investor and clearly very clever, and unfortunately been involved in stealing our IP. But he is not dumb. Marc understood exactly what he was allowed to say and what he wasn't allowed to say.

Presupposition of your questions is that Marc is not a smart person. Marc is very smart.

Q What did he tell you he -- scratch that. Withdraw that.

Did you actually have a discussion with Mr. Abramowitz about the level of detail that he -- which he could describe Palantir to potential customers?

MR. HUESTON: Objection. Asked and

answered.

THE WITNESS: I'll give you some concrete examples of the kind of things I told Marc.

"Marc, the data integration platform that we're thinking about using in oil and gas was used to -- to stop improvised explosives in Iraq. It functioned because the underlying data integration issues are different than people understand. To normalize those -- to normalize the data, you have to rebuild conventional software so that it both understands integration along disparate datasets and can maintain security. Something no one else had done at the time, and honestly, in many cases, still not done."

I explained to Marc the nature of the software. I explained to Marc the nature of the clients; i.e., some of the most sensitive clients in the world, clients that we don't mention externally, clients that we're not allowed to legally mention externally, and clients that we wouldn't mention externally even if we were allowed to because of the kind of work they do to help each and every one of us every day.

Explained this in detail. And one of Marc's famous quips on this is basically to smirk

and say something like, "I obviously understand this; I'm not an idiot."

Marc is a very smart person. Marc understood what everyone understands: Our software is used and among the most important institutions, again, some of the most sensitive use cases in the world, and it functions because of blueprints we developed over now 20 years.

I explained this to Marc. I explained it to him in the context of oil and gas. I explained it in the context of cyber. I explained it in the context of health care. I explained it in the context of improvised explosives and our special operators. I explained it in the context of the CIA. I explained it in the context of the FBI. I explained this over nearly a decade.

Marc is a very smart person. He probably did not need that explanation, but his listening and reaffirming of this clearly established that he understood the sensitivity of this, as would any normal human being.

BY MR. SIMON:

Q Again, when you described something to him, did you actually say what he could and what he couldn't use in conversations with the potential

customer of the company?

MR. HUESTON: Objection. Asked and answered.

THE WITNESS: Yes, I did. But, again, I believe your question presupposes Marc would not understand the distinction between IP used in a clandestine context --

(Reporter interruption for clarification.)

THE WITNESS: -- in a clandestine context, like the CIA, special operations.

We explained that we were going to use this IP in a commercial context, that much of what we were talking about was not understood in public.

And Marc -- Marc asserted to me affirmatively -- it wasn't as much that I asked Marc; it was Marc affirming assertive- -- affirmatively that he understood these things.

I also believe that this is below the level of a sophisticated investor.

BY MR. SIMON:

Q Well, for example, did you tell Mr. Abramowitz how he could describe Palantir's -- Palantir's dashboard or interface?

MR. HUESTON: Objection. Vague.

THE WITNESS: Well, first of all, anything

that Marc understood about software had to be described to him. Marc is a very smart person, obviously very -- but he does not understand software.

So -- so I explained to him -- and others; I directed Marc to meet with others. We were interested in oil and gas exploration. The problem involved in oil and gas exploration is, A, how do you drill for it more expeditiously, which is a problem with factorial difficulty, because every piece of sand throws off a data, and they work in a combinatorial way. So you need software to figure out how to drill and under what conditions. You also need software to figure out how to drill more safely.

This to us looked like a problem that was similar but different than other data problems we had dealt with. And we began to explain to him exactly how this would work. I referred him to people on -- at Palantir who were working on this -- on this specifically.

I believe, and I believe it's fairly obvious, that any idea Marc had about software in these contexts came from us.

///

BY MR. SIMON:

Q So did you or did you not tell him how he could describe Palantir's dashboard or interface to potential customers?

MR. HUESTON: Objection. Vague and otherwise asked and answered.

THE WITNESS: You're also switching the question. The dashboard is not -- it's the underlying IP, which is the engine.

So obviously we explained to him the UI, but that the crown jewels that he -- that we exposed him to were exactly how you manage the software, how you build the software, how you implement the software, and how you do it in a way where the client can actually use it, is a complete chain of custodial IP from beginning to end, from the base substrate of the kind of data you're going to have to how you integrate it, to how you actually use it in subsets so different -- different people can use -- hit the same substrate of data. And then the final layer, which is the UI or the -- how you actually present it so that technical and nontechnical users can integrate it.

All -- all this stuff you can now -- you know, there's like -- is like you can see in our

culture. But we were describing how to do this a decade before anyone else had thought about this, which is why Palantir became -- although we are in our infancy -- a multibillion-dollar company.

BY MR. SIMON:

Q Dr. Karp, you never did any of that in writing; correct?

A You mean did I, Alex Karp, write a memo for my employee?

Q No -- yeah -- I'm sorry.

Mr. Abramowitz was your employee? Is that your testimony?

MR. HUESTON: Objection. Calls for a legal conclusion. Otherwise asked and answered.

THE WITNESS: Did I do a legal memorandum for someone who is working at my behest? No --

BY MR. SIMON:

Q No.

A -- they're working at my behest, and I did it in the way I work with everyone, which is the most efficient way for me, which is to talk to him regularly.

Q Did you describe any of the things that you've talked about for Mr. Abramowitz in writing? I'm not asking you about a legal memo. I'm asking

whether you described things that you've testified about in writing to Mr. Abramowitz?

MR. HUESTON: Actually, you did use the word "memo."

But if you understand the question, you can answer.

THE WITNESS: I worked with Mr. -- Marc the way I work with every other client at Palantir. It is almost all verbal.

So was there any -- why would I write something to somebody who's working at my behest? I'm not reporting to him; he's de facto reporting to me.

BY MR. SIMON:

Q You have testified again today that you provided Mr. Abramowitz Palantir's crown jewels or treasured jewels; correct?

A I think that --

MR. HUESTON: Objection --

THE WITNESS: Yeah. I did testify to that belief.

BY MR. SIMON:

Q And you said that included an area of cyber insurance; correct?

A There were three prominent areas that we --

I was trying to get Marc to help us on. It was oil and gas -- exploration, mostly, is what we were interested in; health care, but health care really is a -- it was evaluating the cost of care, but also doing research on clinical research of two divergent areas; and cyber, which was more than one area. It was de facto what more lay people would view as active cybersecurity, but for sophisticated actors. Again, sophisticated actors. And then trying to take very sensitive IP we built for the special forces to create more secure forms of interinstitutional data sharing.

And those were the areas we were working on, were very interested in, and those areas are areas that have become, from a technical perspective, a big part of our business now seven, eight, nine years later and generate a lot of our revenue.

Q Did you tell Mr. Abramowitz how Palantir's software could be used in the underwriting context for cyber insurance?

A I explained to Marc that classical insurance companies do not have the ability to underwrite cyber because they don't have an ability to under- -- to understand the underlying risk. And

there's a delta between the actual risk and their perceived risk that would be best monetized in the context of insurance. And that finding an insurance partner could help us fully monetize our IP.

And he believed that we -- i.e., Marc working at our behest -- could be very helpful in this context.

Q Did you provide any further detail about how Palantir's software could be used in the underwriting context?

MR. HUESTON: Objection. Vague. Otherwise asked and answered.

THE WITNESS: Well, how much detail do you want? I mean, I can -- I mean, I don't -- I realize there's a limited time here, but if you -- so, if I -- an enterprise actually is not an enterprise the way lay people believe it is; it's actually a conglomeration of data sources that are not connected.

And that those -- because they're not connected, it's very hard to track the inflow/outflow of the data asset.

Sophisticated actors understand this and target data -- target sensitive IP areas of a company by largely using an obfuscatory path to

those data assets. Understanding how one actually can prevent that is a massive data integration issue.

PG product that we had built currently had some aspects of that IP but the fuller version of that IP would have required a -- an adjacent project which we were at the time working on. That adjacent project is -- is quite difficult to pull off. But we believed, if we did that, there would be enormously valu- -- then the question is how do you get paid for that. That's the -- that's the insurance aspect.

But the technical aspect, which is for us obviously the most interesting and at the end the most valuable, is -- is built upon IP that we started building in 2003 and extending it, mostly involving structured data, but also involving unstructured data because there's no other way to understand what's actually valuable to the -- to -- to the person hacking into your institution.

Last, not least, conventional software products are just not built to do this. So the people that are powering these enterprises are actually facilitating the hackers. And we believed we had a product to -- to -- we could build a

product based on our IP that would solve this problem, and still believe this is an enormously important problem.

BY MR. SIMON:

Q And you said all that to Mr. Abramowitz?

A Of course. Many, many, many times.

Q And, again, I'm trying to understand, in terms of cyber insurance, what else did you say to Mr. Abramowitz?

MR. HUESTON: Objection. Vague.

THE WITNESS: Well, I just did a cursory version of the product engine that would power this. Because, if you understand that an enterprise is vulnerable, say 20 percent more vulnerable than a normal cyber apparatus could verify, an insurance company, there's a delta between the vulnerability and the price in the market, and that can be -- that -- that delta is something that the cyber insurance company could cover.

And we explained both the technical part of this, which I went through; I could go through it more -- but -- and then we explained the business opportunity, which is real, to Marc.

Marc does not understand software; so -- but we had to make sure he understood enough

software so he could help us explain to clients why there's an underlying problem, but without exposing our IP, and then figure out, is there -- is there -- is there -- is there an insurance party?

And, by the way, at our behest, we had a number of conversations. So...

BY MR. SIMON:

Q When did those conversations take place?

A I don't know the exact year, but I know we went off and talked to -- and I don't believe he set this up, but it was part of -- we talked to [redacted]. We talked to [redacted].

I don't know the exact years, but these are companies we were actively engaging in with. And I was informing Marc along the way of the details, or the details that he could understand.

Q And you were describing to Mr. Abramowitz your dealings with [redacted] is that your testimony?

A I -- I was --

MR. HUESTON: Objection. Asked and answered.

Go ahead.

THE WITNESS: I was keeping Marc abreast of our ongoing business opportunities under the

assumption that he was on our team, helping us think of how adjacent opportunities could actually be built. So I know some of the places we talked to are the places I just mentioned.

BY MR. SIMON:

Q What I was asking, though, was when you had conversations with Mr. Abramowitz about cyber insurance issues.

MR. HUESTON: What's the question?

THE WITNESS: I don't understand the question.

BY MR. SIMON:

Q Yes. When did you have conversations with Mr. Abramowitz about the --

A We --

Q -- cyber insurance issues that you had described?

A We began working on cyber insurance roughly after we launched PG successfully. So it was obviously something we had thought about early on, but we began to think about it more -- in a more systematic way, like 2007, 2008.

So from 2007 to 2008 to the point where we, to our great shock, discovered Marc was stealing these ideas, to 2016, I guess, we were involved in

these issues, and, at least up until 2015, sharing these issues with Marc as a trusted advisor and someone we thought could help expand our market opportunities.

Q Were these conversations that you say you had with Mr. Abramowitz one-on-one conversations?

A Mostly. But obviously I introduced Marc to a number of the most trusted, most important people at Palantir, and that introduction included an assignment to them: "Please introduce Marc. Marc is a layperson" -- this is what I said -- "Marc is a layperson, but he's -- he's very smart. There are certain -- we need to help him understand how our software works so that he can help us strategize and, in this context of his work with us, actually figure out where best to expand our market," expand the IP we had been working on for nearly a decade to get into new markets, markets that we have now gotten into.

And so the -- most of our conversations were one on one on the phone, almost always verbal. Or he'd send me an email. He would come by the office.

By the way, as you're aware, Marc moved into our neighborhood --

(Reporter interruption for clarification.)

THE WITNESS: Sorry.

We had a friendly relationship. But it's not the case that every conversation we had was one on one. I did handoffs inside Palantir where I explained exactly this to members of Palantir, and they -- they were there.

BY MR. SIMON:

Q Dr. Karp, I think you testified earlier today that Mr. Abramowitz, on hundreds or hundreds or thousands of times made promises of confidentiality to you; is that correct?

A Well, if you think about how I met Marc, when he invested, I think something like 2003, 2004, and you remember he was dropping by the office, calling me, and then he moved into the neighborhood, we were in constant -- pretty regular contact.

And it is in retrospect kind of like the number of times -- so you just take, you know, once a week, 54 times 10; so -- probably times two. So that's, like, probably a thousand interactions.

Marc made an effort to establish that he was a trustworthy person on many occasions.

I want -- it's probably worthy of giving you the context. I was mentioning very sensitive

things to Marc, like, "Why did this part of the product work at the agency? Why did -- why would this work at the agency and not work in oil and gas? Why did we have to build something new in oil and gas if we wanted to do oil and gas?"

You can't just talk about the CIA's classified work and what is working and what's not without the other person being -- asserting and being believably trustworthy. Which is why the discovery of his theft is particularly surprising.

Q New question: Did you discuss classified work that Palantir did with Mr. Abramowitz?

A I discussed the theoretical -- I discussed the software that was used.

By the way, that's not classified; so you know. Like, the part that I discussed with him was sensitive, but not classified. But it is sensitive. It's like, how does the software work? Under what conditions does it work?

None of that's classified, but it is very, very sensitive.

Q So --

A By the way, it's not just sensitive to the government. These things -- Palantir has become a multibillion-dollar company, and a lot of what has

powered our success are these crown jewels.

Q Back to our -- just so I get back to the number of times that you say Mr. Abramowitz promised you confidentiality, is it your testimony that it could have been a thousand occasions?

MR. HUESTON: Objection. Misstates the testimony, and it's already asked and answered.

THE WITNESS: Nearly in every interaction, Marc made a point -- and this is -- you know, you sound so surprised, but there was a reason Marc moved into my neighborhood. He was establishing that we should trust him. There's a reason why he came by a lot. He was establishing we could trust him. There was a reason why he mentioned over and over something to the effect of, "Of course, you don't have to tell me I can't tell someone this." Hundreds of times.

I mean, I talked to Marc -- it was -- Marc was a part of Palantir, part of our life. That's why we trusted him so much.

BY MR. SIMON:

Q Okay. And these promises took place at your offices at Palantir, lobby -- in the lobby of Palantir, the halls of Palantir, and when you met on the street. I believe that was your testimony the

last time. Did he make the promises at all of those locations?

MR. HUESTON: Objection. Misstates the testimony and compound.

You can answer if you can.

THE WITNESS: And many more. Coffee shops. Walking around Stanford. Interactions when we ran into one another.

BY MR. SIMON:

Q And I think you said, almost every time you met, he made such promises; correct?

A In one form or another. I mean, by the way I would -- I would include his -- the way in which he ingratiated himself in general into Palantir is a general underscoring of his promise of trust and confidentiality, that he's a part of our company, is part of our Palantir family.

Q And these promises covered both professional and personal matters; is that correct?

A Well, Marc was a friend, but most of our discussions were more on, well, what can we do with IP? How can we expand? Where can we go?

Q So did these promises cover, for example, Palantir's financial information?

MR. HUESTON: Objection. Vague.

THE WITNESS: We -- most of my discussions with Marc were about product and how we can actually fully monetize it.
BY MR. SIMON:
Q Okay. Was there anything that wasn't covered by Mr. Abramowitz's promises of confidentiality?
MR. HUESTON: Objection. Vague. Otherwise calling for a legal conclusion.
THE WITNESS: I don't -- I think there's a significant legal aspect to the question you're asking.
I can tell you Marc was very adamant to me and I believe others that he was someone we could trust. And we relied on our perception and your perception that he's a sophisticated and intelligent person.
BY MR. SIMON:
Q Was -- was there anything that wasn't covered -- in terms of your understanding of your interactions with Mr. Abramowitz -- that wasn't covered by his promises of confidentiality?
A Well, I remind you, I'm not a legal officer; so this is much more of a friendship in the context of building a business relationship that was

both friendship and business. And I obviously relied on the legal department to specify the kind of questions you're asking.

But in the context of a normal discourse, one doesn't take out a contract and say one establishes -- he understood very well that we had crown jewels and that we did not want them exposed. And, honestly, it was beyond our comprehension that he would then, through an act of theft, try to patent them.

Doesn't really make...

Q Dr. Karp, you never asked Mr. Abramowitz to sign a written nondisclosure agreement. I understand that's not your role, and you didn't actually ask him to sign one; correct?

A It is my assumption that everyone who enters Palantir's building signs an NDA. So I was working under the assumption that he had signed one. I don't know. The legal department dealt with that. And -- but my -- my working assumption is that our legal department deals with that, and that everyone entering our building has signed an NDA.

Q So you never actually saw a written NDA prior to the time that this litigation began?

A Nor would I -- anyone expect me to see one.

We're a large and sophisticated business. Our legal department deals with that. I never -- I don't believe in the history of my being CEO I've ever asked a single person to show me the legal work that they've signed, under the assumption that we have a legal department.

Q Dr. Karp, if you assumed that there were written nondisclosure agreements whenever Mr. Abramowitz came into Palantir, why did you have all of these oral discussions about secrecy?

MR. HUESTON: Objection. Argumentative.

You can answer if you can.

THE WITNESS: Well, again, my assumption is that the legal department did its job. Most of these assertions didn't come from me; they came from Marc. So I would have to ask him, why was he asserting all the time that we could trust him?

I was working under the assumption that, as a sophisticated person and as someone who had affirmed that he understood the difference between broad conversations, theft, and the protection of our IP, that this was probably not the issue.

But, you know, unfortunately I was wrong, and -- you know, these were -- there was very -- Marc spent a lot of time explaining to us how much

he could -- we could trust him.
BY MR. SIMON:
Q Just so I understand, so you're in the hallway, you're in the lobby talking to Mr. Abramowitz about something, and he says to you, "I'm going to keep that secret"?
MR. HUESTON: Objection --
MR. SIMON: Have --
MR. HUESTON: -- argumentative and -- argumentative and misstates his testimony. And otherwise asked and answered repeatedly.
THE WITNESS: Should I answer?
BY MR. SIMON:
Q Yes.
A I'll give you -- I'll give you an example. The -- the underlying way in which Palantir's commercial -- government product, the technical way -- again, this is not classified, but it's sensitive -- it was certainly not understood. And this is why that product has no competition in the world. You have to rebuild the way a certain product, Lucene, is built so that you can index against the underlying data so you don't move the data, which is not allowed, but you can still put characteristics on top of the data so that you

can -- you can put a rules engine on top of it, and it can work according to societal or cultural or institutional norms, which makes it --

(Reporter interruption for clarification.)

THE WITNESS: Societal, cultural, or institutional norms.

So it makes it valuable in France; it makes it valuable in Denmark; it makes it equally valuable in America, which all are different legal structures and different customs.

And I -- you know, it was like -- and Marc -- Marc always had a way of basically saying, "I understand this is sensitive and that this is not the kind of thing that I would discuss."

And then, when you went -- we went to the oil and gas, health care, and cyber context, for whatever reason, the -- what we were building is -- is still not commonly understood a decade later. And so there were discussions about, "Hey, this is the kind of thing we don't want to say externally. This is the kind of thing we should say externally. These are -- this is the way we would show the product, but these are the parts of the product we're not going to expose. These are the things that are very difficult to build. These are the

things that are easy to build. We can expose the things that are easy to build, but maybe we shouldn't expose the things that are hard to build."

And no. It's like, you're framing our culture as if this is, like, a normal corporate culture. It's like the way Palantir works and part of our success is we have constant communication.

This is the secret of Silicon Valley.

So we're not sitting in a law firm, meeting in a formal context with an agenda. We're in ongoing discourse. Marc was part of that ongoing flow of discourse, absorbing our IP, trying to, we thought, help us further its monetization, and unfortunately at the same time stealing it.

BY MR. SIMON:

Q With respect to cyber insurance, what did you tell Mr. Abramowitz you wanted to say externally and what you didn't want to say externally?

MR. HUESTON: Objection. Compound. Vague. And then I think otherwise asked and answered.

THE WITNESS: We had -- cyber insurance basically came down to -- your -- it was -- Marc may not have quite understood the distinction that was cyber insurance and just general cyber.

Cyber insurance was a way of monetizing the

underlying technical problem we were trying to solve. So the underlying technical problem we were trying to solve was twofold: One, how do you do a diagnostic inside an enterprise where the -- the systems are disparate.

So what did we want to share externally? We wanted to share that there is a problem that you do not understand that there's a financial opportunity. And that we could solve this.

What we did not want to share externally is how exactly are we going to build our product, because this was nearly a decade before anyone understood this. So what exactly -- how exactly do you write the code? How do you implement the code? Under what conditions do you implement the code? How far along is our product? When will it be delivered? Under what conditions it could be delivered.

And, by the way, there was a second part of this which is kind of not -- is part of the way I believe Marc saw this, but may not have -- we were also looking very closely at what's called nexus peering.

Nexus peering is a product we built for the U.S. Special Forces, which allows you to -- to

disseminate data where you have high latency. High latency means that your product has to still work with essentially technical hiccups. It also -- but there's a time sequencing issue to nexus peering, which means the data -- the whole computer will crash because the time sequencing is not unified.

And we were thinking about how we could take this -- again, not classified, but very sensitive product and put it in the hands of commercial users so that they could share more sensitive data.

Obviously, as an example, we were not eager to explain the -- how -- how we used what's called a vector clock to build this. So if you understood how we're using the vector clock to build nexus peering, as a matter of theory, you could build that yourself.

So there were layer after layer after layer of things that -- you know. And there's business specificity. Like which -- who are we talking to? Under what conditions are we going to work with this client? How do we assess the client's technical capabilities? How do we assess our ability to actually help them?

These are all parts of very sensitive

MR. SIMON: I think we've been going a little more than an hour, and I'd like to take a short break, maybe ten minutes, come back on the record?

MR. HUESTON: Well, if you are insisting. This is, you know, an imposition on Dr. Karp's day; that's why it's only four hours. And we were prepared to keep going.

But if you need to take a break, I can't stop you. So --

MR. SIMON: Off the record.

THE VIDEOGRAPHER: We're off the record at 1:21 p.m.

(A recess was taken from 1:21 p.m. to 1:33 p.m.)

THE VIDEOGRAPHER: We are on the record at 1:33 p.m.

BY MR. SIMON:

Q Dr. Karp, showing you what is being marked as Exhibit 284. It's an email relating to a meeting that you had with Mr. Abramowitz on July 12th, 2014. I believe you testified about this in your last deposition.

Do you recall that?

A I don't recall what I said in my last

deposition, which I think was over a year ago, maybe a year and a half ago, two years ago. And I would need to read the email if you want me to comment on it.

(Whereupon, Exhibit 284 was marked for identification by the Court Reporter.)

BY MR. SIMON:

Q You can read it quickly and see if it refers to you meeting with Mr. Abramowitz on July 12th, 2014.

A He's writing to Kelly Maze, my assistant at the time. I'm not cc'd, but yes.

Q Okay. And you don't actually remember this meeting with Mr. Abramowitz; correct?

A I remember meeting with Marc regularly. I obviously don't remember each day, each time I met with Marc, partly because it was so frequent.

Q You don't remember what subjects were discussed at this meeting; correct?

A Well, as you --

MR. HUESTON: Objection. Foundation.

THE WITNESS: This meeting is eight years ago. I -- I do recall in general what I talked to Marc about; I do not remember specifically at each

meeting eight years ago what we discussed.

BY MR. SIMON:

Q So you don't recall what was discussed at this meeting; correct?

MR. HUESTON: Objection. Asked and answered.

THE WITNESS: I know the subject matters we often discussed. I do not recall what we discussed eight years ago in July.

BY MR. SIMON:

Q And you did often meet on personal matters as well as Palantir business matters; correct?

A Marc was a friend, and we did, we met on personal -- we met personally. He was a friend. He lived in the neighborhood, and there was a friendship.

Q On or after July 12th, 2014, did you personally disclose any proprietary or confidential Palantir information to Mr. Abramowitz?

A Again, we're talking about hundreds of meetings over years. I continued to disclose sensitive things to Marc really up until our relationship was damaged by my -- the suspicion we began to have that he might have been involved in stealing our IP.

So, you know, this I think is 2014. So, you know, I didn't -- I wasn't aware of -- of real proof that he was involved in theft. So I'm sure that I was continuing to share very sensitive things, including blueprints, and very sensitive ideas about our product and our business strategies with Marc.

BY MR. SIMON:

Q Can you identify any specific information that you disclosed to Mr. Abramowitz on or after July 12th, 2014?

A Well, I would have talked to him in detail about, again, what we called, I believe, Horsepower.

I would have talked to him in detail about how we were planning to rebuild the nexus peering architecture for cyber.

I would have talked to him about how we believed we could take the rebuild of Lucene in the context of what we called Project Gotham to use in oil and gas.

I would have talked to him about how you can under- -- you can better understand the cost of -- of customer care in health care.

I would have talked to him about how you could better understand the -- doing diagnostics and

research in the context of -- of building biometric bioIP; so therapeutics.

I would have talked to him about how our product is used with clandestine clients, not the classified things, to which I don't have access to, but the sensitive parts about our product, which are sensitive and not classified.

I would have talked to him about general business strategies in software.

I would have talked to him about specific countries we were thinking of working in.

I would have talked to him about the assessment of our clients, which is also very sensitive because it's not always positive.

And many, many, many more things.

Q You say you would have.

A I did.

Q Do you remember -- you did?

A Yes.

Q And -- and you're absolutely certain that that was after July 12th, 2014, and not before July 12th, 2014?

A No. I would say I'm absolutely certain that, from the time I met him until the time we stopped talking, I talked in detail about just a few

of the things I'm discussing, but other things, and that this is eight to ten years back.

The reason why I vividly remember it is because the IP is IP that I and Palantirians have been working on every day for the last two decades. And that's why I remember these discussions vividly.

Q I'm sorry, you remember vividly discussions after July 12th, 2014, with Mr. Abramowitz?

MR. HUESTON: Objection. Misstates his testimony. Otherwise asked and answered.

THE WITNESS: I remember vividly having ongoing discussions with Marc about the blueprints that made -- that powered and continue to power Palantir over a long period of time.

So do I remember what I discussed with him on July 12th, 2014? Of course not.

Do I remember what I discussed him in the range of that time, the kind of subject matter, what I was exposing to him, the reps he made that we could trust him? Yes, I remember that.

BY MR. SIMON:

Q Identify any specific information that you disclosed to Mr. Abramowitz on or after July 12th, 2014?

MR. HUESTON: Objection. Asked and

answered.

THE WITNESS: Well, again, I don't want to waste you or the Court's time, but I'm happy to tell you more about Horsepower. I'm happy to tell you more about nexus peering, I'm happy to tell you about how to underwrite the cost of care. I can tell you more about how -- what -- some of the technical issues that we exposed to him about doing research in the health care context, about oil and gas, about various clients.

But those are the kind of topics I talked to him in detail in the context of our trusting relationship and under the assumption that he would guard our crown jewels.

BY MR. SIMON:

Q I'm trying to, though, understand, do you know for a fact what, if anything, in the way of Palantir's confidentiality or proprietary information you disclosed to Mr. Abramowitz on or after July 12th, 2014?

MR. HUESTON: Objection. Asked and answered.

THE WITNESS: Again, over the context of what I -- amounts to nearly a decade, I met with Marc regularly, and we -- and before and after this

date. And I know that, until I was forced to unfortunately break off contact with him because of my assumption that there might be something wrong, that later proved unfortunately to be true, I shared with him enormous -- in enormous specificity our IP, our blueprints, and he shared with us and me and not just me his intention to guard these crown jewels.

BY MR. SIMON:

Q Was there anybody present when you made any disclosures to Mr. Abramowitz on or after July 12th, 2014?

A Well, again, you're asking a specific date. But in that period I handed Marc -- I introduced Marc to -- among the more valuable people in our company. And at nearly every handoff, I gave another introduction of the kinds of things that Marc could and could not help us with and instructed people to really explain to him how this kind of company is built.

Those --

(Reporter interruption for clarification.)

THE WITNESS: Those blueprints are our crown jewels. And I spent -- not just alone, but with people -- I assume that, you know, people at Palantir who are also -- you know, were witnesses to

me saying this.

BY MR. SIMON:

Q Who did you introduce Mr. Abramowitz to on or after July 12th, 2014?

A Well, again, I'm not asserting what -- you're picking a date eight years ago and asking, you know, did it -- what happened on this date.

And what I'm asserting is I don't know what happened on that particular date, but I do know I introduced him to Shyam -- I reintroduced Shyam, Kevin, this guy Miles; I think last name was Seiver. There was a woman running our health care work whose name escapes me.

These were very important people at Palantir, and I introduced and reintroduced Marc to these people in that time range. I'm not asserting I know exactly what I did on July 12th, 2014, the day before, the month before or after.

I am not asserting but saying that I met with Marc -- testifying that I met with Marc regularly, and I explained these issues, not -- and then, when I reintroduced him to people at Palantir, I continued to explain how Marc could help us and the sensitivities of our work.

Q I wasn't just asking about July 12th; I was

asking any time on or after that date.

And is it your testimony that you introduced Mr. Abramowitz to people at Palantir on or after July 12th, 2014?

MR. HUESTON: Asked and answered.

THE WITNESS: It's my testimony that, a time frame that is almost a decade, I introduced and reintroduced Marc to the most important people at Palantir, and re- and re- -- and introduced and reintroduced the ideas and blueprints that were our crown jewels.

BY MR. SIMON:

Q Dr. Karp, you are aware that Mr. Abramowitz had an interest in the health care area; correct?

MR. HUESTON: Objection. Vague.

THE WITNESS: I'm aware that I directed Marc to work in the area of health care on the back of our blueprints and IP.

BY MR. SIMON:

Q You're aware that Mr. Abramowitz was interested in drug development; correct?

A Well --

MR. HUESTON: Objection. Vague.

THE WITNESS: -- in particular, I asked Marc to work on -- the clinical studies involving

drug development include important technical issues that we believed we could solve at the time. And because of that, I was directing Marc to investigate this with our ideas and gathering his inputs in order to accelerate that work.

BY MR. SIMON:

Q You knew that Mr. Abramowitz had run a medical devices company, didn't you?

A I knew that Marc was a sophisticated investor and had a lot of experience in business. I know he was involved investing in a company in Sweden.

I don't remember -- what I remember is that Marc had a lot of business experience, and that's part of the reason why we thought working with him would be valuable and part of the reason why we of course believed he could assimilate the somewhat technical material and help give us -- and help us in dissemination of those -- of our products to more conventional companies.

I don't, though, remember the specific -- specificities of his business interests.

Q And Mr. Abramowitz tried to introduce [redacted] to Palantir, didn't he?

A I don't recall whether Marc introduced us

to [redacted]. There are two [redacted] [redacted].

[redacted] which is a customer now, was not somebody that Marc introduced us to definitively.

We did do a meeting with the [redacted], or it's -- they're separate companies because they were split after the war. I don't recall if Marc introduced us, but I do recall asking Marc, "Can you help us in -- help us monetize our IP?"

Because the underlying issue in clinical development is the data sources are not normalized; so seeing -- getting patient data from one sample and then comparing it to another is not accurate. You actually have to normalize the data across data silos, both structured and unstructured. This looked to be isomorphic to what we had done in the intel community. I explained that to Marc.

And we did do a meeting at the [redacted] I don't remember that Marc -- if Marc set it up. He may have; so I'm not disputing that. But I just don't recall.

Q Mr. Abramowitz also suggested that Palantir approach Roche in 2011, didn't he?

MR. HUESTON: Objection. Vague.

THE WITNESS: You know, I don't -- there -- there are different kinds of suggestions that come from advisors. You know, there are only a limited number of companies. So whether Marc inter- -- suggested we talk to Roche or not, it's -- obviously, we know the leading companies in the world.

I don't remember Marc being involved in our initial and unfruitful discussions with Roche. I don't think he was involved because I believe I met the CEO at a conference.

But it's entirely possible in the context of Marc working at the behest of Palantir that he made suggestions. And that's -- that's very normal for a -- a kind of context of trusted advisor in a company.

(Reporter interruption for clarification.)

MR. SIMON: Yes.

Q Could you refresh your "Marked Exhibits" folder. Show you what's been previously marked as Exhibit 136.

(Whereupon, Exhibit 136 was previously marked for identification by the Court Reporter.)

THE WITNESS: Yes, I have it. But just a minute. This is the -- 136 is -- is the same one we just went over, Marc Abramowitz to Kelly Maze?

MR. HUESTON: I think -- go ahead and just open it and wait for a question.

Exhibit 136, previously marked.

Mr. Simon, you're on mute. I don't know if that's intentional.

MR. SIMON: I'm trying to get Exhibit 136 brought up.

MR. HUESTON: Okay.

BY MR. SIMON:

Q Okay. Should be in your file now, Exhibit 136. It's an email between Mr. Abramowitz and John Amos in 2011. You're not copied on this --

MR. HUESTON: Hold on. I have to say, give me a moment 'cause my 136 was the prior, and now I see a new 136, John Amos. So give me a second.

Okay, now I have it.

Do you have it, Dr. Karp?

THE WITNESS: I believe it's from Marc Abramowitz to John Amos.

MR. HUESTON: All right. We're on the same one.

Okay, thank you.

BY MR. SIMON:

Q Okay. The last email, dated September 20th, 2011, Mr. Abramowitz writes to Mr. Amos.

By the way, do you know who Mr. Amos is?

A It sounds very familiar, but -- if you told me what he does, I might recollect it, but --

Q Later do you recall dealing with him in connection with a potential deal with ORIX?

A I remember -- if ORIX is a company in Texas, then I remember -- I remember going to Texas after discussing with Marc and him explaining why it might be valuable and then agreeing it might be valuable in going there.

I'm not sure that this is the same thing, but I do recollect that.

Q I think -- believe this is before Mr. Amos is with ORIX.

But in the last email, Mr. Abramowitz writes (as read):

> I have been after Palantir for years for using Palantir for drug development and management of R & D with multi locations like [redacted].

You -- that was the case, wasn't it, that

Mr. Abramowitz was after you to try to get -- to get Palantir involved in drug development and management of R & D?

A Well, Barry, as you know, I have to just review the email quickly before I can comment, but I'll take -- do it very quickly so as not to waste your time.

Q These emails that I'm referring to is the last email on the page.

A Oh, I see. At the end where Marc writes to John Amos where I'm not cc'd, okay.

MR. HUESTON: Dr. Karp, yeah, just read it to yourself and just let him know when you're ready for a question.

THE WITNESS: I'm ready.

BY MR. SIMON:

Q Yes. Had Mr. Abramowitz been after you for years to use Palantir for drug development and management of R & D?

MR. HUESTON: Objection. Vague and also compound.

THE WITNESS: I mean, first of all, I can't really speculate on this -- Marc's relationship with Amos. I -- I can tell you I explained to Marc over a number of years how our product could be used in

health care. I've already explained in some detail how that would work. I explained it to Marc, and I asked Marc at our behest to help us find clients.

I can't speculate as to why -- what Marc is saying here, but obviously in the context of his business development efforts, I don't know.

But I do know that the IP or the blueprints for how to do this in really two contexts: One is normalizing a data across datasets so that you can do clinical research more effectively, and the other, pricing the cost of health care, were things that we explained to Marc in great detail.

BY MR. SIMON:

Q Mr. Abramowitz went on to say (as read):

I've been told by CEO that if we have serious capital to pay for development and use of engineers, they will consider.

See where he says that?

MR. HUESTON: Objection -- objection. Foundation.

THE WITNESS: I don't know how to answer this, because this is Marc writing to someone in 2011 where I'm not cc'd. So I -- I'm a --

///

BY MR. SIMON:

Q Well, did you have such conversation with Mr. Abramowitz?

MR. HUESTON: Objection. Vague.

THE WITNESS: I can only repeat what I've already testified to, which is that I explained how our software could be used in this context; I asked Marc; and Marc agreed to help us as an advisor, a trusted advisor in helping to monetize our IP.

I believed as a sophisticated investor he understood the difference between helping us monetize our IP and stealing the IP, and -- and I can't comment on what he was saying where I'm not involved in any way 11 years ago.

BY MR. SIMON:

Q Just for a little context, before 2011 Palantir only had a total of $55 million of revenue during its entire prior existence; correct?

A I mean, you'd have to talk to our finance department. I don't think that's actually true. Because, it's like it was like -- bookings 30 -- 33 -- 60 -- I don't think those numbers are right.

But -- and as a point of reference, in the history of Palantir, roughly, which also could provide the numbers here, we have done about

6 billion in revenue. So -- just under.
So the IP we're discussing now, parts of it have generated -- whatever one thinks the value of the company -- more than $5 billion in revenue.
But we -- obviously, the exact numbers, I don't think you have the exact numbers right, but I'm not disputing. I think -- I thinks that's actually -- I think the figure is significantly higher.
Q Is it true that prior to 2011 Palantir had only spent a total of $56 million on R & D over its entire history?
MR. HUESTON: Objection. Foundation.
THE WITNESS: You know, a lot -- you should -- we really have to talk to our finance department. A lot depends on how you calculate R & D. In reality, the whole company was an R & D company, and I would personally view every expenditure that involved --
(Reporter interruption for clarification.)
THE WITNESS: I'm sorry. -- software developers as part of R & D.
What is an indisputable fact is what we built, whatever the numbers you want to take, turned into one of the largest, most important companies in

the world.
BY MR. SIMON:
Q So, given the context, back before 2011, isn't it the case that you wanted somebody, for example, interested in health care to fund specifically engineers to work on it?
MR. HUESTON: Objection. Vague.
THE WITNESS: In general, that's just not how we think about -- how we thought about building Palantir. We sought investors to invest in core Palantir, and we were in charge of deciding how to invest in the products we were building. So I don't -- I don't think that's accurate.
MR. SIMON: Tab 10.
Q Dr. Karp, if you can refresh your "Marked Exhibits" folder, this will be Exhibit 285.
(Whereupon, Exhibit 285 was marked for identification by the Court Reporter.)
THE WITNESS: I don't have a 285. I have a "Please Delete." Is that --
MR. HUESTON: Look right above "Please Delete." Do you see a 285?
THE WITNESS: It's 284. Oh, now it's 285. I have it.

A "Was great to see you" -- "we're excited" -- "please let us" -- oh, I see. Okay. That's -- that's what Laura -- and I think she pronounced her name "Shapiro," actually, but it is -- does look like it would be Chaparro -- but, again, so that is what she wrote.

Q Okay. That was a logical question for her to ask; right?

A Meaning you're asking me to speculate on an email from eight years ago where I'm in cc.

Q Okay.

A I don't know if it's logical.

Q "Where does ORIX see our technology fitting in?"

That's the basic question; correct?

MR. HUESTON: Objection. Misstates the document. Argumentative.

THE WITNESS: Yeah. You're -- you're restating the document. It is very plausible that Marc was sending over suggestions. He -- it's also the case that we were in the business of evaluating those suggestions with our ideas, ideas built upon -- by this time -- and he said 167 -- -76 million dollars in revenue.

All of that -- I mean, that was built from

2008 to 2014. So that's a pretty significant ramp based on IP that we had built from 2004. So it's building upon deep-rooted technology.

And obviously we had a lot of insights about what could work and what couldn't. And, as a trusted adviser, it was Marc's role to send things over the transom that we could evaluate.

BY MR. SIMON:

Q Dr. Karp, you constantly talk about the growth of Palantir since the events in the case.

MR. HUESTON: Objection. That mischaracterizes his testimony.

BY MR. SIMON:

Q Did the -- did the existence of Mr. Abramowitz's patent applications prevent that growth from taking place?

MR. HUESTON: Objection. Foundation. Misstates his testimony. And compound.

THE WITNESS: And also social-scientifically impossible to answer. You would need a counterfactual.

But it was very disturbing to us to find out that someone we trusted dearly was involved in theft, and that was damaging to Palantir.

///

BY MR. SIMON:

Q Okay. How was it damaging to Palantir?

MR. HUESTON: I'm sorry, I couldn't hear the question.

BY MR. SIMON:

Q How was it damaging to Palantir?

MR. HUESTON: Objection --

THE WITNESS: Because we --

MR. HUESTON: -- vague. Overbroad. And otherwise calls for a legal conclusion.

You can answer if you can.

THE WITNESS: We have a trusted advisor, someone we worked with for years, who we educated and taught about IP, we taught about how -- we've taught him how software works at a time when no one had any inkling of how this could work, who ingratiated himself into Palantir and moved to Palo Alto, spent lots of time cultivating our -- his relationship with us, and, lo and behold, the whole time he's taking our IP and -- which he doesn't understand but could copy basically -- and -- and engaging in theft. And that was very damaging for Palantir.

Also, I think there is a -- a way in which having someone in your company who you've misjudged

is -- is damaging for our general reputation. And I think that was damaging for Palantir. And -- and -- and we at Palantir feel like it was a grave injustice.

BY MR. SIMON:

Q Dr. Karp, do you recall any conversations you had with Ms. Chaparro about her interactions with Mr. Abramowitz?

A Well, Lauren at the time was heading up our -- our health care outreach, and I remember introducing Marc to Lauren. And in that context, I remember talking to them both about the health care opportunities and how in research -- especially in research, meaning how you could make clinical studies more accurate, help their efficacy, essentially, both in terms of speed and in terms of accuracy.

And I think Lauren touched on the [redacted] deployment as well, although I'm less certain of that, but -- which was involved in -- in figuring out the actual costs of health care.

But -- and I remember introducing Marc and being involved around the office when they were talking, when I was talking to Marc.

Q Do you remember any of the conversations

you had with Ms. Chaparro about Mr. Abramowitz?
A Well, again, I -- I remember their -- introducing them, and I remember going through the basis of our IP, why I thought this was valuable and why I thought Lauren should engage with him.
And that required explanation. You know, Marc was --
MR. HUESTON: Let him finish his answer.
No, finish your answer, Dr. Karp.
THE WITNESS: Marc is a sophisticated investor, a very smart person, but obviously a person at a software company would want to know, well, how is somebody who has minimal understanding of software going to help us? And that's something that I explained to the people that I introduced Marc to.
BY MR. SIMON:
Q I'm sorry. So what did you say to Ms. Chaparro about that?
MR. HUESTON: Objection. Asked and answered.
THE WITNESS: Should I answer?
MR. HUESTON: If you can.
THE WITNESS: Sure.
So, if you take just the two examples that

we've discussed -- I didn't want to go into too much detail on it because of the time limits -- but in research and development, you have datasets that are disparate; they're not normalized; there's a question of can they be normalized; the kind of software you would need to normalize them; what parts of Palantir's IP would work there; what parts would need to be built; is there a market fit to what we have and what we built?

Very different, actually, set of issues around actually figuring out the underlying cost of health care. You have patients with different health outcomes; it's not clear if you can change the outcomes and the cost by intervening in different ways at different times.

Those are questions that we were passionate -- still are passionate about, and I introduced Marc to Lauren and explained those issues to Marc, and then explained to Laura how Marc could help us.

BY MR. SIMON:

Q Did you have any conversations with Casey Ketterling?

MR. HUESTON: Objection. Vague as to time.

///

BY MR. SIMON:
Q About the same time.
A I don't recall talking to Casey. Very -- very possible I did. But, again, this is -- Lauren played a bigger role, or at least a role that -- where I interacted with her. And I don't really -- I don't remember, you know, eight years ago talking to Casey.
Q But you do remember eight years ago talking to Ms. Chaparro?
A Yeah, because she was leading these efforts.
MR. SIMON: Tab 24.
Q Dr. Karp, I show you what's being marked as Exhibit 290.
(Whereupon, Exhibit 290 was marked for identification by the Court Reporter.)
BY MR. SIMON:
Q Have you had a chance to review that, Dr. Karp?
A No. But I will take the opportunity if you so afford it to me.
Q I'm going to ask a question; so why don't you review it.

A Okay. I have reviewed it very quickly.
Q This is an exchange between Mr. Abramowitz and Ms. Chaparro in February of 2014, copied to you and Mr. Kawasaki; correct?
A Yes.
Q And Mr. Abramowitz is raising the issue of whether Palantir will be interested in Code-n, the company; correct?
A In the email at the end, the last email, he references Code-n.
Q And he actually says to Ms. Chaparro and copy to you (as read):

Company's backed by some serious investors and me.

So he's making clear that he actually has an interest in Code-n; correct?
MR. HUESTON: Objection. Misstates the document.
THE WITNESS: Where -- where is that?
BY MR. SIMON:
Q The middle email. (As read):

Lauren, this company is backed by some serious investors (and me).

A That's what he writes.
Q (As read):

Seems a pretty good use case for
Palantir.
Correct?
A That's what he writes.
Q Says (as read):
Do you want me to pursue for us
or make an intro?
Right?
A He asks if he should pursue it for us, yes.
Q And Ms. Chaparro responds (as read):
We have been taking a look at
their product, and there's some
interesting overlap between our
workflows and their offering.
Correct?
A Again, I -- I don't recall this email; I'm just reading along with you. But that is what is written.
Q Well, did you have any conversation with Mr. Abramowitz about concerns that he had an investment in a potential competitor?
A My reading of this email is he asks "pursue for us," and then she responds "we."
So, you know, there's a we-us nexus which I think underscores confidentiality, IP, trust,

because of us; sometimes they don't happen because of them.

This is eight years ago. I don't know why a deal wasn't reached. I know that there was no deal.

Q Mr. Amos did open up a relationship between Palantir and [redacted]; correct?

A Well, we --

MR. HUESTON: Objection. Vague.

THE WITNESS: Should I answer?

MR. HUESTON: If you can.

THE WITNESS: We work with [redacted]. I'm pretty sure the relationship with [redacted] went through one of our large German clients. It's certainly possible -- again, I -- as I've mentioned, I don't have a clear notion of what our relationship is with Mr. -- ORIX, but -- or Amos, but we do work with [redacted]. It's possible he's one of the many people introduced us there.

My recollection is the primary driver of that was one of our large European clients that uses our product in the area of research and development precisely because of the attributes that make it so special and valuable, the attributes which your client attempted to steal.

BY MR. SIMON:
Q Isn't it true that Palantir went back to MD Anderson after Mr. Amos had made the introduction and after the deal with ORIX had fallen through?
MR. HUESTON: Objection. There's no established foundation for the question. It's also otherwise compound.
THE WITNESS: Yeah. I don't -- as I've mentioned to you, and I'm happy to repeat, but for the record, it is on your clock for me to repeat this and repeat this -- very happy to do it -- I don't have a crisp re- -- memory of the -- of the exact specificities of what we did with ORIX or Mr. Amos.
I do know that at some point past this we ended up being introduced to them -- the relevant introduction, in -- according to my recollection -- again, this is a large and sophisticated company -- went through one of our large European clients. And because of the -- the product development we had done and their utilization of it, they were a particularly good reference, and that has tracked into a very important part of U.S. medical research.
BY MR. SIMON:
Q Dr. Karp, did you have any discussions with

Bippy Siegal about the oil and gas exploration area?

A Not to my recollection. To my recollection, I've never -- I don't believe I've ever met Bippy Siegal. Marc has mentioned him as a friend of his and mentioned him often as someone who knows a lot about oil and gas, but I don't believe I've ever met him.

Q Did you have any discussions with Mr. Abramowitz about his background investing in oil and gas?

A Well, I spent a lot of time explaining to Marc how software would be relevant, how our product would be relevant in oil and gas, a product that now powers a multibillion-dollar contract with [redacted]

And in that context, I remember him not so much mentioning his insights into oil and gas, but referencing one of his closest friends was an expert in this area. And I think he recalls -- he calls him Bippy, not Bibby. But -- something like Bippy Siegal. Yeah.

Q Dr. Karp, who is Tyler Scriven?

A Tyler used to work at Palantir. I don't remember exactly when he left, but if I had to guess, like, 2017, 2018. Worked closely with Shyam.

Q Were you aware that Mr. Abramowitz was with

Mr. Scriven on a trip to Israel to explore possible acqui-hires in 2014?
A I was not aware of that.
Q So you didn't have any conversations with Mr. Abramowitz with respect to that trip?
A Or I don't recall any. I mean, again, this is eight years ago. I don't -- I don't -- it's very possible. I mean, again, it's eight years ago. I don't -- I don't recall. I don't recall him --
Q And you don't recall any conversations with Mr. Abramowitz about those efforts?
A No.
Q The -- did you have any discussion with Mr. Scriven about Mr. Abramowitz's role in connection with that trip?
A Not that I recall. I knew -- I knew Tyler. So I knew Tyler, but it wasn't -- he was not someone I talked to super regularly. He -- I would run into him in the halls, we would talk. He worked directly for Shyam and did a lot of work with Shyam.
Q Did you have discussions with anyone about that trip that you can recall?
A No.
Q Did you ever personally authorize Mr. Abramowitz to commit Palantir to pay the travel

or other expenses of any potential business partner or customer or acqui-hire?

A Well, again, you're now getting into the area of common practice in the business. It's a common practice of Palantir that people who work at Palantir as advisors or employees or however you want to define it in legal terms had certain obligations; ones you're well aware of that were very aware well --

(Reporter interruption for clarification.)

THE WITNESS: Like fiduciary obligations, but also that Palantir had certain obligations in return in the context of that relationship, paying normal and understandable business expenses.

I was not involved in that, though I would expect, given that Marc was a trusted advisor to Palantir, that he would have -- you know, he may have submitted business expenses, but I obviously would not be involved in that.

BY MR. SIMON:

Q Okay. And is it fair to say that -- well, did anyone ever tell you that Palantir was obligated to pay them anything because of a commitment made by Mr. Abramowitz?

MR. HUESTON: Objection. Vague.

going on here. Obviously, you would think it's weird too if somebody who, without a law degree, was patenting your law degree. So it just seemed very odd.

And then obviously, given how much I cared and trusted Marc, I wanted to give him the benefit of the doubt. At some point we found out that, you know, there was -- unfortunately what happened, happened.

Q Did you ever ask Mr. Abramowitz about his cyber insurance patent application?

A I never had reason to ask Marc about his theft, the same way you wouldn't ask the robber about stealing your -- your silverware.

I -- I gave Marc, in this case the person who stole our IP, the benefit of the doubt to the very last minute, because I cared about him. And at the -- at the point where it was impossible to give him the benefit of the doubt, we had to let the chips fall where they may fall, which is why we're here.

Q Okay. Were you aware in September 2014 that Mr. Abramowitz was filing a cyber insurance patent?

MR. HUESTON: Objection. Vague. Otherwise

calls for a legal conclusion.

THE WITNESS: I'm not a lawyer, but it is blatantly odd that somebody who is not involved in software, who did not study software engineering, who has never built a software company, who quite plainly has no understanding of software issues would file a patent.

So I have -- I would have no reason to suspect that Marc would file a patent application. He knows nothing about software. It's like -- it is the most ridiculous thing.

It's like you have this person who is very smart, obviously brazen, he knows nothing about software -- I think would admit knows nothing about software. I don't even know how you file a patent if you're Marc. Like, what is the basis of your patent? Your knowledge of software works? So what lets you build the software? How do you take it apart? I'm not sure Marc could actually describe what is in this patent if asked.

And so why would I come up with the idea that Marc is going -- it would be like me patenting how to -- I don't know -- how to do -- how to build a flying saucer. No one expects it. I was not expecting it.

Honestly, I was quite surprised when I heard it, and in disbelief. Because a smart person doesn't usually patent something they know nothing about, for very obvious reasons: Eventually someone is going to ask you, what is in this patent? Why do you think it's in this patent? Why does software work this way? Under what conditions?

What are Marc's answers going to be to that? I divined it from the heavens?

I don't know, but I know that -- I know where it came from, as will everyone when this goes to a jury, which is that it came from us; they are our trade secrets. I explained to these -- these to Marc as trade secrets. He violated my friendship. He violated the trust of Palantir. And I gave him the benefit to the very last minute because I trusted him and we trusted him.

BY MR. SIMON:

Q I'm sorry, you told Mr. Abramowitz that certain things were trade secrets?

A I told Marc that these were our crown jewels. I told Marc that -- Marc that these were very valuable secrets. Marc acknowledged that these were our crown jewels. Marc acknowledges over innumerable interactions that he would show

discretion.

And, by the way, I don't -- you know, the insinuation of your question is that Marc is somehow not sophisticated or smart enough to realize he knows nothing about software and there were our trade secrets. Maybe you can convince a jury of that. We will see.

I think that's a very, very hard claim to Marc -- to make, especially since Marc is going to have to explain, where did you learn this? How did you learn this? How does -- how do you rebuild Lucene? Why would you rebuild Lucene? Under what conditions would you rebuild Lucene? Why would you implement it this way? Why would you not implement it? What kind of limitations are there on software in an oil and gas exploration context that are not in a health care context? What is the difference between software used in -- in each one of these three contexts? What IP is missing? Under what conditions should you develop it? Where did you divine these things that later went on to -- to lead to a multibillion dollar company?

There's a very simple answer: We taught it to Marc. Marc is a very sophisticated person. Nobody is going to believe that Marc did not

understand that these were trade secrets. No one is going to believe that Marc developed this himself. And we will leave this to experts and the court of law to decide if someone can believe that.

We don't believe it, and that's why we're pursuing this case.

Q You actually haven't -- again, you have said you have never seen the patent applications; correct?

A I have never seen the patent applications, but I know where they came from.

Q Who is Ryan Taylor?

A Ryan Taylor is one of our senior leaders in the legal -- on the legal team. He now is the chief legal officer at Palantir.

Q In 2014 he was on your staff; correct?

A I mean -- yes. I mean, Palantir has floating roles, and I worked closely with -- with Ryan very productively for I guess around a decade.

Q Didn't you instruct Mr. Taylor in September 2014 to meet with Mr. Abramowitz and obtain information about the cyber insurance patent?

A I don't recall the exact --

MR. HUESTON: Okay, I'm -- I'm going to object. I'm going to make sure you just don't

disclose actual communications.

THE WITNESS: Okay. Well, it's -- I have an ongoing discussion with Ryan as -- as a head of our legal team, maybe there's not much else I can say, according to my lawyer.

MR. HUESTON: I think you can -- what you -- if it's an action, you can say "yes" or "no" --

THE WITNESS: I -- I -- there were rumblings, and I believe they came to me from Gavin, but it might have been Ryan -- it was Gavin or Ryan -- there was something -- just a general feeling that something was amiss with Marc.

The question was raised, "Hey, Marc, are you doing anything with our IP, broadly speaking?" Again, this is, you know, eight years ago.

The normal answer of somebody who is a trusted advisor who is also not technical would be, "Of course there's nothing going with the IP. I'm not a software engineer. How could I file a patent? And, by the way, I'm your trusted advisor, and I would never do anything that would violate your trust/I'm also a smart person. No one would ever believe I wrote these patents."

That was not Marc's answer. Marc's answer

STATE OF CALIFORNIA )
COUNTY OF RIVERSIDE ) ss.

I, Paula A. Pyburn, CSR No. 7304, RPR, CLR, in and for the State of California, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given.

Before completion of the deposition, review of the transcript [ ] was [xx] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated: February 15, 2022.

Paula A. Pyburn, RPR, CLR
CSR No. 7304
Certified Shorthand
Reporter for the
State of California

# EXHIBIT 2

HOFFMANN EITLE

Translation of Response to the Complaint as filed at the Regional Court Munich I on 20 Nov. 2019.

HE File: 208 748
**Court Docket:** 21 O 11054/18

# Response to the Complaint

**Palantir Technologies, Inc.**
(Freshfields Bruckhaus Deringer)

**– Plaintiff –**

versus

**Marc L. Abramowitz**
(Hoffmann Eitle)

**– Defendant –**

we would like to thank the Court for the granted extension of the time limit and are responding on behalf of Defendant to the complaint dated 6 August 2018:

# Requests

We **request**

I. that the action be dismissed;

II. that the costs of the lawsuit be imposed on Plaintiff;

III. that Plaintiff be ordered, within a time limit to be set by the Court, to provide Defendant with an appropriate cost security pursuant to Sec. 110 German Code of Civil Procedure, the amount of which must not be less than EUR 2,846,175.30; and

IV. that, if Plaintiff fails to provide the cost security in due time, the action be declared to be withdrawn pursuant to Sec. 113 German Code of Civil Procedure.

We herewith moreover announce that Patent Attorney Dr. Georg Siegert and all other patent attorneys of the law firm Hoffmann Eitle will be collaborating in this case.

HOFFMANN EITLE

# Grounds


**1. Introduction and Setting Out the Context .................... 4**
1.1 Summary .................... 4
1.2 Defendant's Patent Applications .................... 6
1.3 Parties to the Lawsuit and Background .................... 7
1.3.1 Plaintiff .................... 7
1.3.2 Defendant .................... 8
1.3.3 Relationship Between the Parties .................... 8
1.3.4 Defendant's Inventions .................... 9
1.3.5 Exploring Cyber-insurances Opportunities .................... 9
1.3.6 Disputes Between the Parties – the Bigger Picture .................... 10
1.3.7 The US Proceedings .................... 11
**2. Lack of Patentability of the Applications in Suit .................... 13**
2.1 Non-technical Features and their Consequences for Patentability .................... 14
2.1.1 German Patent Act .................... 14
2.1.2 EPC .................... 15
2.1.3 Conclusion .................... 17
2.2 The Teachings of the Applications in Suit .................... 18
2.2.1 Patent Application WO'919 .................... 18
*2.2.1.1 Claims .................... 18*
*2.2.1.2 Assessment .................... 18*
2.2.2 Patent Application WO'049 .................... 20
*2.2.2.1 Claims .................... 20*
*2.2.2.2 Assessment .................... 21*
2.3 Patentability Over the Prior Art .................... 23
**3. No Legal Interest in Declaratory Relief .................... 23**
3.1 Request 1) .................... 24
3.1.1 Requirements for Legal Interest in Declaratory Relief Are Not Given .................... 24
3.1.2 G 3/92 Cannot Justify the Legal Interest in Declaratory Relief .................... 24
*3.1.2.1 Plaintiff Is Not Entitled to a Right to a New Application of the Applications in Suit .................... 25*
*3.1.2.2 Board of Appeal Presupposes Case-Specific Assessment by National Court .................... 28*
*3.1.2.3 Priority Cannot Be Claimed by Mere Co-Owner .................... 30*
3.2 Requests for Declaratory Relief 2) and 3) .................... 30
**4. No Legitimate Interest in Filing a Legal Action due to Tardiness .................... 31**
**5. The Requests for Declaratory Relief Are Unsubstantiated .................... 35**
5.1 Applicable Law .................... 35
5.2 Patentability Is Relevant for All Requests .................... 36
5.3 No Communication of a Finished Invention .................... 38
5.4 The Submission Does Not Meet the Requirements of Case Law .................... 41
5.5 No Entitlement to the Right .................... 41
**6. International and Local Jurisdiction .................... 42**
6.1 No Jurisdiction Based on Protocol on Recognition .................... 42
6.2 No Jurisdiction Under the General Rules .................... 42
**7. Value in Dispute .................... 43**
**8. Cost Security .................... 44**

## 1. Introduction and Setting Out the Context

### 1.1 Summary

1 The action is to be rejected in all points. Already due to evident lack of patentability of the Applications in Suit and Plaintiff's tardiness (**section 2**) are here the necessary legal interest in declaratory relief (**section 3**) and the legal interest in filing a legal action (**section 4**) missing. Furthermore, the requests are unfounded (**section 5**). In addition, the international and local jurisdiction of the court is lacking for all requests (**section 6**). The statements on the value in dispute are unsubstantiated and obviously exaggerated (**section 7**). In any case, a further handling of the complaint is to be set aside until Plaintiff has provided the necessary cost security (**section 8**).

2 Since the end of 2016, Plaintiff has been filing legal actions against Defendant, initially in the USA and now also internationally. Defendant has been one of the first investors in Plaintiff and has financially and personally supported Plaintiff for about a decade. Upon *inter alia* Plaintiff's repeated attempts to interfere with Defendant's sales of Palantir shares to third parties, in August 2016 Defendant requested Plaintiff through his attorneys to be given access to business records in order to investigate this and potentially further wrongdoing on the part of Plaintiff.

3 Plaintiff reacted quickly and vehemently, *inter alia*, by filing an action at the Superior Court of the State of California on 1 September 2016, in which it alleges that Defendant had stolen trade secrets. On the merits, this allegation is the same as that forming the basis for the present proceedings, just in different legal clothing. This is an ancient allegation. The facts of the case had been known to Plaintiff since October 2014. Defendant, with whom Plaintiff had wanted to work with in establishing a cyber-insurance business in a later to be defined manner, had informed Plaintiff of his priority application before filing it and in fact offered to disclose it subject to a confidentiality agreement. In April/May 2015, in a heated telephone conversation, Plaintiff's CEO , Alexander Karp, accused Defendant of misappropriating trade secrets. Defendant, who regarded this conversation as erratic and irrational, decided to withdraw from his investment in Plaintiff.

4 Plaintiff, which previously had not accepted Defendant's offer of inspecting the at the time not yet laid open US-application subject to an NDA, did not show any further interest in Defendant's applications after this telephone conversation. This only changed after Defendant threatened, more than one year later, to take legal steps against the violation of his shareholder's rights. From Defendant's point of view, with the various actions, Plaintiff is attempting to exploit its significant economic superiority over Defendant, who is an individual, to suppress any

investigation of its wrongdoing. The present legal action was apparently filed in order to shower Defendant in the USA with a complex and time-consuming discovery, which Plaintiff had been denied by the *Superior Court* based on its action of September 1 as Plaintiff had not even been able to sufficiently describe the allegedly misappropriated trade secrets in those proceedings.

5 Plaintiff's submission in the present proceedings is equally unsubstantiated. Plaintiff more or less simply asserts that one or more members of its staff had the entire teaching of the Applications in Suit in their hands and informed Defendant thereof in a meeting. As the only alleged evidence, Plaintiff submitted an invitation email to this meeting, which already contradicts this submission, and an undated advertising brochure for its product CyberMesh, which had already been generally advertised by the date of priority (margin no. 117). We are pleading ignorance that one or more of Plaintiff's employees have allegedly made the invention and that the rights of such person(s) actually passed to Plaintiff (margin no. 146). In the US proceedings – contrary to its general assertion in the present proceedings – Plaintiff already acknowledges that it is in any case not solely entitled to the rights to the teaching of the Applications in Suit (margin no. 34).

6 Plaintiff, moreover, obviously has no real interest in the lapsed Applications in Suit, not only because it was talking in public about CyberMesh and cyber-insurances without obtaining patent protection in time (margin no. 99**Fehler! Verweisquelle konnte nicht gefunden werden.**), but also since, from a European point of view, as pure business methods, the teachings of the Applications in Suit obviously are not patentable (**section 2.2**).

7 The complaint, which *inter alia* seeks to "revive" applications that had long lapsed, raises many new and complex legal questions, the conclusions of which clearly militate against admissibility and substantiation of the complaint here. It would be the first time that a German court acknowledges a right to refile and be granted a patent for lapsed applications, long after the public could legitimately rely on their disclosure having become public domain. Acknowledging this would cause a radical upheaval to a patent system that relies on clear time limits and transparency as to what has become public domain.

8 The apparent lack of patentability of the Applications in Suit is not only relevant for the requests for declaratory relief for damages, but also for Request 1). The exception allowed by the Federal Court of Justice for the entitlement to pending patent rights cannot be transferred to the present case. The reason is that it is not merely a matter of whether a defendant is entitled to hold on to a pending application, but whether a plaintiff is permitted to file such an application anew, irrespective of the rights of third parties who could and can legitimately trust that the

teachings had become public domain, and who, as no right of continued use would exist, would be exposed to the concern to retroactively be regarded as infringers. It will, moreover, have to be taken into account that Plaintiff for months stood idly by and watched the impending irremediable loss of rights with regard to the Applications in Suit, which ultimately occurred in January/March 2018 only, although it had already initiated the parallel US-proceedings in September 2016.

9 It also has not been decided by the Enlarged Board of Appeal and it is ruled out according to the – as far as apparent – undivided commentary literature in Germany and the case law of the Higher Regional Court Munich to grant the plaintiff a right to file a new European patent application for the same invention pursuant to Art. 61 (1) (b) EPC if the plaintiff is at least not solely entitled to the rights to the invention, as Plaintiff already conceded in the USA (margin no. 34).

### 1.2 Defendant's Patent Applications

10 The basis for the lawsuit are two PCT applications which were filed by Defendant in the United States (highlighted by grey shading below). They belong to a series of applications having priorities from the same period, by which Defendant sought patent protection for his ideas:

| Date of Priority | Application Number | Title |
|---|---|---|
| 5 March 2014 | US2015254766 | System and Method for Generating a Dynamic Credit Risk Rating for a Debt Security |
| | US2017140461 | |
| 21 October 2014 | WO2016/064919 | Dynamic Security Rating for Cyber Insurance Products |
| | WO2016/065049 | Joined and Coordinated Detection, Handling, and Prevention of Cyberattacks |
| 29 October 2014 | WO2016/069857 | Dynamic Analysis of Health and Medical Data |
| | WO2016/069861 | Dynamic Analysis of Health and Medical Data Applied to Clinical Trials |
| 19 December 2014 | US2016178796 | Dynamic Analysis of Data for Exploration, Monitoring, and Management of Natural Resources |

11 WO2016/064919 ("**WO'919**"), entitled *Dynamic Security Rating for Cyber Insurance Products*, was filed on 20 October 2015 claiming the priority of US application US62/066,716 of 21 October 2014. The application was published on 28 April 2016.

12 WO2016/065049 ("**WO'049**"), entitled *Joined and Coordinated Detection, Handling, and Prevention of Cyberattacks*, has 21 October 2015 as its application date and claims the priority of the same US application, US62/066,716. This application was also published on 28 April 2016.

13 In view of the discussion regarding patentability of business inventions, which was in flux in many countries at the time, Defendant initially did not restrict the available standard option of all possible subsequent filing states for his PCT applications, but after expiry of the 31-month period he did not to pursue the Applications in Suit in the EPC territory since he – rightly, as will be explained in **section 2** below – did not see any realistic chances of bringing the Applications in Suit to grant here. The reason for this is that according to the interpretation of Art. 52 (2) EPC by the European Patent Office then and now, the subject matter of the Applications in Suit is clearly not patentable.

### 1.3 Parties to the Lawsuit and Background

14 Plaintiff, of course, presents the relationship between the parties only in a one-sided and partial manner. So as to give the Court a more complete picture that is closer to reality as regards the actual background and facts, we have to go into more detail. We hope that this makes it easier for the Court in the further course of the proceedings to assess the very complex matter.

#### *1.3.1 Plaintiff*

15 As is correctly described in the Complaint, Plaintiff is a privately owned, Silicon Valley-based technology company set up in 2003, which deals with so-called "big data" applications. It claims to be one of the most valuable "startups" (with a value of billions or even tens of billions US$ being ascribed to it).

16 As a privately held company, Plaintiff is not subject to the disclosure requirements associated with companies listed on the stock exchange but is nonetheless answerable to its shareholders by virtue of statutory and contractual terms. Corporate law (fiduciary) duties, which here may have been violated by Plaintiff to the detriment of Defendant, are naturally all the more significant where there is, as in the case of Plaintiff, considerable overlap between shareholders and management and, thus, the risk of conflicts of interest. For example, the Chief Executive Officer of Plaintiff, Alexander Karp, held more than 60 million Palantir shares in 2009 and still 40 million in 2017.

17 However, even for a privately held company, Plaintiff with its not very transparent corporate culture is in many respects an unusual company. Not a single shareholder meeting has ever been held by Plaintiff to date, nor have the shareholders otherwise been generally and regularly informed of the company's

business development and strategy. This unusual lack of transparency may be due to the business field of Palantir, which is in the sphere of intelligence service, which also reflects on the shareholders and employees. Plaintiff is known, in particular, for its data collection and analysis platform *Palantir Gotham* which is used not only by the CIA, i.e. the foreign intelligence service of the United States, but also by other intelligence agencies and military institutions, to evaluate large data volumes. One of the first investors in Plaintiff was a venture capital fund attributed to the CIA and some of Plaintiff's senior staff come from security agencies. While secrecy with respect to operations may be understandable due to the sphere of business and is perhaps not surprising given the professional background of a significant part of Plaintiff's staff, it is not justifiable with respect to such circumstances where Plaintiff is accountable to its shareholders.

#### *1.3.2 Defendant*

18 Defendant is a successful entrepreneur and investor. At the request of co-founder and current CEO Alexander Karp he was an early financier in Palantir. Currently he holds more than five and a half million Palantir shares through an investment vehicle called *KT4 Partners LLC* and a charitable trust, i.e. the *Marc Abramowitz Charitable Trust 2*.

#### *1.3.3 Relationship Between the Parties*

19 Investments in startups involve a high degree of risk. Therefore, investors are very much interested in supporting the company not only financially, but also in its business development. Hence, also the Defendant, Marc Abramowitz, kept in contact with Palantir, in particular the CEO Alexander Karp, who had personally approached him to become one of the first investors. For about a decade, the Defendant worked collaboratively with Plaintiff, *inter alia*, by searching for new business opportunities.

20 As stated above, as one of the major shareholders, Defendant also had legal rights based on agreements with the company. There has been and there still is an *Investors' Rights Agreement (IRA)* (which has been amended several times), granting Defendant *inter alia* access to Plaintiff's business records and the right to debate on the business development with Plaintiff's management. Furthermore, Defendant was and still is a party to the *First Refusal and Co-Sale Agreement* between Plaintiff and a number of main investors, which, under certain conditions, gives the parties a right of first refusal as well as a co-sale right in relation to shares in Palantir.

21 The assertion that Defendant surreptitiously gained Plaintiff's trust and systematically investigated Plaintiff is incorrect and downright absurd. Plaintiff is

anything but careless in protecting what is regarded as trade secrets as secrecy is virtually part of its DNA. It is implausible to portray Plaintiff as being trustful and naive and succumbing to Defendant's devious investigations. With the contacts to Plaintiff, which are portrayed in the Complaint as alleged investigation by Defendant, he exercised his rights as a shareholder and also acted in consultation with Plaintiff in presenting Plaintiff with business opportunities.

22 Rather, it was Plaintiff who regularly, and also in this instance, utilized Defendant for its own purposes, as is apparent, for example, from the e-mail from Kevin Kawasaki (**FBD 7**):

> "I think we should focus Marc and our selves on getting the first customer. Once we have a deal outlined, we can then move to setting up the structure or do it simultaneously."

[This is followed by a German translation.]

### *1.3.4 Defendant's Inventions*

23 Starting in at least 2013 and continuing into 2014, the Defendant, Marc Abramowitz, developed various (business) ideas around a concept of dynamic and predictive analysis of value-driving factors. Starting point of this thought process was the dynamic assessment of debt securities. Defendant had incurred significant devaluations in the global financial crisis of 2008 when mortgage-backed securities lost value suddenly and massively. He asked himself if a dynamic and predictive analysis of changes in the various value-driving factors for such securities could keep valuations more up-to-date and relevant. This bond rating idea and underlying dynamic-analysis concept was thus developed by Defendant well before the only meeting with Plaintiff on cyber-insurance that is specifically mentioned in the Complaint.

24 The Defendant then applied the same considerations developed with regard to the valuation of bonds also to the analysis of medical data for clinical trials, particularly for so-called phase IV trials involving thousands or even millions of patients and aimed at discovering rare side effects in authorized medicinal products, to the analysis of such data for a dynamic determination of health insurance premiums, to the use of dynamic and predictive analyses in the exploration of natural resources, and to the subject matter of the Applications in Suit.

### *1.3.5 Exploring Cyber-insurances Opportunities*

25 Defendant presented Plaintiff with these concepts and tried to develop new business opportunities with Plaintiff. He introduced Plaintiff to potential business

partners and customers in the respective lines of business and to experts with corresponding industry knowledge to implement such new business opportunities. Defendant prepared and filed the aforementioned patent applications together with his patent attorney, John Squires, and Mr. Squires' staff, to have his concepts protected.

26 However, although Plaintiff would show initial interest in Defendant's initiatives, it never followed through. This was also the case when Defendant spoke to Plaintiff about the development of a cyber-insurance business. Plaintiff initially encouraged Mr. Abramowitz to build this business himself and later, if the business opportunity was realizable, to somehow work together in a yet to be defined manner. Subsequently, Defendant used his resources to explore the business idea and consulted a number of industry experts and lawyers specializing in insurance law. Together with his patent attorney John Squires, Defendant also applied his inventive concept of dynamic and predictive analysis of data for the assessment of securities from his application of March of the same year to the determination of insurance premiums and filed the priority application for the Applications in Suit, and informed Plaintiff thereof – even in advance. He offered Plaintiff to send them the application subject to a confidentiality agreement, but Plaintiff never accepted that offer. Plaintiff at the time seemed to have lost interest in the business idea of cyber-insurance.

27 Months later, in April/May 2015, in a telephone conversation, Plaintiff's CEO, Alexander Karp, accused Defendant of stealing Plaintiff's confidential information. Defendant was deeply troubled by the accusations, and by the unhinged way Mr. Karp levelled them. After all, Plaintiff knew about – and had in fact encouraged – Defendant's cyber-insurance efforts. And he had told Plaintiff about the patent application in advance, half a year before that point in time. Due to Alexander Karp's erratic and irrational behavior Defendant decided to withdraw from his investment in Palantir. Again, Plaintiff did nothing.

#### *1.3.6 Disputes Between the Parties – the Bigger Picture*

28 Defendant found a first buyer for some of his shares, the hedge fund Highbridge Capital Management LLC, and a deal was struck in May 2015. Complying with his obligation under company law, Defendant informed Plaintiff in advance of the forthcoming sale. However, Plaintiff then immediately tried to use this confidential information to its own ends by having its broker DTA offer Palantir's own shares to Highbridge in an attempt to outmanoeuver Defendant, which however failed in this case.

29 In October 2015, Defendant then found a buyer for his remaining shares, the Chinese firm CDH. When Plaintiff learned that Defendant had negotiated a sale to

CDH and that its representative Brooklands was conducting a final due diligence, what happened with Highbridge now took place again: Plaintiff's broker DTA contacted Defendant's buyer, offering CDH the option of buying shares from Plaintiff directly rather than from Defendant and demanding that CDH does not further proceed with Defendant. Since Plaintiff additionally offered more influence on the management, it succeeded this time in enticing Defendant's buyer away from him.

30 It is quite surprising that Plaintiff actively prevented a shareholder, whom it now accuses of having abused his position as shareholder, from giving up this shareholder position at the time.

31 Defendant, who felt that his rights had been violated by this repeated misuse of confidential information regarding his planned transactions, sent a request to Plaintiff through his attorneys in August 2016, seeking to obtain access to books and certain business records of Plaintiff to investigate whether his shareholder rights had been violated by Plaintiff.

32 After initially signaling willingness to cooperate, Plaintiff then suddenly attempted to deprive this request of its legal basis by amending the Investors' Rights Agreement (IRA).

#### *1.3.7 The US Proceedings*

33 Probably as a further attempt of a preemptive counterstrike, since Defendant's attorney had requested inspection of Plaintiff's books, Plaintiff dug out the old accusation of misappropriation of trade secrets. Approximately a year and a half had passed since the telephone conversation with Alexander Karp (see margin no. 27 above) without Plaintiff having shown even the slightest interest in the patent applications. On 1 September 2016 Palantir lodged a legal action before the Superior Court of the State of California, claiming misappropriation of its trade secrets. This action, in which Plaintiff failed repeatedly to describe its allegedly misappropriated trade secrets with particularity, as California law requires, is now pending before a US federal court.

34 However, Plaintiff conceded there – in contrast to the present proceedings –that even from Plaintiff's perspective it did not invent everything in those patent applications, meaning that Plaintiff could only seek co-inventor's rights. For instance, its attorney, John T. Zach, set forth in a hearing on 18 May 2018 before Judge Mary Arand (excerpt from the official minutes):

> For example, you'll see in this disclosure, we don't cite to every claim, right. We only cite to claims that are ours. We leave out a variety of claims from his own patent applications that we didn't come up with. The only stuff that we're claiming for this purpose is the stuff we came up with.
>
> This isn't a case where we just threw the application at them and said, It's all ours.

[This is followed by a German translation.]

35 Furthermore, Plaintiff also asserted on 2 September 2016 in so-called Derivation proceedings before the *US Patent and Trademark Office* that it is entitled to the inventor's rights to the patent application US 14/919,506 of Defendant (published as US2016/0112445). Plaintiff asserted *inter alia* that the subject matter of patent claim 1 of this patent application of Defendant had already been included, in an essentially identical way, in Plaintiff's own patent applications, i.e. the applications US 2014 61 942 480 of 20 February 2014 and US 2014 14 280 490 of 16 May 2014. The priorities of Plaintiff's US applications are also claimed by a pending European patent application, EP 2 911 078. We are introducing these into the proceedings as

**Exhibit HE 1**.

36 Defendant – on the other hand – filed a formal request for book inspection (Sec. 220 Books and Records Action) at the Court of Chancery of the State of Delaware since Plaintiff had amended the IRA and still denied inspection of the books. This request was partially granted in the first instance on the grounds that, since shareholders have generally not been provided with information, since attempts have been made to amend the IRA retrospectively, and since violation of his shareholder rights has been sufficiently substantiated, the Defendant in the present proceedings and petitioner in those proceedings could sufficiently substantiate an initial suspicion of wrongdoing on the part of Plaintiff, entitling him to access certain documents. This decision has in the meantime been confirmed by the Supreme Court of the State of Delaware and even extended in terms of the scope of the right of access. The decisions in this case are final and binding.

37 As regards Plaintiff's blocking the sale of shares to CDH, Defendant furthermore filed a tortious interference suit at the Superior Court of the State of Delaware on 14 December 2017. On 22 August 2018, the court denied Palantir's motion to dismiss. That lawsuit is thus still pending.

38 In our opinion, the present lawsuit was nothing more (at least originally) than a vehicle intended to give a boost to Plaintiff's US trade secret violation case which had become stuck. Since the US court had held that the action lacked substantiation, the court had not allowed Plaintiff to enter into discovery, as desired by Plaintiff. The present law suit allowed Plaintiff to bypass the US Court in the trade secret violation case by filing, based on Sec. 1782 U.S.C, an *ex parte* discovery request quasi as "legal assistance" for the German proceedings, which Plaintiff did immediately after that complaint had been filed, but long before service.

39 In Defendant's view, Plaintiff was thus never really interested in the Applications in Suit and is not interested in them today, if only for the reason that the Applications in Suit could never mature to grant neither before the European Patent Office nor the German Patent and Trademark Office.

**2. Lack of Patentability of the Applications in Suit**

40 According to both the European Patent Convention and the German Patent Act, schemes, rules and methods for doing business and computer programs do not constitute inventions. Thus, patents can only be granted for such creative achievements that solve technical problems with technical means. Non-technical concepts, no matter how creative they may be *per se*, including in particular business ideas, are excluded from patent protection.

41 The Applications in Suit teach completely generic data processing concepts and non-technical organizational methods using well-known elements (processor, computer network). There are thus no technical problems that would be solved by technical means, which is why patent protection is ruled out. Before explaining this in detail in **section 2.2**, we will at first – briefly – discuss how such business inventions are treated under patent law according to the guidelines of the German Patent and Trademark Office and the European Patent Office in view of the corresponding decisions of the Federal Court of Justice and the Boards of Appeal.

## 2.1 Non-technical Features and their Consequences for Patentability

### *2.1.1 German Patent Act*

42 According to Sec. 1 (1) German Patent Act, patents are only granted for inventions that are in a technical field.

43 For instance, the Guidelines for Examination of Patent Applications of the German Patent and Trademark Office (edition 11 January 2019) in section 2.3.3.2.1 (page 12, left column, first full paragraph) state the following with reference to the Federal Court of Justice Judgments "*Wiedergabe topografischer Informationen*" of 26 October 2010, X ZR 47/07, and "*Fahrzeugnavigationssystem*" of 23 April 2013, X ZR 27/12:

> "If a patent claim with a combination of technical and non-technical features is to be examined, this claim is basically patentable. However, non-technical features are to be disregarded in the examination for inventive step."

available at: www.dpma.de/docs/formulare/patent/p2796.pdf

44 According to Sec. 1 (3), no. 3, German Patent Act, schemes, rules and methods for doing business and programs for data processing systems do not constitute inventions. They are excluded from the patent protection defined in Sec. 1 (1) German Patent Act. Sec. 1 (4) German Patent Act stipulates that the exclusion applies only to that extent that protection is sought for said subject matter or activities *as such*.

45 Furthermore, the above-mentioned guidelines of the German Patent and Trademark Office state the following in section 2.3.3.2.1 (page 12, left column, seventh full paragraph) with reference to the Federal Court of Justice decisions "*Suche fehlerhafter Zeichenketten*" of 17 October 2001, X ZB 16/00; "*Dynamische Dokumentengenerierung*" of 22 April 2010, Xa ZB 20/08, and "*Webseitenanzeige*" of 24 February 2011, X ZR 121/09:

> "However, the exclusion of the subject matter or activities specified in 1) to 4) applies only to the extent that protection is sought for these as such (Sec. 1 (3), (4) German Patent Act), that is, they are excluded from patent protection only to the extent that they are claimed separately from a specific implementation. The exclusion does not apply if the teaching contains instructions that contribute to the solution of a specific technical problem with technical means."

### *2.1.2 EPC*

46 The provisions according to the EPC are identical to those of the German Patent Act with regard to technical nature and the exceptions to patentability, with Art. 52 (1) EPC corresponding to Sec. 1 (1) German Patent Act, the exception according to Sec. 1 (3), no. 3, German Patent Act being found in Art. 52 (2) c) EPC, and the restriction of Sec. 1 (4) German Patent Act being mirrored in Art. 52 (3) EPC.

47 According to the *Guidelines for Examination in the European Patent Office* (November 2018 edition), the following principles apply to determine when a subject matter relates to a business activity (part G, chapter II, section 3.5.3):

> "Subject-matter or activities which are of financial, commercial, administrative or organisational nature fall within the scope of schemes, rules and methods for doing business, which are as such excluded from patentability under Art. 52 (2) (c) and (3). In the rest of this section, any such subject-matter or activities will be subsumed under the term "business method".
>
> Financial activities typically include banking, billing or accounting. Marketing, advertising, licensing, management of rights and contractual agreements, as well as activities involving legal considerations, are of a commercial or administrative nature. Personnel management, designing a workflow for a business process or communicating postings to a target user community based on location information are examples of organizational rules. Other activities typical of doing business concern operational research, planning, forecasting and optimisations in business environments, including logistics and scheduling of tasks. These activities involve collecting information, setting goals, and using mathematical and statistical methods to evaluate the information for the purpose of facilitating managerial decision-making.
>
> If the claimed subject-matter specifies technical means, such as computers, computer networks or other programmable apparatus, for executing at least some steps of a business method, it is not limited to excluded subject-matter as such and thus not excluded from patentability under Art. 52 (2) (c) and (3)."

available at www.epo.org/law-practice/legal-texts/html/guidelines/d/index.htm

48 As regards the question of examination for inventive step, part G, chapter VII, section 5.4, of the aforementioned Guidelines of the European Patent Office specifies the following:

> "It is legitimate to have a mix of technical and non-technical features appearing in a claim, as is often the case with computer-implemented inventions. The non-technical features may even form a major part of the claimed subject-matter. However, in the light of Art. 52 (1), (2) and (3), the presence of an inventive step under Art. 56 requires a non-obvious technical solution to a technical problem (T 641/00, T 1784/06).
>
> When assessing the inventive step of such a mixed-type invention, all those features which contribute to the technical character of the invention are taken into account. These also include the features which, when taken in isolation, are non-technical, but do, in the context of the invention, contribute to producing a technical effect serving a technical purpose, thereby contributing to the technical character of the invention. However, features which do not contribute to the technical character of the invention cannot support the presence of an inventive step (T 641/00). Such a situation may arise, for instance, if a feature contributes only to the solution of a non-technical problem, e.g. a problem in a field excluded from patentability (see G-II, 3 and sub-sections).
>
> The problem-solution approach is applied to mixed-type inventions in such a way as to ensure that inventive step is not acknowledged on the basis of features not contributing to the technical character of the invention, while all those features which do contribute are properly identified and taken into account in the assessment. To this end, where the claim refers to an aim to be achieved in a non-technical field, this aim may legitimately appear in the formulation of the objective technical problem as part of the framework of the technical problem that is to be solved, in particular as a constraint that has to be met (T 641/00; see step (iii)(c) below and G-VII, 5.4.1)."

49 As regards the classification of computer programs under patent law, part G, chapter II, section 3.6, of the aforementioned EPO Guidelines states the following:

> "Computer programs are excluded from patentability under Art. 52 (2) (c) and (3) if claimed as such. However, following the generally

applicable criteria for Art. 52 (2) and (3) (G-II, 2), the exclusion does not apply to computer programs having a technical character.

In order to have a technical character, and thus not be excluded from patentability, a computer program must produce a 'further technical effect' when run on a computer. A 'further technical effect´ is a technical effect going beyond the 'normal' physical interactions between the program (software) and the computer (hardware) on which it is run. The normal physical effects of the execution of a program, e.g. the circulation of electrical currents in the computer, are not in themselves sufficient to confer technical character to a computer program (T 1173/97 and G 3/08).

Examples of further technical effects which confer technical character to a computer program are the control of a technical process or of the internal functioning of the computer itself or its interfaces (see G-II, 3.6.1)."

#### *2.1.3 Conclusion*

50 Thus, the following principles apply according to both the German Patent Act and the European Patent Convention:

- Claiming a business activity falls under the exclusion from patentability pursuant to Sec. 1 (3), no. 3, German Patent Act and Art. 52 (2) c) EPC.
- Even though a mixture of technical and business features does not constitute a business method as such, and therefore is not excluded from patent protection *per se*, the inventive step of such a mixed teaching can only be based on **technical** features solving a **technical** problem.
- Thus, patents can only be granted for such creative achievements that solve technical problems with technical means. Non-technical concepts, no matter how creative they may be *per se*, including in particular business ideas, are basically disregarded when assessing patentability.
- For computer programs there must be a so-called "further technical effect", i.e. the mere fact that a computer program runs automatically does not create a technical character. Rather, a computer-implemented invention must be linked either to a technical process taking place outside the computer, or it must further develop the technical functioning of the computer itself to be regarded as a technical solution to a technical problem.

## 2.2 The Teachings of the Applications in Suit

### *2.2.1 Patent Application WO'919*

#### *2.2.1.1 Claims*

51 According to its independent claim 1, patent application WO'919 is directed at

> "A method for producing insurability ratings for a product or service, the method comprising:
>
> receiving, at a processor that is implemented at least in-part by electronic circuitry and coupled to a computer network, real-time data indicative of cyber attacks that are likely to diminish a value of the product or service;
>
> using the processor to process the real-time data to compute a real-time damage assessment associated with losses to the product or service due to occurrence of one or more cyber attacks, the damage assessment computed using at least a likelihood of the occurrence of the one or more cyber attacks, a likelihood of success of the one or more cyber attacks, and a measure of severity of damage to the product of service as a result of the occurrence of the one or more cyber attacks; and
>
> using the processor to determine an insurability rating for the product or service that is usable for determination of an amount of insurance that sufficiently insures against the occurrence of the one or more cyber attacks, wherein the insurability rating is determined at least in-part based on the real-time damage assessment and is changeable in response to changes in the received real-time data."

[This is followed by a German translation.]

52 The further independent claims relate to various subject matter for implementing the method according to claim 1: Claim 19 relates to a computer program product, and claims 37 and 38 relate to a device, and claim 39 relates to a system.

#### *2.2.1.2 Assessment*

53 The generation of insurability ratings is not a technical issue, but a purely insurance-related one. Data which assesses cyber attacks as to their potential to diminish a value are no technical data, but in the end crime statistics, i.e. data in a pure business context (diminution in value). Damage assessment using likelihoods

relevant to the damage is a purely insurance-related issue. The same applies to insurability ratings for determination of an insurance premium.

54 Thus, the claim is essentially directed at a business process. The mention of electronic circuitry and coupling to a communication network might in principle impart technicity to the subject matter of the application, however, when dividing the teaching according to technical and non-technical aspects, the following picture results (amendments added):

> “A method for producing ~~insurability ratings for a product or service~~ data, the method comprising:
>
> receiving, at a processor that is implemented at least in-part by electronic circuitry and coupled to a computer network, real-time data ~~indicative of cyber attacks~~ ~~that are likely to diminish a value of the product or service~~;
>
> using the processor to process the real-time data to compute ~~a real-time damage assessment~~ data ~~associated with losses to the product or service due to occurrence of one or more cyber attacks, the damage assessment computed using at least a likelihood of the occurrence of the one or more cyber attacks, a likelihood of success of the one or more cyber attacks, and a measure of severity of damage to the product of service as a result of the occurrence of the one or more cyber attacks~~; and
>
> using the processor to determine ~~an insurability rating for the product or service~~ data ~~that is usable for determination of an amount of insurance that sufficiently insures against the occurrence of the one or more cyber attacks, wherein the insurability rating is determined at least in-part based on the real-time damage assessment and is changeable in response to changes in the received real-time data~~.”

55 From a patent law perspective, it is thus obviously an entirely generic data processing concept using well-known elements (processor, computer network). No technical problem can be discerned, and the described elements do not achieve a “further technical effect” either, i.e. this is neither a control program nor is a data processing system being advanced.

56 Consequently, it is immediately apparent that no patent would have been granted for the patent application WO‘919 at the GPTO or the EPO.

57 It is moreover apparent that the subject matter of the application is a computer implementation of a commercial concept with the specific purpose of obtaining, by means of real-time data processing, current valuations of financial assets, in this case an insurance product. In essence, it is therefore a matter of dynamic value analysis of intangible assets. However, as already explained in **section 1.3.4**, Defendant has been considering issues of dynamic value analysis of financial instruments such as securities at least since 2013 and filed US patent application 14/198.015, published as US2015/0254766 A1, on 5 March 2014. It can therefore be seen that the subject matter of the application is a further development on the long-standing field of interest of the Defendant, Mr. Abramowitz.

### *2.2.2 Patent Application WO‘049*

#### *2.2.2.1 Claims*

58 According to its independent claim 12, patent application WO‘049 is directed at

> “A computer implemented method of managing a consortium of monitoring systems which detect and handle cyberattacks, comprising:
>
> registering each of a plurality of monitoring systems as a member in response to corresponding registration requests for becoming a member of the consortium of monitoring systems, wherein each of the monitoring systems is associated with a distinct, independent business entity and each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations comprising a processor and a memory and monitoring one or more client computer systems for cyberattacks to the client computer systems and associated with one or more specialists who can physically work with the client computer systems, and wherein at least one of the monitoring systems comprises one or more local handling stations;
>
> receiving a report in electronic format from a first member coupled to a computer network;
>
> processing the electronic report to detect a cyberattack to a client computer system of the first member;
>
> responding to the cyberattack with the first member and a second member, wherein the second member assigns computing or human resources for mitigating the cyberattack; and

updating a repository of data related to cyberattacks accessible to members of the consortium."

[This is followed by a German translation.]

59 The independent claim 1 relates to a corresponding central monitoring station, and claim 23 relates to a corresponding computer program product.

#### *2.2.2.2 Assessment*

60 As set out above in margin no. 47, administrative and organizational methods also constitute schemes, rules and methods for doing business, which are not regarded as technical.

61 The method of WO'049 is essentially an organizational method, as already stated in the preamble, for "managing a consortium of monitoring systems". Registering consortium members is a purely organizational act, without any technical relevance. Allocating monitoring systems to different business entities is also a pure business organization measure.

62 Configuring monitoring stations in such a way that they are associated with an expert is merely an issue of work organization since it is only determined that an employee must sit, for example, in front of a computer. The aspect of work organization is also emphasized in that part of the claim, in which human resources are assigned.

63 Receiving and reading reports from a first organization member to recognize a problem to which a second member of the organization is to respond by using human resources and/or equipment, followed by recording the process in a suitable register is a classic organizational procedure, as has been known for centuries from commercial or governmental organizations.

64 The police can be used as an example of such an organization: a first police officer reports about a crime taking place, which is recorded by a second police officer, and both police officers take countermeasures using their resources, and finally submit a report thereof to a central register.

65 Similar procedures exist e.g. in the cooperation between aircraft certification authorities and airlines. If an airline detects cracks in a critical component of one of its airplanes, it informs the appropriate certification authority, which assesses the situation and, if necessary, requests other airlines to check their airplanes of the same type for identical faults, potentially conduct repairs and report the results. The conclusions drawn by the certification authority, e.g. obligatory checks upon a certain strain on the airplane, are then included in a repository of

data, in Germany for example in the so-called aviation news 2 of the official journal of the federal aviation agency.

66 When separating the technical from the non-technical elements, the following picture results (amendments added):

> "A computer implemented method of managing ~~a consortium of~~ monitoring systems which detect and handle cyberattacks, comprising:
>
> ~~registering each of a plurality of monitoring systems as a member in response to corresponding registration requests for becoming a member of the consortium of monitoring systems~~, wherein ~~each of the monitoring systems is associated with a distinct, independent business entity and~~ each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations comprising a processor and a memory and monitoring one or more ~~client~~ computer systems for cyberattacks to the ~~client~~ computer systems~~ and associated with one or more specialists who can physically work with the client computer systems~~, and wherein at least one of the monitoring systems comprises one or more local handling stations;
>
> receiving ~~a report~~ data in electronic format ~~from a first member coupled to~~ via a computer network;
>
> processing the electronic ~~report~~ data to detect a cyberattack to a ~~client~~ computer system ~~of the first member;~~
>
> responding to the cyberattack ~~with the first member and a second member, wherein the second member assigns computing or human resources~~ for mitigating the cyberattack; and
>
> updating a repository of data related to cyberattacks ~~accessible to members of the consortium~~."

67 As the monitoring systems and monitoring stations are not specified any further, considering the computer implementation of the method, they are merely generic computers. Hence, the only aspect which potentially could be regarded as technical in the subject matter of the claim is the implementation of the non-technical organizational method (creating a consortium with work instructions for the members) using well-known technical means, which are only designated generically as computers and computer networks. No technical problem can be discerned since the claimed teaching is nothing more than the implementation of

the administrative procedure. Even less so is there a “further technical effect” with regard to the use of computers.

68 It is to be noted that the EPO deems it unnecessary to cite prior art for such types of claimed subject matter. It rejects them without further ado. For instance, part B, chapter VIII, section 2.2.1 of the Guidelines states the following:

> “For claims directed to computer-implemented business methods, if the features contributing to the technical character of the claimed subject-matter are so well-known that their existence at the relevant date cannot reasonably be disputed (T 1411/08, Reasons 4.1 and 4.2, and T 690/06, Reasons 13), no documentary evidence as to the relevant state of the art is required in the search report.”

69 Consequently, it is also directly apparent in this regard that no patent would have been granted for the patent application WO‘049 before the GPTO or the EPO.

70 It must be noted again at this point that Defendant had been working on business ideas and their IT-implementation at least since 2013.

### 2.3 Patentability Over the Prior Art

71 As Plaintiff is well aware, the Applications in Suit are moreover not patentable in view of an extensive body of prior art documents. Should Plaintiff dispute that the features remaining when disregarding all non-technical features are so notorious that citing documentary evidence for them is unnecessary, or should Plaintiff submit that disclosure beyond the above cited independent claims allegedly establishes patentability, we reserve the right to make further submissions in this regard.

## 3. No Legal Interest in Declaratory Relief

72 Plaintiff is even lacking the required legal interest in declaratory relief under Sec. 256 German Code of Civil Procedure for all requests.

73 Plaintiff justifies its Declaratory Interest in Request 1) with its intention to file new European patent applications pursuant to Art. 61 (1) b EPC. However, a legal relationship concluded between the parties does not establish a declaratory interest (see **section 3.1** below). The highly controversial decision of the Enlarged Board of Appeal of the European Patent Office of 13 June 1994 (G 3/92), which is invoked by Plaintiff, is also untenable and cannot establish a declaratory interest.

74 As regards Requests 2) and 3), Plaintiff merely postulated that a damage exists, which as such does not establish a declaratory interest (see **section 3.2** below).

## 3.1 Request 1)

### *3.1.1 Requirements for Legal Interest in Declaratory Relief Are Not Given*

75 A legal interest in a declaration would only be given if the right or the legal situation of the plaintiff were threatened by an actual risk of uncertainty and the judgment were suited to remove *this* risk. Essentially, the declaratory interest has to lie in the relationship of the parties (Federal Court of Justice, Judgment of 8 July 1983, court docket: V ZR 48/82, as published in NJW 1984 at 2950).

76 In the relationship between the parties, the declaration of the lack of entitlement, as requested with Request 1), does not lead to legal consequences going beyond the determination of a claim to compensation of damages, which is already the subject of Requests 2) and 3). Even according to Plaintiff's own submission, Plaintiff does not have a claim to the assignment of the Applications in Suit (cf. Complaint, page 24).

77 A legal relationship concluded in the past essentially does not establish a declaratory interest (*Greger*, in: Zöller, "*§ 256 ZPO*", margin no. 7 with further references). Even though the Federal Court of Justice, beyond the entitlement claim, generally regards a declaratory action for the determination of ownership of the inventor's right to be available, the Declaratory Interest ceases when the patent application in dispute falls away (this was held explicitly in the reverse case of an applicant's declaratory action, Regional Court Dusseldorf, judgment of 5 May 2004, 4 O 378/01, as published in BeckRS 2009, at 7924).

78 Thus, Request 1) is merely a prior question to the alleged claims of Plaintiff to compensation of damages, as asserted with Requests 2) and 3). According to established case law, such a prior question cannot be subject to a declaratory judgment separately (cf. e.g. Federal Court of Justice, judgment of 19 April 2000, court docket: XII ZR 332/97, as published in NJW 2000, at 2280; decision of 21 January 2014, court docket: II ZR 87/13 with further references).

### *3.1.2 G 3/92 Cannot Justify the Legal Interest in Declaratory Relief*

79 The reference to G 3/92 cannot justify a Declaratory Interest with respect to Request 1).

80 In the past, the Federal Court of Justice assumed that a Declaratory Interest was given if it could be expected that the Declaratory Judgment would create a sufficient basis for the acknowledgment of a claim to be pursued before other authorities (Federal Court of Justice, judgment of 29 April 1958, court docket: VIII ZR 198/57, as published in BGHZ 27, at 190). However, there are at least three reasons why G 3/92 is unable to create such a basis.

81 The interpretation of the EPC must be re-evaluated by the seized Court and proves to be unpersuasive (see **section 3.1.2.1** below). The Board of Appeal also refers to an assessment by the national courts and thus implicitly presupposes a basis for a claim under national law, which is not provided by the EPC (see **section 3.1.2.2** below). Moreover, such a right to a new application, and thus a Declaratory Interest, would in any event require an exclusive right to the invention, i.e. not merely co-entitlement, since Plaintiff would otherwise not have the exclusive right to file a new application; such an application would infringe the rights of Defendant (see **section 3.1.2.3** below).

##### *3.1.2.1 Plaintiff Is Not Entitled to a Right to a New Application of the Applications in Suit*

82 The decision of the Board of Appeal is not binding for the German Court. The European Patent Office does not have the final competence to interpret the EPC. The relationship of the German courts to decisions of the European Patent Office was addressed by the Federal Court of Justice with regard to validity proceedings before both decision bodies in the judgment *Walzenformgebungsmaschine*. While the national court must consider the arguments of the EPO's instances, the German court is nonetheless free to assess questions of law differently and to come to a different conclusion, and thus tasked to decide itself (cf. Federal Court of Justice, decision of 15 April 2010, Xa ZB 10/09, margin no. 13 *et seq.*). For this reason, although the practice of the Federal Court of Justice is largely harmonized with that of the European Patent Office, there are still significant differences in the application of the EPC.

83 The decision of the Enlarged Board of Appeal is not only highly controversial and, as far as can be seen, has so far remained without further application, but above all it is incorrect:

84 The possibility of filing a new application *instead* of an abandoned application pursuant to Art. 61 (1) b) EPC cannot be reconciled with the EPC as a whole. The right to choose given to the entitled person exists only "as long as the European patent has not yet been granted" (Rule 16 (1) b, Implementing Regulations to the EPC) and thus implicitly requires – as do the provisions for a divisional application to which Art. 61 (2) EPC refers – that the application is still pending (see in detail the grounds given in section 8. in G 3/92).

85 The option of filing a new application instead of a lapsed application has never been envisaged in the history of the EPC, which was pointed out in particular by the EPO President of that time, Paul Braendli, in an *amicus curiae* brief, i.e.

**Exhibit HE 2:**

23.1 It has never been envisaged that the benefit of the provision should be extended to the cases where the original application would have ceased to exist, because of abandonment or withdrawal, as it was considered that the possibility of having the proceedings suspended together with the limitation of the original applicant's option to withdraw the application ensured sufficient protection. Abandonment, on the other hand, could be avoided through the rightful owner's own action in place of the original applicant (cf. attachment 9).

[This is followed by a German translation.]

86 Above all, however, the decision taken by majority opinion in G 3/92 neglects the reasonable interests of third parties who trust that an abandoned application has become public domain. In addition to the serious systematic and historical concerns, this was, for the minority opinion of the Enlarged Board of Appeal, an essential reason for rejecting a claim to a priority that had ceased to exist (G 3/92, section 8.7):

> "If it were permissible for a new application to claim the filing date and priority date of an application which has long since lapsed, this would unacceptably prejudice third parties. For instance, if it were permissible, the new application could be validly filed well beyond the date on which the earlier application had lapsed. Third parties using the subject-matter of the application in the period between the lapse of the earlier application and the filing of the new application would retrospectively become infringers. Such third parties would have no defence because, unlike Article 122(6) EPC, Article 61 EPC does not grant such third parties a continued right freely to use the invention."

87 Even the majority opinion in G 3/92 could not deny that the claiming of the priority of a lapsed patent application after a dilatory action to be granted entitlement to the right to a patent causes considerable problems for uninvolved third parties. However, it considered the national courts to be responsible for addressing such issue (G 3/92, section 4.4; emphasis added):

> "In a case where the unlawful applicant's earlier application has been published, and is no longer pending at the time when a claim to the right to the grant of a European patent is made to a national court,

the establishment of the lawful applicant's right to the grant may potentially **prejudice third parties** who have commenced commercial activities involving the subject-matter of the earlier application on the assumption that such subject-matter is in the public domain and cannot therefore be the subject of a European patent. In general, the longer the interval between the time when the earlier application ceases to be pending and the time when the lawful applicant's right is established by a national court, the greater the possibility of such third party prejudice."

88 However, the fact that the national courts cannot effectively limit the impact on third parties by keeping the period between the lapse of the patent and the "revival" thereof short is overlooked here. Firstly, in individual cases there may not be any delay on the part of the entitled applicant if he was not aware of the application. Secondly, Art. 61 (1) b EPC requires a *final and binding* decision. Even if the entitled party acts without delay, a *final and binding* decision can only be expected years after the patent application has lapsed. During these years, third parties may have already made considerable investments in a technology which they could legitimately assume to be in the public domain. However, given the legal system, this would not prevent them from defenselessly becoming infringers retrospectively since the EPC does not provide any legal basis for a continued right of use.

89 A decision of the court would thus not only contradict the correct interpretation of the EPC, but interfere considerably with the rights of third parties, which already excludes a legitimate interest of Plaintiff in the present case.

#### 3.1.2.2 *Board of Appeal Presupposes Case-Specific Assessment by National Court*

90 In G 3/92, the EPO takes into account that in a purely British context the UK Comptroller had already acknowledged a claim of the entitled party pursuant to national law and ordered the entitled party to file a new application claiming the filing date of the lapsed European application (cf. the facts laid out in **Exhibit HE 2**).

91 Ultimately, the majority opinion of the Enlarged Board of Appeal shifts the weighing of conflicting interests and the determination of the conditions for a claim as to whether in the respective case a claim to "revival" of the lapsed patent application is appropriate to the national court. It clearly assigns the examination of the claim in the individual case, not only with regard to the entitlement but also with regard to the further circumstances, to the competent national court pursuant to the decisive *national* legal provisions (cf. G 3/92, section 3.4):

> "When a national court of the appropriate Contracting State decides an individual case concerning a claim to entitlement to the grant of a European patent under the Protocol on Recognition, it will apply the particular national law which governs determination of the case, which may or may not be its own national law, within the framework of its own legal system."

92 Thus, the Board of Appeal leaves it to the national court to decide on the basis of the substantive, applicable law (in this regard, see **section 5.1** below) if and under which conditions one can be entitled to file a new application with the effective filing date of a lapsed application.

93 The EPC, on the other hand, does not provide that other Member States than the United Kingdom *must* provide such an option as well. The reason for this is that it is at the discretion of the national legislator in what way, i.e. under which conditions, the enforcement of entitlement to the European patent application is granted, as apparent from the explanatory memorandum relating to Art. II, Sec. 5, Act on International Patent Conventions (as published in BT-Drs. 7/3712, page 19):

> "However, it remains unspecified and thus at the discretion of determination by the national law of the Member States in what way the accordingly entitled party is supposed to enforce its right vis-à-vis the unlawful applicant or patent proprietor."

94 The option of entitlement to lapsed rights has not been provided by the German legislator, and the Federal Court of Justice explicitly denied applying G 3/92 to national proceedings, in particular the national proceedings before the GPTO (Federal Court of Justice decision "*Drahtbiegemaschine*" of 29 April 1997, court docket: X ZB 19/96, as published in GRUR 1997, at 890, 892; emphasis added):

> "In contrast to German law, considerations of analogy were not necessary. Therefore, the substantial counterarguments set out in the minority opinion and reproduced in the decision of the Enlarged Board of Appeal are ultimately regarded as irrelevant; in the context of analogy considerations, however, said arguments would have a stronger weight."

95 In the "*Drahtbiegemaschine*" decision, the Federal Court of Justice deals with the question of whether the (allegedly) entitled party in the proceedings before the GPTO can claim the priority of an abandoned application even if the narrow conditions of Sec. 7 (2) German Patent Act are not fulfilled (for instance since the applicant has given up the national patent application after a warning letter and therefore it was impossible to perform opposition proceedings, which are required pursuant to Sec. 7 (2) German Patent Act, on the grounds of unlawful usurpation). An argument against this, in the opinion of the Federal Court of Justice, is protecting the public from an unpredictable revival of abandoned applications. The entitled party still has the option of suing the applicant for damages (if the conditions for such a claim to damages are fulfilled – which is not the case here, see **section 5** below):

> "The proprietary right to the achieved result [of the invention] is an absolute, intangible property right that is comparable to other absolute rights. If such rights are impaired, a compensation for this is as a rule sought by the legal system by acknowledging a claim to compensation of damages (cf. Sec. 823 (1) German Civil Code) or a claim to surrender of undue enrichment. This also applies if exercising this right has been made impossible by a third party. Since the petitioner seeks compensation with its request for the fact that by withdrawal of the application the prior applicant has denied the petitioner from exercising its rights to the filed technical teaching, in this event a claim under civil law against the third party can be regarded as an appropriate solution. This applies all the more since it is largely at the inventor's own discretion to safeguard his inventor's right by filing an application for his invention in due time."

96 For the same reasons, determination of entitlement to a European patent application is excluded if said application has lapsed. Otherwise, an abandoned patent application would be revived through the back door of the European proceedings to the detriment of the legitimate interests of third parties. This is supposed to be excluded pursuant to German law.

#### *3.1.2.3 Priority Cannot Be Claimed by Mere Co-Owner*

97 Even if one were to ignore the above-stated obstacles, and when applying G 3/92, Plaintiff still cannot claim the priorities of the applications in dispute if it is at most co-entitled (which is not the case here either) to the PCT applications in dispute.

98 Only the party holding the full rights to the patent can freely choose from the three options provided in Art. 61 (1) EPC. Mere co-owners cannot use the alternative of filing a new European patent application for the same invention set out in Art. 61 (1) b) EPC. The reason for this is that co-owners would not be entitled in full to this new application and thus would create the basis for a new entitlement suit (*Haedicke*, in: Haedicke/Timmann, “*Handbuch des Patentrechts*”, 1st edition (2012), Sec. 3 margin no. 233; *Kraßer/Ann*, Patentrecht, 7th edition (2016), Sec. 20 margin no. 108; *Bremi/Stauder*, in: Singer/Stauder, *loc. cit.*, Art. 60 margin no. 10).

99 Plaintiff has already conceded in the US trade secret violation case that Defendant is at least entitled to co-inventor’s rights (see margin no. 34 above).

### 3.2 Requests for Declaratory Relief 2) and 3)

100 The two requests directed at the determination of the obligation to pay damages require that either a specific damage has been incurred or that the first occurrence of damage in the future is “sufficiently likely” (cf. established case law of the Federal Court of Justice, as published in NJW 2015, at 1683). These conditions are absent in the present case since the occurrence of damage is not to be expected here or is at least highly uncertain and Plaintiff has not set forth in a substantiated manner what would indicate the likelihood of damage to be incurred in the present case.

101 The occurrence of a damage is presently already excluded by the fact that the Applications in Suit are not patentable (see **section** 2.2 above).

102 As a result, all of the requests for declaratory relief are lacking the necessary Declaratory Interest, and thus the condition for a judgment on the merits is not met.

### 4. No Legitimate Interest in Filing a Legal Action due to Tardiness

103 Even if one were to regard a Declaratory Interest to be possible in theory on the basis of G 3/92 – contrary to the fundamental decisions of the German legislator and the clear position of the Federal Court of Justice (**section 3.1** above) – Plaintiff in any case has no legitimate interest in filing a complaint in general.

104 According to the established case law, the requirement of legitimate interest in filing a complaint is supposed to prevent that requests made in a legal action reach the stage of being assessed as to whether they are well-founded although they obviously do not need legal protection through such assessment (see e.g. Federal Court of Justice judgment of 25 October 2012, court docket: III ZR 266/11, as published in NJW 2013, at 464 with further references). Thus, vexatious litigation, which obviously does not make any sense, is not supposed to be allowed. This is only assumed by way of exception but is appropriate here due to Plaintiff's tardiness when pursuing its alleged rights.

105 Due to the third-party interests involved, tardiness of an allegedly entitled party precludes "revival" of the lapsed application pursuant to Art. 60 (1) b) EPC. This was even acknowledged by the majority opinion in G 3/92, which assigned such cases to be dealt with in the national courts (G 3/92, section 4.4, second paragraph):

> "The extent to which a national court, when deciding upon a claim under Article 1(1) Protocol in a case where the earlier application is no longer pending, should take into account any delay by the lawful applicant in commencing and prosecuting proceedings to establish his right and the possibility of consequent third party prejudice, is a matter to be considered by national courts."

106 Although Plaintiff was aware of the alleged violation of its rights by Defendant since the priority application had been filed in October 2014 and although Plaintiff was aware or should have been aware of the Applications in Suit at the latest since their publication in April 2016, Plaintiff did not file an entitlement action when the Applications in Suit were still pending before the EPO; in any case once Plaintiff had become aware or at least should have had to be aware of imminent loss of rights that could not be remedied, Plaintiff should have prevented this, should have requested provisional legal protection or at least should have filed a complaint in main proceedings without culpable delay and requested a stay of the proceedings at the EPO. Plaintiff also would have had more than ample time for this, but preferred staying inactive.

107 As already explained, in **October 2014**, Defendant informed Plaintiff in advance of his plan to file the priority application. In **spring 2015**, Mr. Karp made his irrational allegations to Defendant, and on **1 and 2 September 2016**, Plaintiff commenced proceedings before the Superior Court of the State of California and the USPTO relating to, *inter alia*, the US and PCT applications by Defendant. Plaintiff thus had every reason to closely monitor the development of the PCT applications.

108 This is where the present case differs from the circumstances on which G 3/92 is based. In that case, the petitioner only became aware of the application filed by the non-entitled party during the search regarding its own patent application, as apparent from the facts presented in detail in the *amicus curiae* brief of the EPO President (see **Exhibit HE 2**, page 1 *et seq.*). At that point in time, the application filed by the non-entitled party had already lapsed.

109 When Defendant did not submit the respective filing fees within the time limit of 31 months pursuant to Art. 11 (3) PCT in conjunction with Art. 153 (1) A) EPC pursuant to Rule 159 B) EPC, both Applications in Suit were already deemed to be withdrawn pursuant to Rule 160 EPC since **21 April 2017** and thus **more than 15 months** before Plaintiff commenced the present proceedings. At the latest with the communication of loss of rights of the EPO **dated 26 June 2017** (see below, blue arrows), which could be viewed in the EPO Online Register, Plaintiff could have become aware of the withdrawal of the applications and would thus have had a specific reason for direct action.

**Event history: WO2016064919**

Refine search | ST36 | Espacenet | Report error | Print

| Date | Description | European Patent Bulletin date, issue number |
|---|---|---|
| 24.11.2017 | PCT data prior to European publication | |
| 24.11.2017 | Publication notification | published on 27.12.2017 [2017/52] |
| 04.08.2017 | Change: Application deemed to be withdrawn: despatch of communication + time limit | |
| 05.07.2017 | PCT data prior to European publication | |
| 26.06.2017 | New entry: Application deemed to be withdrawn: despatch of communication + time limit | |
| 04.05.2016 | PCT data prior to European publication | |
| 29.04.2016 | PCT data prior to European publication | |

**Event history: WO2016065049**

Refine search | ST36 | Espacenet | Report error | Print

| Date | Description | European Patent Bulletin date, issue number |
|---|---|---|
| 16.02.2018 | Application deemed to be withdrawn | published on 21.03.2018 [2018/12] |
| 10.02.2018 | PCT data prior to European publication | |
| 03.02.2018 | Change: Application deemed to be withdrawn: despatch of communication + time limit | |
| 29.11.2017 | PCT data prior to European publication | |
| 01.09.2017 | Publication notification | published on 04.10.2017 [2017/40] |
| 01.09.2017 | Change: Application deemed to be withdrawn: despatch of communication + time limit | |
| 21.07.2017 | Change: Application deemed to be withdrawn: despatch of communication + time limit | |
| 05.07.2017 | PCT data prior to European publication | |
| 26.06.2017 | New entry: Application deemed to be withdrawn: despatch of communication + time limit | |
| 04.05.2016 | PCT data prior to European publication | |
| 29.04.2016 | PCT data prior to European publication | |

110 The communications of loss of rights pursuant to Rule 112 Implementing Regulations to the EPC are of declaratory nature and inform about the loss of rights, which has already occurred (Bühler in: Singer/Stauder, "*Europäisches Patentübereinkommen*", 7th edition, (2016), Art. 106 margin no. 36). In said communications, the EPO moreover advises how to remedy the loss of rights ("Further processing" pursuant to Rule 121 Implementing Regulations to the EPC) by payment of an increased fee within two months after service on the petitioner. By way of example, we are submitting the Communication regarding WO'419 as

**Exhibit HE 3**.

111 At the point when the loss of rights was communicated, Plaintiff could still have remedied the loss of rights e.g. by payment of the filing fees on account of Defendant, and could have safeguarded its (alleged) rights by filing an entitlement action and requesting a stay of the examination before the EPO. Plaintiff also had more than enough time for this, i.e. more than half a year. As is furthermore apparent from the Online Register, the EPO did not succeed in serving the

communications so as to trigger the time limit, and therefore the communications were dispatched again on 25 July 2017 (WO'049) and on 11 August 2017 (WO'919) and eventually served by public notification in the European Patent Bulletin (pursuant to Rule 129 Implementing Regulations to the EPC, red arrows). It only became impossible to remedy the loss of rights three months after the public notification, i.e. as late as on 27 March 2018 (WO'919) and 4 January 2018 (WO'049).

112 Plaintiff could not rely on Defendant to make use of the remedies set out in the communications.

113 Plaintiff is trying to conceal that it waited for an unreasonably long time by referring to a further EPO communication to Defendant, i.e. the final instructions of the EPO dated 9 February 2018, which only relates to WO'049 and which is also merely of declaratory nature (white arrow). It was already obvious from the register in June 2017 (blue arrows) that Defendant would not prosecute the Applications in Suit.

114 Thus, Plaintiff failed to make use of the repeatedly available, simpler legal remedies which could have safeguarded the legitimate expectations of the public and it took Plaintiff <u>more than 13 months</u> (or still more than half a year if one were to assume – which is herewith denied – that Plaintiff only had final certainty regarding the loss of rights that had already occurred on 21 April 2017 through the final instructions dated 9 February 2018) before it commenced its legal action on the basis of facts that Plaintiff had known for years and that had at the latest with the US proceedings in September 2016 also been legally assessed.

115 That this is far too late for reasons of third-party protection is apparent from a comparison with the time limits for reinstatement. For instance, with regard to reinstatement into the priority term pursuant to Art. 87 EPC, a preclusion time limit – *irrespective of awareness* – of only two months is provided in Rule 136 Implementing Regulations to the EPC. This is a comparable case precisely due to the third-party interests involved. However, even in other cases, Rule 136 Implementing Regulations to the EPC only allows reinstatement within two months after removal of the impediment (in the present case: Plaintiff becoming aware of the loss of rights due to non-entry into the European phase).

116 In the present case, Plaintiff's tardiness precludes a legitimate interest in the extraordinary legal remedy, as intended with the Declaratory Action, of a retroactive "revival" of the Applications in Suit.

117 Not only Plaintiff's tardiness substantiates the lack of Plaintiff's legitimate interest. Plaintiff was also obviously not interested in obtaining patent protection

for its alleged cyber-insurance invention. Plaintiff shared its interest in becoming active in the cyber-insurance business not only openly with Defendant, but also with the public, e.g. on 6 November 2014 at a conference called "Web Summit" in Dublin. Also CyberMesh has been publicly promoted by Plaintiff long before, for example, in a prospectus dated 2013, but also in various YouTube videos, which we will also submit if this is denied. We are submitting said prospectus as

**Exhibit HE 4**.

## 5. The Requests for Declaratory Relief Are Unsubstantiated

118 The three Requests for Declaratory Relief are furthermore not justified on the merits. Firstly, Plaintiff substantiates its claims only on the basis of German law and overlooks that Californian law is applicable here (**section 5.1**).

119 Even if German law is auxiliarily taken as a basis, the Court has to consider the lack of patentability of the Applications in Suit. The lack of patentability precludes both the declaration of entitlement and a damage of Plaintiff (**section 5.2**). In any case, Plaintiff did not communicate a finished invention to Defendant (**section 5.3**). With regard to the alleged entitlement situation as asserted by Plaintiff the complaint already lacks a sufficiently substantiated explanation of the technical teachings of the Applications in Suit, as described therein in general form but also by means of specific embodiment examples. Plaintiff has thus failed already to comply with its burden of substantiation (**section 5.4**). Finally, based on what Plaintiff has submitted so far, it is moreover not entitled to a claim (**section 5.5**).

### 5.1 Applicable Law

120 Plaintiff seems to assume readily that German law is applicable. However, as clarified by the Enlarged Board of Appeal in G 3/92 with the insertion that the national court has to apply the decisive national legal provisions for the decision of the case (see margin no. 90 et seq. above), the Protocol on Recognition does not contain conflict of law. The applicable law has to be determined by the national court pursuant to its own, international private law.

121 Before Regulation (EC) No. 864/2007 ("Rome II Regulation") entered into force, in respect of non-contractual liability for damages on the grounds of unlawful application for a German or European patent, the Federal Court of Justice focused on the law of the place where the act occurred pursuant to Art. 40 (1) Introductory Act to the German Civil Code (Federal Court of Justice judgment "*Beschichtungsverfahren*" of 27 September 2016, court docket: X ZR 163/12). The Higher Regional Court Karlsruhe applies German law in respect of

entitlement to a PCT application relating to an invention made in Germany owing to "facts and circumstances affecting only Germany" (judgment of 28 April 2010, court docket: 6 U 147/08). On this basis, the Higher Regional Court Munich also considered subjecting cases of unlawful application of a European patent as infringement of an IP right within the terms of Art. 8 (1) Rome II Regulation to the principle of territoriality (Higher Regional Court Munich judgment of 7 December 2017, court docket: 6 U 4503/16, margin no. 117), but ultimately left this question unanswered owing to competing contractual claims to assignment.

122 The Higher Regional Court Munich rightly refrained from applying the principle of territoriality since the specific association in Art. 8 (1) Rome II Regulation is limited to the question of *infringement* of IP rights; the ownership of the right is precisely not comprised (see *Drexl*, in: "*Münchener Kommentar, Internationales Privatrecht II*", 7th edition (2018), Intangible Property Right, margin no. 184). This is also the only interpretation of the provision that makes sense. When consequently applying the principle of territoriality to the application of a European patent (Requests 1) and 2)), the German court would be forced to assess the question of entitlement pursuant to the law of all EPC Member States. The associated difficulties were reason enough for the Higher Regional Court Munich to consider transferring the focus consideration pursuant to Art. 8 (2) Rome II Regulation (cf. Higher Regional Court Munich, court docket: 6 U 4503/16, margin nos. 119, 121, by reference to the European Court of Justice judgment of 27 September 2017, in the case C-24/16 – "*Nintendo gegen Big Ben*"). After all, the mosaic-like consideration that would be necessary when applying the principle of territoriality would also contradict the uniform association with *lex loci delicti commissi* by the Federal Court of Justice in the "*Beschichtungsverfahren*" decision.

123 Thus, the general rules are to be applied, i.e. the association under the law of the joint habitual residence (Art. 40 (2) Introductory Act to the German Civil Code / Art. 4 (2) Rome II Regulation). Consequently, U.S./Californian law has to be applied to the question that needs to be decided on here, i.e. the entitlement to the Applications in Suit.

124 The relevant legal standards have to be determined by the court *ex officio* (one of many citations confirming this is: Cepl/Voß/Rinken "*ZPO*" Sec. 293 margin no. 10).

### 5.2 Patentability Is Relevant for All Requests

125 Even if one were to – incorrectly – apply German law, the court inevitably has to consider the lack of patentability of the Applications in Suit with regard to Requests 2) and 3) as to the declaration of the obligation to pay damages as well as the declaration of unlawful application as requested with Request 1). It was explicitly emphasized by the Federal Court of Justice in the "*Gummielastische*

*Masse I*" decision that patentability is to be examined as a rule as a prior question by the court and exceptions are only made for entitlement claims (Judgment of 17 January 1995, court docket: X ZR 130/93) (emphasis added):

> "The general courts have to decide themselves on prerequisite matter in lawsuits pending before said courts […]. It is true that the question of patentability and thus the protectability of the usurped part of the application is not to be considered in an entitlement action [with reference to the Federal Court of Justice judgments "*Spinnturbine I*", as published in GRUR 1979, at 692 [693], and "*Stangenführungsrohre*", as published in GRUR 1962, at 140)]. This is based on the concept that the general courts are not supposed to anticipate the result of examination proceedings before the patent offices and patent courts and should not interfere with pending proceedings to provide the entitled party with claims arising from an application filed without entitlement. However, protectability of an invention is to be examined if a legal action for declaration of unlawful usurpation (Federal Court of Justice judgment "*Stangenführungsrohre*", as published in GRUR 1962, at 297) or for injunctive relief against the allegation of unlawful usurpation [...] has been lodged."

126 Exceptions such as for entitlement actions are, however, to be narrowly interpreted as a rule and the grounds for an exception are precisely not given in the present constellation of Request 1). In contrast to an entitlement action pursuant Sec. 8 German Patent Act and Art. II Sec. 5 Act on International Patent Conventions, the court precisely does not interfere with pending proceedings on the basis of the lapsed applications. In contrast to an entitlement action, in which only the rights of the parties to the lawsuit are affected, a "revival" of the Applications in Suit would directly violate the rights of third parties (margin no. 87 *et seqq.* above), and therefore patentability has to be taken into account when deciding on whether the extraordinary request can be granted.

127 Since the subject matter of the Applications in Suit is not patentable there is moreover no violation of any other right protected pursuant to Sec. 823 German Civil Code. This has also been decided already by the Federal Court of Justice (*ibid.*; emphasis added):

> "Accordingly, the appeal court was not allowed to leave the question of protectability of the usurped matter undecided. The appeal court had to decide on a claim to compensation of damages, which is primarily to be assessed pursuant to Sec. 823 (1) German Civil Code.

> The inventor's right asserted by Plaintiff pursuant to Sec. 6 German Patent Act is an intangible property right to the invention and thus "another right" within the terms of Sec. 823 (1) German Civil Code [...]. The inventor's right can only be deemed to be violated unlawfully by application and renouncement if the invention was patentable [...]. This condition for the claim to compensation of damages has not been found by the appeal court. The contested judgment is therefore to be set aside to the extent that it established the defendant's obligation to pay damages (Sec. 564 (1) German Code of Civil Procedure)."

128 Thus, the evident lack of patentability of the Applications in Suit deprives all three requests of well-foundedness.

### 5.3 No Communication of a Finished Invention

129 Plaintiff asserts that by filing the Applications in Suit Defendant violated the inventor rights held by Plaintiff as alleged legal successor of the project team. As set out by the Federal Court of Justice in the "*Steuervorrichtung*" decision, the inventor right requires a (finished) technical finding and the announcement thereof (judgment of 18 May 2010, court docket: X ZR 79/07; see also Haedicke/Timmann, "*Patentrecht*", Sec. 3 margin no. 15). For instance, the following is stated by the Federal Court of Justice in margin no. 28 of the decision (emphasis added):

> "The inventor already achieves this position by making the invention, i.e. by recognizing how a specific **technical** problem can be solved by certain **technical** means ([...]), and announces this finding – although not to the public in order to keep it confidential – in such a way that it can be used as instruction for carrying out a technical teaching."

130 Since a *finished* invention is necessary for conception of invention, the adoption of someone else's suggestions or ideas that have not yet been condensed into a reproducible invention does not give rise to an assignment claim (Kraßer/Ann, "*Patentrecht*", 7th edition, Sec. 20 margin no. 12, and Regional Court Munich I, judgment of 22 February 2018, court docket: 7 O 4209/17, margin no. 31).

131 Plaintiff's employees did not communicate such a finished invention to Defendant. Plaintiff has merely submitted an e-mail, dated 9 June 2014, of Shyam Sankar (**FBD 6**). At most, this e-mail describes the non-technical business idea of a cyber-insurance, i.e. perhaps a suggestion or idea, and definitely not the inventions of the Applications in Suit.

132 Obviously, this was only one of several very abstract ideas on the part of Plaintiff, and definitely not a matured invention. This fact cannot be obscured by Plaintiff's inaccurate translation. The e-mail reads as follows in the English original (emphasis added):

> "We are <u>exploring</u> launching our own cyber insurance business …."

133 This has been translated by Plaintiff as follows:

> [translated back from German] "We are pursuing a launch of our own cyber-insurance business …."

134 However, as will be known to the Court, the English verb "to explore" means "to examine", "to investigate" or "to sound out". Thus, Plaintiff was still in a basic fact-finding phase in June 2014, and definitely not already "pursuing", as asserted in the Complaint. This is also confirmed elsewhere in the email:

> "There is a tremendous amount of operational know how needed here on both the cyber end and the insurance end. We feel confident about what we can do on the cyber end […]. But we need to partner with an entrepreneurial insurance or reinsurance company."

[This is followed by a German translation.]

135 Thus, Mr. Sankar acknowledges that at that time Plaintiff was completely lacking the operational know how on the insurance end and that they intended to gain this in future by partnering with an entrepreneurial insurance. It is also described in the e-mail what is meant by Mr. Sankar by operational know how on the cyber end, i.e. monitoring the networks of customers for attacks and weaknesses, prescribing quarterly security measures for customers, and letting the insurance lapse if these are not implemented.

136 Since Plaintiff had no further knowledge at that time, it was not possible to communicate more in the meeting that took place the following day. As confirmed in the internal report by Mr. Sankar and Mr. Kevin Kawasaki (**FBD 7**), the – relatively short – meeting covered only the commercial implementation of the idea and related real estate transactions.

137 The unsubstantiated assertions in section C.II.3 of the Complaint (page 20), i.e. that in this meeting Mr. Sankar also explained "all of the aspects later incorporated by Defendant into the Applications in Suit" which then are listed therebelow, are incorrect and are <u>denied</u>. Against the background that Mr. Sankar admitted the day before not to have any know-how in this regard and that

according to his report of the meeting technology was not even addressed therein, these assertions are not even plausible at all.

138 As to Plaintiff's further submissions regarding the alleged developments of Cyber Mesh and cyber-insurances in the "project team" since the beginning of 2013, <u>we are pleading ignorance pursuant to Sec. 138 (4)</u> particularly with respect to the submission in section C.I. of the Complaint and primarily where Plaintiff submits:

> "Plaintiff recognized the difficulties for companies to get efficient and reasonable insurances against cyber attacks, also because it is not possible for insurance companies to establish the suitable insurance concepts and insurance premiums. Therefore, the project team pursued the development of a system which enables a determination of a cyber attack risk as accurate as possible. For that, Plaintiff wanted to use the ability to access and understand customer data in real time. One starting point was also the CyberMesh-based consideration that with real-time information on cyber attacks read out and exchanged within the system, *inter alia*, one could also improve corresponding insurance systems."

139 It is astonishing what Plaintiff supposedly has developed since the beginning of 2013, although is identified as unknown know how by the head of the project team in his e-mail of June 2014. This submission is not credible and will also have to be substantiated by Plaintiff.

140 As further alleged proof of its alleged invention, Plaintiff presents an undated text obviously used for advertising its CyberMesh product (**FBD 5**), without even explaining when this was drawn up and whether it was transmitted to Defendant at all. What Plaintiff fails to mention is that CyberMesh was no internal development product at all, but a product advertised by Plaintiff long before the priority date of the Applications in Suit, 21 October 2014 (see above margin no. 117).

141 The submission that "Plaintiff's employees or directors mentioned these project developments" to Defendant, specifically no later than June 2014, is so unspecific it cannot be commented on.

142 The only specific indication that an employee of Plaintiff talked of this idea of a cyber-insurance at all, the email submitted as FBD 6, also proves the immaturity of said idea and the vast lack of knowledge by Plaintiff regarding the invention of the Applications in Suit. Therefore, Plaintiff did not have a finished invention and did not communicate such to Defendant either. In fact, Defendant's application with the priority date of 5 March 2014 shows that the essential inventive concept of dynamic and predictive (real time) analysis of data representing the numerous

factors influencing the assessment of insurance premiums is solely attributable to Defendant (see **sections 1.2**, **1.3.4** and **1.3.5** above).

### 5.4 The Submission Does Not Meet the Requirements of Case Law

143 Plaintiff's submission does not even in general meet the requirements of the Munich courts for a full entitlement. Plaintiff must set forth that the technically reproducible teaching underlying the invention, as described in the Applications in Suit in general form but also by means of specific embodiment examples, was known in its entirety to Plaintiff and that Plaintiff communicated said teaching to Defendant. In this regard, the entire invention described in the respective Application in Suit and its origin must be considered. The general statements in the Complaint do not suffice. Plaintiff has the burden of proof for this (Higher Regional Court judgment of 7 December 2017, court docket: 6 U 4503/16, margin no. 92) and thus also the burden of substantiation.

144 It will also have to be excluded that Defendant has provided a creative contribution to the Applications in Suit since otherwise Plaintiff would take away more from Defendant than that to which Plaintiff is entitled (Federal Court of Justice judgment "*Blendschutzbehang*" of 12 March 2009, court docket: Xa ZR 86/06, margin no. 14: "This would take away more from the defendant than the appeal court deemed to be disclosed to the plaintiff by the employee K."; Higher Regional Court Munich, judgment of 15 September 2016, court docket: 6 U 472/15, at the end of section II.A.1.c.: "The reason for this is that the legal action pursuant to Art. II, Sec. 5 (1), sentence 1, Act on International Patent Conventions and Art. 60 (1), sentence 1, EPC serves to eliminate an existing situation of unclear entitlement, and not to create such a situation of non-entitlement again by attributing a creative contribution to an invention to an unentitled person that has no right thereto under the law.").

### 5.5 No Entitlement to the Right

145 Moreover, Plaintiff lists a total of seven persons who were allegedly members of the "project team" that allegedly created the inventions. This submission is inconclusive since a "project team" cannot be an inventor, but only one or more individual persons; however, it is left unspecified in the Complaint who is supposed to have been creative regarding the inventions of the Applications in Suit and in particular which specific contribution was made by whom.

146 As a precaution, <u>we are also pleading ignorance pursuant to Sec. 138 (4)</u> regarding the statements that one of said members of the "project team" had been creative regarding the inventions of the Applications in Suit and that rights arising therefrom have in fact been transferred to Plaintiff.

## 6. International and Local Jurisdiction

### 6.1 No Jurisdiction Based on Protocol on Recognition

147 As regards the jurisdiction of the Court, Plaintiff cannot rely on the *Protocol on Jurisdiction and the Recognition of Decisions in respect of the Right to the Grant of a European Patent* of 5 October 1973 ("**Protocol on Recognition**") with regard to any of its requests. According to its wording alone, this Protocol only pertains to "claims, against the applicant, to the right to the grant of a European patent [...]" (Art. 1 of the Protocol on Recognition) and therefore requires that the European patent application is pending (see, explicitly, the *amicus curiae* brief, **Exhibit HE 2**, margin no. 14).

148 As regards the claim to compensation of damages asserted with Requests 2) and 3), the Protocol on Recognition does not contain any provision in any case. Jurisdiction by factual connection is also ruled out for these Requests (cf. Federal Court of Justice Judgment of 28 February 1996, XII ZR 181/93, as published in NJW 1996, at 1411, 1413).

### 6.2 No Jurisdiction Under the General Rules

149 Consequently, only the general rules on jurisdiction apply. According to those general rules, the Court seized here does not have jurisdiction either.

150 According to the case law of the European Court of Justice, the exclusive jurisdiction for the registration or the validity of patents and other IP rights as laid down in Art. 24, no. 4, of the *Regulation (EU) No 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters* ("**Brussels I Regulation**") does not apply to a dispute on entitlement (as regards the previous provision in the Brussels Convention: European Court of Justice Judgment "*Duijnstee*" of 15 November 1983, 288/82, margin no. 24). The further provisions of the Brussels I Regulation do not apply to Defendant since Defendant is domiciled outside a Member State of the European Union (cf. Art. 6 (1) Brussels I Regulation).

151 The only conceivable connecting point for all three requests is therefore the place of jurisdiction of the unlawful act pursuant to Sec. 32 German Code of Civil Procedure. The case law of the Federal Court of Justice allows that redress be sought at the place where the infringing act was committed and at the place where a legally protected right was violated. On the other hand, the place where the damage occurred is generally irrelevant (cf. Federal Court of Justice Judgment of 14 May 1969, I ZR 24/68, as published in NJW 1969, at 1532). The jurisdiction pursuant to Sec. 32 German Code of Civil Procedure is justified by the particular relationship of the dispute to the forum established by the place of action or

occurrence, but this must not lead to an unbounded extension of jurisdiction (Federal Court of Justice Judgment of 2 March 2010, VI ZR 23/09, as published in NJW 2010, at 1752, margin no. 17).

152 At no time did Plaintiff act within the German territory (let alone the jurisdiction of the Regional Court Munich I). Plaintiff's accusation is that PCT applications (with effect also for the territory of the EPC and Germany) were filed in the United States.

153 The seat of the European Patent Office (Requests 1) and 2)) or of the German Patent and Trademark Office (Request 3)) cannot be regarded as place of occurrence either since there is no violation of the legally protected right (as here: the right to a European or German patent). By designating the EPC States – which according to Rule 4.9 *of the Regulations under the PCT* constitutes the standard option for PCT applications and requires no further action – the PCT applicant merely obtains the option of initiating the European or national phase and of obtaining a corresponding patent (cf. *Hesper*, in: Singer/Stauder, *loc. cit.*, Art. 153, margin no. 59), which, however, necessarily requires further actions. Treatment equal to direct filing during the 31-month period is merely a reflex of Art. 11 (3) PCT and does not yet violate the right to the European or German patent. Only the entry into the European or national phase creates the necessary reference to Germany, which the Federal Court of Justice considers necessary in other constellations of the worldwide impact of an act for reasons of predictability and controllability in order to avoid an unbounded extension of the place of jurisdiction of the unlawful act (cf. Federal Court of Justice in NJW 2010, at 1752, margin nos. 17, 20).

154 The alleged loss of rights concerns questions of damages, which cannot establish the jurisdiction of the unlawful act. This is clear from the following control consideration: If Defendant had filed the PCT application only for countries outside the EPC, this would not have had any impact on the asserted damage (the missed opportunity to obtain a European or German patent for the alleged invention). The reason for this is that even in such a case the publication of the PCT application as prior art would have constituted a bar to Plaintiff's own application.

**7. Value in Dispute**

155 Plaintiff's sparse indications as to the value in dispute are so unspecific they cannot be commented on. Plaintiff only provides submissions as to the damages caused by cyber attacks, but not as to whether there is also a market for cyber-insurances, let alone cyber-insurances making use of the Applications in Suit. The

suggestion to set the maximum value in dispute is probably intended to suggest – in the absence of substantiated factual arguments – that the Applications in Suit have an enormous economic value, which is incorrect for the reason alone that they are not patentable (see **section 2** above). Plaintiff not even asserted that it or a third party would make use of the Applications in Suit in the Federal Republic of Germany, or that this would be foreseeable. Such a high commercial value therefore cannot be ascribed to the Applications in Suit.

156 Thus, the value in dispute should be considerably reduced; we suggest setting it at EUR 250.000 per Application in Suit, i.e. a total of EUR 500.000.

**8. Cost Security**

157 Plaintiff is obliged to provide cost security pursuant to Sec. 110 German Code of Civil Procedure since its headquarters is in the US and thus not in any Member State of the European Union or any Contracting State to the Agreement on the European Economic Area. None of the exceptions pursuant to Sec. 110 (2) German Code of Civil Procedure can be considered in the present case.

158 As to the amount of the security for procedural costs we suggest – based on the value in dispute proposed by Plaintiff – an amount not less than EUR 2,846,175.30. This amount is composed of the reimbursable costs of the German attorneys at law and patent attorneys, Defendant's foreign attorney, and the court fees and the expected reimbursable costs for translations and travel expenses of Defendant for all three instances according to the list enclosed as

**Exhibit HE 5.**

159 The legal action is therefore unfounded, and the request to dismiss the legal action and the further requests are to be allowed in view of the above.

Dr. Clemens Tobias Steins
Attorney at Law

HOFFMANN EITLE

# List of Exhibits

**HE 1** EP2911078

**HE 2** *Amicus curiae* brief of the EPO's President in the G 3/92 proceedings

**HE 3** Communication of 21 June 2016 regarding WO'419

**HE 4** CyberMesh prospectus

**HE 5** List of expected reimbursable procedural costs

# EXHIBIT 3
FILED UNDER SEAL

**From:** Marc Abramowitz <marc.abramowitz@gmail.com> on behalf of Marc Abramowitz
**Sent:** Monday, April 28, 2014 8:51 PM
**To:** Gavin Hood
**Subject:** Re: Any scheduling updates?

Or at least you and me and Kevin if around
We have

Orix
Syncort
[redacted]
Next intro

To status check

DC tomorrow!

On Apr 28, 2014 9:56 AM, "Gavin Hood" <ghood@palantir.com> wrote:
Marc,

We just caught up on the scheduling and we're not going to be able to make the week of 5th May work with Alex this time. Let's catch up when you're back in CA.

Gavin

**Gavin Hood**

**Palantir Technologies | Chief of Staff to the CEO**
**ghood@palantir.com | 646-670-1964**

---

**From:** Marc Abramowitz <marc.abramowitz@gmail.com>
**Date:** Sunday, April 27, 2014 at 2:44 AM
**To:** Kevin Kawasaki <kkawasaki@palantir.com>, Gavin Hood <ghood@palantir.com>
**Subject:** Any scheduling updates?

# EXHIBIT 4

FILED UNDER SEAL

**HUESTON HENNIGAN LLP**
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Yahor Fursevich, State Bar No. 300520
yfursevich@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898

*Attorneys for Plaintiff*
*Palantir Technologies Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARC L. ABRAMOWITZ, in his individual capacity and as trustee of the MARC ABRAMOWITZ CHARITABLE TRUST NO. 2, Abramowitz PARTNERS LLC, a Delaware limited liability company, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:19-cv-06879-BLF<br><br>**PLAINTIFF PALANTIR TECHNOLOGIES INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT MARC ABRAMOWITZ'S FOURTH SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:** **DEFENDANT MARC ABRAMOWITZ**

**RESPONDING PARTY:** **PLAINTIFF PALANTIR TECHNOLOGIES INC.**

**SET NUMBER:** **FOURTH**

Plaintiff PALANTIR TECHNOLOGIES INC. ("Palantir"), by and through its attorneys and pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, hereby submits the following objections and responses ("Responses") to the Interrogatories, Set Four, of Defendant Marc L. Abramowitz ("Abramowitz") as follows:

## PRELIMINARY STATEMENT

Palantir's investigation and development of all facts and circumstances relating to this action is ongoing, and, consequently, Palantir continues to investigate the facts relating to the above-captioned action (the "Action"). These Responses are made without prejudice to, and are not a waiver of, Palantir's right to rely on other facts or documents at trial.

By making the accompanying Responses to Abramowitz's Interrogatories, Palantir does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of its Responses into evidence in this Action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Palantir makes the Responses herein without in any way implying that it considers the Interrogatories or Responses thereto to be relevant or material to the subject matter of this Action.

Palantir expressly reserves the right to supplement, clarify, revise, or correct any or all of the Responses herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

## GENERAL OBJECTIONS

The following general objections ("General Objections") are incorporated in Palantir's specific responses to each Interrogatory. Palantir's response to any Interrogatory is not and shall not be deemed a waiver of Palantir's General Objections, and the absence or inclusion or any reiteration in a specific Response is neither intended as, nor shall be construed as, a limitation or waiver of any General Objection.

1. Palantir objects to and will not respond to the Interrogatories to the extent that they seek to impose obligations different from, or in addition to, those provided by the Federal Rules of Civil Procedure, any orders that may be entered in this case, relevant standing orders and guidelines, and relevant case law.

2. Palantir objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they seek the discovery of information that is neither relevant to the claims or defenses of any party in this Action nor proportional to the needs of the Action.

3. Palantir objects to the Interrogatories to the extent that they seek information protected by applicable privileges (including, but not limited to, the attorney-client privilege and the attorney work product privilege) or are otherwise protected under applicable law (collectively "Privileged Information"). To the extent that any Privileged Information is produced or otherwise disclosed, the production or disclosure will have been inadvertent and should not be deemed a waiver of any privilege. Palantir hereby reserves the right to object to the disclosure or use of such Privileged Information at any stage of these or any other proceedings.

4. Palantir objects to the Interrogatories to the extent that they assume disputed facts or legal conclusions, or purport to characterize facts in describing the information requested. Palantir hereby denies any such disputed facts, legal conclusions, or characterizations to the extent assumed by any of the Interrogatories. Any Response by Palantir to any such Interrogatory is without prejudice is not intended to be, and shall not be construed as, an admission that any factual or legal predicate or characterization is accurate.

5. Any response by Palantir to the Interrogatories shall not be deemed or construed in any way to be an adoption, admission, or agreement by Palantir that requested information is relevant, material, or admissible. Palantir reserves the right to object to the admissibility into evidence of any such information and to any further discovery requests calling for or pertaining to such irrelevant information.

6. Palantir objects to the Interrogatories to the extent that they seek information that is already known to Plaintiffs, publicly available, or already accessible by Plaintiffs and thus

unreasonably cumulative, duplicative, and/or obtainable from other sources that are more convenient, less burdensome, or less expensive.

7. Palantir further objects to the Interrogatories to the extent that they seek information that is not within Palantir's possession, custody, or control, and to the extent they seek information not available to Palantir through a reasonable inquiry.

8. Palantir objects to the Interrogatories to the extent that they call for speculation, opinion, or a legal conclusion.

9. Palantir objects to the Interrogatories to the extent that they call for disclosure of Palantir's confidential or proprietary information, trade secrets, research, development, commercial information, or any other competitively sensitive information.

10. Palantir objects to the Interrogatories to the extent that they are vague, ambiguous, or fail to describe with reasonable particularity the information requested, and also to the extent they are unduly burdensome or expensive, unreasonably cumulative or duplicative, or obtainable from some source that is more convenient, less burdensome, or less expensive.

11. Palantir further objects to the Interrogatories to the extent they are compound, conjunctive, or disjunctive and contain improper subparts.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

12. Palantir objects to the Definition of "IDENTIFY" or "DESCRIBE", and any Definition, Instruction or Interrogatory that incorporates that Definition, as vague, overly broad, unduly burdensome, and not proportional to the needs of the Action, and to the extent it purports to include information outside of Palantir's possession, custody, or control.

13. Palantir objects to the Definition "YOU," "YOUR" and "PALANTIR" and any Definition, Instruction or Interrogatory that incorporates that Definition, as vague, overly broad, unduly burdensome, and not proportional to the needs of the Action, and to the extent that it purports to include information relating to or in the custody, possession, or control of parties other than the parties named in this the Action. Palantir will construe those terms to refer to Palantir Technologies Inc.

14. Palantir objects to the Definition of [redacted] on the ground that it is vague and ambiguous. Palantir shall construe this term to mean and refer to the publicized data breach [redacted] suffered in 2014.

15. Palantir objects to each Definition to the extent it purports to extend beyond a reasonable scope or natural meaning. Palantir will interpret the Definitions, Instructions, and Interrogatories in a reasonable and good faith manner.

16. Palantir objects to the Instructions to the extent that they seek to impose obligations different from, or in addition to, those provided by the Federal Rules of Civil Procedure, any orders that may be entered in this case, relevant standing orders and guidelines, and relevant case law.

**RESPONSES TO REQUESTS FOR INTERROGATORIES**

**INTERROGATORY NO. 22**:

IDENTIFY ALL dates on which Marc Abramowitz entered YOUR offices from January 1, 2014 through May 5, 2015, the person(s) with whom he met during each visit, and the length of time of each meeting.

**RESPONSE TO INTERROGATORY NO. 22**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 5 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

| Date | Approximate Time | Persons Met |
|---|---|---|
| February 18, 2014 | 2pm | John Amos, Matt Scullion, Brad DeLong, Ajay Sudan, Lauren Chaparro, Sebastian Caliri, Kevin Kawasaki |
| March 5, 2014 | 11:30am – 12pm | Alex Karp |
| March 21, 2014 | 10am | Parag Shah, Mike Reilly |
| March 26, 2014 | 3pm – 3:30pm | Gavin Hood |
| April 11, 2014 | 8:30am – 9am | Gavin Hood |
| May 3, 2014 | 1pm – 1:30pm | Alex Karp |
| May 7, 2014 | 2:30pm – 3pm | Gavin Hood |
| May 8, 2014 | 5pm – 5:30pm | Alex Karp |
| June 10, 2014 | 4:15pm – 5:45pm | Shyam Sankar |
| June 6, 2014 | 10:30am – 11am | Gavin Hood |
| July 1, 2014 | 3:30pm – 4:15pm | Gavin Hood |
| July 12, 2014 | 1pm | Alex Karp |
| July 14, 2014 | 5pm – 5:30pm | Kevin Kawasaki |
| July 23, 2014 | 2pm – 2:30pm | Gavin Hood |
| July 26, 2014 | 1pm – 2pm | Alex Karp |
| October 7, 2014 | 11:30am | Tyler Scriven, Joseph Meyerowitz, Matt Kraning, Brian Rowen |
| October 14, 2014 | 1:00pm – 1:30pm | Gavin Hood |
| October 14, 2014 | 2:15pm – 2:45pm | Kevin Kawasaki |
| November 4, 2014 | 12:45pm – 1pm | Alex Karp |
| December 2, 2014 | 5pm – 5:30pm | Alex Karp |
| April 21, 2015 | 9:30am – 10am | Gavin Hood |
| April 29, 2015 | | Lisa Gordon |

Pursuant to FRCP 33(d), Palantir further refers Defendant to the following documents: PALANTIR_CA_00003224, PALANTIR_CA_00002063, PALANTIR_CA_00002064, PALANTIR_CA_00002065, PALANTIR_CA_00006568, PALANTIR_CA_00006581,

PALANTIR_CA_00006582, PALANTIR_CA_00006583, PALANTIR_CA_00009050, PALANTIR_CA_00006571, PALANTIR_CA_00006573, PALANTIR_CA_00006574, PALANTIR_CA_00006577, PALANTIR_CA_00006655, PALANTIR_CA_00006666, PALANTIR_CA_00006671, PALANTIR_CA_00016612, PALANTIR_CA_00020536, PALANTIR_CA_00002060, PALANTIR_CA_00002059, MLA_CA_00009754; MLA_CA_00002413; MLA_CA_00002899; MLA_CA_00006231.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 23**:

IDENTIFY AND DESCRIBE ALL facts supporting YOUR contention that YOU manifested assent that Marc Abramowitz act on YOUR behalf and subject to YOUR control, AND ALL facts supporting YOUR contention that Marc Abramowitz manifested assent to act on YOUR behalf and subject to YOUR control. In responding to this Interrogatory, YOU must IDENTIFY AND DESCRIBE who manifested such assent, when he or she did so, where this was done, how each party manifested such assent, and the witnesses to any such instance.

**RESPONSE TO INTERROGATORY NO. 23**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 14 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

In 2005, Abramowitz (through his entities) became an early investor in Palantir and began cultivating and fostering close relationships with Palantir executives and employees. By late 2012, Abramowitz had gained the trust of Palantir's senior leadership, including Palantir's CEO, Alex Karp, and positioned himself as an advisor, agent, and fiduciary of the company. For example, between 2010 and 2012:

1. Abramowitz continued to cultivate a close personal and professional relationship with Dr. Karp and regularly sought out one-on-one meetings (*see, e.g.,* MLA_CA_00036742; MLA_CA_00030655; MLA_CA_00036827; MLA_CA_00036838; MLA_CA_00036862; MLA_CA_00036937; MLA_CA_00036938; MLA_CA_00037031; MLA_CA_00036732; MLA_CA_00036913; MLA_CA_00036897; MLA_CA_00037765).
2. Abramowitz consistently communicated with Palantir executives to introduce potential opportunities for Palantir, including outlining partnerships or other opportunities that "sound[] like a Palantir fit" and technology that "might be useful to Palantir", and opining on Palantir's market and future direction (*see, e.g.,* MLA_CA_00036788; MLA_CA_00036842; MLA_CA_00036862; MLA_CA_00036863; MLA_CA_00036898; MLA_CA_00030655; MLA_CA_00030677; MLA_CA_00037011; MLA_CA_00037274; MLA_CA_00000334).

Between 2012 and 2014, Abramowitz continued to engage in discussions with Palantir executives, employees. and third parties, including by email, by telephone, and in person, in his capacity as Palantir's fiduciary and advisor. In these communications, Palantir manifested assent that Abramowitz act on its behalf and subject to its control, and Abramowitz similarly manifested assent to so act on numerous occasions. For example:

1. In December 2012, Palantir employee Lauren DeMeuse provided information and materials to Abramowitz in relation to an upcoming Palantir presentation at the University of California, San Francisco (MLA_CA_00037554; MLA_CA_00037607). Abramowitz subsequently emailed Dr. Karp on December 11, 2012, and, referring to his plans to attend

the Palantir presentation at UCSF, wrote: "we should talk about this potential health care drug development area app." (MLA_CA_00037521).

2. In or around February 2013, Abramowitz represented that he could introduce Palantir to Teva Pharmaceuticals for the purpose of pitching Palantir's products. Palantir executives and employees, including Dr. Karp, DeMeuse, Casey Ketterling, and Gavin Hood, assented to Abramowitz operating in such a manner, and Abramowitz similarly agreed to be subject to Palantir's direction while working on this project.
3. In or around January 2013, Palantir invited Abramowitz to attend a 2.5-hour meeting at Palantir's Palo Alto headquarters with Palantir employees DeMeuse and Ketterling to learn more about the application of Palantir's technology in the healthcare space on February 20, 2013 (MLA_CA_00000126). DeMeuse emailed Abramowitz after the meeting writing that she had "enjoyed brainstorming health applications" and would send a set of Palantir materials for Abramowitz to give to Teva Pharmaceuticals (MLA_CA_00000139). Abramowitz thanked DeMeuse and Ketterling for imparting a "much deeper understanding" of Palantir's capabilities in the healthcare space and expressed a desire to move Palantir's efforts on this project "forward together" (MLA_CA_00000139). In response to Abramowitz's representations, Ketterling promised to keep shareable materials "flowing" and to keep Abramowitz updated on any progress (MLA_CA_00000139).
4. On March 28, 2013, Abramowitz emailed DeMeuse and Ketterling, writing: "Shall we set a time next week to see how 'Teva' presentation is going?" (MLA_CA_00000436). Manifesting assent that Abramowitz act on Palantir's behalf, DeMeuse then shared the latest pitch document for Palantir pharmaceutical applications with Abramowitz so that Abramowitz could use this in spearheading introductions to potential clients in pharmaceuticals and healthcare, including Teva Pharmaceuticals (MLA_CA_00000444; MLA_CA_00000446).
5. On February 23, 2013, Abramowitz forwarded to Dr. Karp an email chain between himself and GE Digital, which had asked Abramowitz to provide a business development contact at Palantir to "see how Palantir might be helpful solving analytics problems for GE across its many industrial businesses, including aviation, oil & gas, energy, transportation, and

healthcare." Manifesting his assent to act on Palantir's behalf, Abramowitz forwarded this message to Dr. Karp and stated that they "need[ed] to talk health care" (MLA_CA_00000157).

3. In late February 2014, Abramowitz claimed to have found a "pretty good use case for Palantir." DeMeuse and Abramowitz met to discuss this potential opportunity on February 27, 2014. DeMeuse emailed after the meeting with instructions for Abramowitz, further evidencing the parties' mutual assent for Abramowitz to act on Palantir's behalf and subject to Palantir's control. (PALANTIR_CA_00003199).

6. Starting in January 2014, and continuing through November 2014, Palantir, through at least Dr. Karp, Kevin Kawasaki, and Gavin Hood, assented to Abramowitz working on its behalf (and with Palantir employees) on exploring a potential business deal with Orix Health and Life Sciences. In connection with this opportunity, Abramowitz assented to being subject to Palantir's control as Palantir's agent. For example:

    a. On January 19, 2014, Abramowitz emailed Palantir employees and stated that Dr. Karp had "asked [him] to pursue directly" the Orix opportunity with Palantir's healthcare team. As a result of his expressed manifestation to work on Palantir's behalf to facilitate a partnership with Orix, Abramowitz participated in the introductory meeting between Orix and Palantir in February 2014 (PALANTIR_CA_00001354).

    b. In March 2014, Abramowitz travelled to Dallas, Texas to attend a meeting between Palantir employees (including Kawasaki and DeMeuse) and Orix (PALANTIR_CA_00006673). Abramowitz emailed Dr. Karp to provide an update on the meeting and the "progress" in securing Orix as a "large domestic customer" for "Palantir Health", further manifesting his assent to act on Palantir's behalf (PALANTIR_CA_00002018).

    c. On April 17, 2014, Abramowitz emailed Kawasaki, Hood, and Dr. Karp, seeking a status report from Kawasaki on several deals or partnership negotiations in progress, including Orix. He aligned himself with Palantir and manifested assent to act on Palantir's behalf (PALANTIR_CA_00001840).

d. On April 20, 2014, Abramowitz emailed John Amos, copying Kawasaki, Dr. Karp, and Hood, and stated to Amos on Palantir's behalf that Palantir had a "strong desire to move forward" and build a "good long term marriage" with Orix (PALANTIR_CA_00001826).

e. On April 27, 2014, Abramowitz again manifested his assent to work on Palantir's behalf to move various partnership or potential client deals forward. He emailed Kawasaki and Hood, asking for scheduling updates. Hood responded, stating that they should catch up with Dr. Karp. Abramowitz then listed the companies they needed to "status check", including Orix, [redacted] Syncsort. (MLA_CA_00003416).

f. Abramowitz continued to manifest his assent to act on Palantir's behalf to close the deal with Orix through to at least January 2015. On January 5, 2015, Abramowitz wrote to Matthew Meskell and Hood "Shall we try again with Orix?" After Meskell responded, Abramowitz stated that he would see Amos at a conference and would "get a read and report" (MLA_CA_00007716).

7. On March 9, 2014, Abramowitz represented to a third party that he was a "strategic advisor in the business development function" to Palantir and offered to arrange a meeting with Palantir's healthcare team (MLA_CA_00002820). Abramowitz forwarded the above email to Dr. Karp, manifesting his assent to act on Palantir's behalf and be subject to its control (PALANTIR_CA_00002030).

8. On May 8, 2014, Abramowitz emailed Hood, Dr. Karp, Kawasaki, Tyler Scriven, DeMeuse, and Ajay Sudan, with the subject line "We need to get in front." [emphasis added]. (PALANTIR_CA_00001627). DeMeuse responded to Abramowitz offering to catch up "sometime next week" to "chat[] about our health work." On June 3, 2014, DeMeuse, believing that Abramowitz was acting on Palantir's behalf to make introductions in the healthcare space, met with Abramowitz to give him a "Palantir Briefing" on its work (MLA_CA_00003575; MLA_CA_00003879).

9. Starting at least in March 2014, Palantir and Abramowitz manifested mutual assent for Abramowitz to work on Palantir's behalf and subject to Palantir's control to in relation to its cyber security and natural resources exploration businesses, and to explore potential 'acquihire' opportunities for the company. For example:

a. Between March and June 2014, Abramowitz sought to connect Palantir executives to executives at [redacted] (PALANTIR_CA_00001996).

b. On March 21, 2014, Abramowitz emailed Kawasaki, copying Hood and Dr. Karp, reporting that the Palantir employees were well-placed to "explore the range of possible retail opportunities for Palantir at [redacted]" In the same email, Abramowitz offered to introduce a contact, Bippy Siegel, "to the possible uses of Palantir in the oil and gas exploration and production business which we talked about in Dallas" demonstrating his assent to act on Palantir's behalf in furthering its work in the natural resources exploration sector. (PALANTIR_CA_00001996).

c. On April 1, 2014, Abramowitz emailed Kawasaki, copying Hood and Dr. Karp, and referred to [redacted] as a "big" opportunity that "should be ours," thereby further manifesting his assent to act on Palantir's behalf in connection with the [redacted] opportunity (PALANTIR_CA_00001938).

d. On April 6, 2014, Abramowitz emailed Hood (copying Dr. Karp) seeking to coordinate Joshua Kazam visiting [redacted] at the same time as Dr. Karp. He wrote that he believed this would be "advantageous" because Kazam had "deep relationships at [redacted] and had been "working to introduce Palantir's utility to [redacted] at the senior level" (PALANTIR_CA_00001920).

e. On April 20, 2014, Abramowitz wrote to Kazam with an update on the [redacted] meeting. Abramowitz forwarded his emails with Kazam to Kawasaki, Hood, and Dr. Karp, seeking direction from Palantir about what would be "useful." Manifesting Palantir's assent to Abramowitz acting on its behalf and subject to its control, Kawasaki provided directives to Abramowitz, stating, "Close hold for now. We are

going to move the first thing forward. This is at their instruction." Abramowitz replied: "OK by me. Step by step…" (PALANTIR_CA_00001819).

f. In May 2014, Tyler Scriven, on behalf of Palantir, asked Abramowitz to accompany Scriven on a Palantir business trip to Tel Aviv, Israel. Abramowitz agreed and helped Palantir identify potential business opportunities in advance of the trip (*see, e.g.,* PALANTIR_CA_00185788; MLA_CA_00003586; MLA_CA_00003599; MLA_CA_00003601; MLA_CA_00003662; PALANTIR_CA_00185815; PALANTIR_CA_00185817; PALANTIR_CA_00185820; MLA_CA_00003764).

g. Abramowitz organized and attended meetings with Israeli tech companies on Palantir's behalf (*see, e.g.,* MLA_CA_00003662; PALANTIR_CA_00006705; PALANTIR_CA_00185815; PALANTIR_CA_00185817; PALANTIR_CA_00185820; MLA_CA_00003764). For example, in advance of the trip, Abramowitz suggested a meeting with Windward (an Israeli data company focused on the maritime industry), and then organized this meeting (MLA_CA_00003662; MLA_CA_00003764; MLA_CA_00004117).

h. On July 11, 2014, Scriven emailed Abramowitz updating him on Palantir's ongoing discussions with Windward. Abramowitz responded, manifesting an assent to act on Palantir's behalf by stating that he was "[h]appy to meet" with Windward and "help structure" (PALANTIR_CA_00185799).

10. The parties repeatedly manifested assent that Abramowitz work on Palantir's behalf and subject to its control in relation to Palantir's planned expansion in the cybersecurity and cyber insurance sectors. For example:

a. On June 9, 2014, Shyam Sankar emailed Abramowitz and outlined Palantir's confidential plans in the cybersecurity and insurance field and asked Abramowitz if he wanted to meet with him to discuss these ideas. Abramowitz responded, stating that he would be "delighted" to meet with Sankar (PALANTIR_CA_00014540).

b. In around July 2014, Abramowitz began working with Alex Fishman in exploring a cyber insurance venture on Palantir's behalf. On July 20, 2014, Fishman emailed

Abramowitz, stating that "Karp is excited… this idea of building and then flipping to another insurance co is pretty cool" (MLA_CA_00004494).

c. On August 20, 2014, Abramowitz emailed Alex Fishman with the subject line: "Insurance Co DRAFT memo for A Karp. Review and if helpful I'll send. Marc." The memo reflects Abramowitz working on Palantir's behalf and subject to the supervision and control of senior Palantir executives (MLA_CA_00005398).

d. Abramowitz also made numerous representations to third parties that he was working on Palantir's behalf. For example, on August 21, 2014, Abramowitz told a third party that he had a "real business assignment for Palantir" that he "must pursue" (MLA_CA_00005547). On September 13, 2014, he told an attorney specializing in insurance that he was "working with a partner to create a specialty high limit cyber insurance company utilizing risk reduction and management protocols to be supplied by Palantir." (MLA_CA_00005988).

e. On October 18, 2014, Abramowitz emailed Dr. Karp, seeking to "talk through what we are doing to be sure we are congruent on biz dev" (PALANTIR_CA_00000733).

11. Abramowitz sought guidance from Dr. Karp about his work on behalf of Palantir. For example, on June 19, 2014, Abramowitz sought instructions from Dr. Karp: "Anything for me to do re project you mentioned?" (PALANTIR_CA_00001330). On June 30, 2014, Abramowitz emailed Dr. Karp, thanking him for a call and stating: "Your team and you are superb" (PALANTIR_CA_00001102).

12. From April to October 2014, Abramowitz also manifested his assent to act on Palantir's behalf in introducing Palantir to companies that Abramowitz thought could be potential 'acquihires' for Palantir.

a. Between April and May 2014, Abramowitz acted as an intermediary between Syncsort and Palantir about the potential acquihire of Syncsort (*see, e.g.*, PALANTIR_CA_00001840; MLA_CA_00003416; PALANTIR_CA_00001780).

b. Between July and August 2014, Abramowitz communicated with Scriven, and senior executives and an investor in Talkwheel in relation to a potential acquihire of

Talkwheel. (*see, e.g.,* PALANTIR_CA_00185802; MLA_CA_00004466; PALANTIR_CA_00025019; MLA_CA_00037817; MLA_CA_00005527; MLA_CA_00005509; MLA_CA_00005527).

c. In August 2014, the parties manifested assent for Abramowitz to work on Palantir's behalf regarding another opportunity with Tomodo. On August 12, 2014, Scriven asked Abramowitz if he could assist Palantir by discreetly "back-channel[ing] intel on our behalf," and Abramowitz responded that he was "[o]n it" the same day – assenting to act on Palantir's behalf. On August 29, 2014, Abramowitz then emailed Scriven, Hood, and Karp regarding this project. On August 31, 2014, Abramowitz emailed Shochat, copying Scriven, speaking on Palantir's behalf regarding this project (*see, e.g*., MLA_CA_00005140; PALANTIR_CA_00000869; MLA_CA_00005717; MLA_CA_00005744).

d. On September 14, 2014, Abramowitz introduced a co-founder of Qadium, a potential acquihire target, to Scriven and Hood (PALANTIR_CA_00000806). Abramowitz then attended a meeting on October 7, 2014 between Scriven and Brian Rowen of Palantir and the Qadium co-founders at Palantir's headquarters (*see, e.g*., PALANTIR_CA_00013908; MLA_CA_00006350; PALANTIR_CA_00185894; PALANTIR_CA_00185907; MLA_CA_00006344).

Pursuant to Rule 33(d), Palantir further directs Abramowitz to the following documents, evidencing the parties' manifestation of their assent for Abramowitz to act on Palantir's behalf and subject to Palantir's control: MLA_CA_00000157; MLA_CA_00000560; MLA_CA_00000142; PALANTIR_CA_00165194; MLA_CA_00002436; PALANTIR_CA_00001996; MLA_CA_00003224; PALANTIR_CA_00001840; PALANTIR_CA_00006668; MLA_CA_00003399; MLA_CA_00003551; MLA_CA_00003613; PALANTIR_CA_00013812; PALANTIR_CA_00002030; MLA_CA_00004149; PALANTIR_CA_00000991; PALANTIR_CA_00000729; MLA_CA_00007716; PALANTIR_CA_00000847; PALANTIR_CA_00006649; MLA_CA_00002837; PALANTIR_CA_00001982; PALANTIR_CA_00001920; PALANTIR_CA_00001840; MLA_CA_00003416;

MLA_CA_0000414; MLA_CA_00004442; MLA_CA_00004707; PALANTIR_CA_00185805; PALANTIR_CA_00006703; MLA_CA_00004747; MLA_CA_00005539; PALANTIR_CA_00000901; PALANTIR_CA_00001376; AFCAL0001996; MLA_CA_00005064; MLA_CA_00005671; PALANTIR_CA_00000741.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 24**:

IDENTIFY AND DESCRIBE ALL dates, facts, circumstances, and individuals involved in the "course of conduct" that YOU allege gave rise to Marc Abramowitz's purported confidentiality obligation. See Palantir's Sept. 26, 2021 Amended Response to Interrogatory 13. The time period for this Interrogatory is January 1, 2012 through September 1, 2016.

**RESPONSE TO INTERROGATORY NO. 24**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 15 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

Palantir incorporates by reference its response to Defendant's Interrogatories 11, 13, and 23 herein. Palantir further incorporates by reference its responses to KT4 Partners LLC's Interrogatories 1-3. The course of conduct described in these responses, which occurred over a

period of many years, allowed Abramowitz to gain the trust and confidence of Palantir, and position himself as a fiduciary, agent, and advisor to the company. This in turn gave rise to Abramowitz's fiduciary obligations to protect and preserve the confidentiality of Palantir's trade secrets and confidential information.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 25**:

IDENTIFY where each of the PURPORTED TRADE SECRETS identified in the TRADE SECRET DISCLOSURE appears in each of the PATENT APPLICATIONS.

**RESPONSE TO INTERROGATORY NO. 25**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 24 in Defendant's Rule 30(b)(6) notice. Palantir objects to the definition of "PATENT APPLICATIONS," and adopts the definition of "Patent Applications" as set forth in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

The following claims, abstracts, embodiments, and specifications in Abramowitz's patent applications disclose Palantir's trade secret information set forth in the Disclosure:

- Trade Secret 1 – Claims 1-23; Specifications 0007, 0008, 0051, 0083-0093, 0096, 0102-0103; 0105, 0107, 0113-0114, 0120-0122, 0137 and Figures 10, 12-14, 16-17 of USPTO Application No. 14/919,506.

- Trade Secret 2 – Claims 2, 13-15, 22; Specifications 0097, 0099-0100, 0124, 0138; and Figures 12-13 of USPTO Application No. 14/919,506.

- Trade Secret 4 – Claims 2, 13-15, 22; Specifications 0099-0100, 0124, 0138; and Figure 13 of USPTO Application No. 14/919,506.

- Trade Secret 6 – Claims 9-10; Specifications 0085, 0120, 0141; and Figure 17 of USPTO Application No. 14/919,506.

- Trade Secret 9 – Claims 13-14, 16-17, 31-32, 34-35; Specifications 0046-0047; and Figure 3A of USPTO Application No. 14/918,398. Specifications 0040-0041, 0052, 0066, 0070, 0077; and Figures 3A of USPTO Application No. 14/919,506. Claims 13-14, 16-17, 31-32, 34-35, 43; Specifications 0034-0035; and Figure 3A of USPTO Provisional Application No. 62/066,716.

- Trade Secret 11 – Claims 1-2, 10-12, 18, 19, 21, 28, 36-39; Specifications 0033-0039, 0046-0047, 0054, 0058-0064, 0067-0068, 0071-0072, 0074, 0077; and Figures 3A, 3B, 3C, 5, 7 of USPTO Application No. 14/918,398. Specifications 0042-0046, 0053, 0057-0060, 0065-0066, 0068-0069, 0073, 0076, 0078, 0080; and Figures 3A, 3B, 3C, 5, 7 of USPTO Application No. 14/919,506. Claims 1-2, 3-4, 10-12, 13, 18-19, 21, 28, 36-39, 41-42, 46; Specifications 0022-0027, 0033-0035, 0037, 0039, 0043-0049, 0052-0053, 0056-0057, 0061; and Figures 3A, 3B, 3C, 5, 7 of USPTO Application No. 62/066,716.

- Trade Secret 12 – Claims 1, 3-4, 10-14, 16-17, 19, 21-22, 28, 31-32, 34-35, 37-39; Specifications 0033-0037, 0046-0047, 0050-0054, 0058-0064, 0067-0068, 0071, 0077; and Figures 4-5, 7 of USPTO Application No. 14/918,398. Specifications 0041-0044, 0052, 0057, 0059-0060, 0065, 0069-0070, 0073, 0077, 0080; and Figures 4-5, 7 of USPTO Application No. 14/919,506. Claims 1, 3-4, 10-14, 16-17, 19, 21-22, 28, 31-32, 34-35, 37-42, 46; Specifications 0033-0036, 0022-0025, 0038-0039, 0043-0049, 0052-0053, 0056, 0061; and Figures 4, 5, 7 of USPTO Application No. 62/066,716.

- Trade Secret 13 - Claims 1, 3-4, 10-14, 16-17, 19, 21-22, 28, 31-32, 34-35, 37-39; Specifications 0048, 0050-0054, 0058-0064, 0067-0068, 0071, 0072, 0074, 0077; and Figures 3B, 4, 5, 7 of USPTO Application No. 14/918,398. Specifications 0041-0044, 0054, 0057, 0060, 0065, 0069, 0076-0077, 0080; and Figures 3B, 4, 5, 7 of USPTO Application No. 14/919,506. Claims 1, 3-4, 10-14, 16-17, 19, 21-22, 28, 31-32, 34-35, 37-42, 46; Specifications 0036, 0038, 0039, 0043-0049, 0052-0053, 0056-0057, 0061; and Figures 3B, 4, 5, 7 of USPTO Application No. 62/066,716.

- Trade Secret 14 – Claims 1, 10, 18, 19, 21-22, 28, 37-39; Specifications 0050-0054, 0058-0064, 0067-0068, 0071-0072, 0074, 0077; and Figures 4-5, 7 of USPTO Application No. 14/918,398. Specifications 0043-0045, 0055, 0058, 0064, 0069, 0077-0078, 0080; and Figures 4-5, 7 of USPTO Application No. 14/919,506. Claims 1, 10, 18, 19, 21-22, 28, 37-39, 40, 46; Specifications 0038-

0039, 0043-0049, 0052-0053, 0056-0057, 0061; and Figures 4-5, 7 of USPTO Application No. 62/066,716.

- Trade Secret 16 – Claims 2, 20, 37-39; Specifications 0040, 0049-0050, 0052, 0054, 0074, 0077; and Figures 3C, 5 of USPTO Application No. 14/918,398. Specifications 0040, 0042, 0046, 0056-0057, 0060, 0064, 0067, 0072, 0078, 0080; and Figures 3C, 5 of USPTO Application No. 14/919,506. Claims 2, 20, 37-39, 42; Specifications 0028, 0037-0039, 0061; and Figures 3C, 5 of USPTO Application No. 62/066,716.

- Trade Secret 17 – Claims 37-39; Specifications 0040, 0051, 0053, 0055, 0056, 0057, 0068-0069, 0077; and Figures 6-8 of USPTO Application No. 14/918,398. Specifications 0042-0044, 0046, 0056, 0058, 0062-0063, 0066, 0074, 0078; and Figures 6-8 of USPTO Application No. 14/919,506. Claims 37-39; Specifications 028, 0040-0042, 0044, 0053-0054, 0061; and Figures 6-8 of USPTO Provisional Application No. 62/066,716.

To the extent the patent applications do not disclose Palantir's trade secrets, they derive from Palantir's trade secrets listed in the Disclosure.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 26**:

IDENTIFY AND DESCRIBE ALL facts supporting YOUR allegation that Trade Secret Nos. 18, 20, 21, and 22 listed in the TRADE SECRET DISCLOSURE retain their status as YOUR "trade secret" despite YOUR assertion that these PURPORTED TRADE SECRETS were published in the PATENT APPLICATIONS.

**RESPONSE TO INTERROGATORY NO. 26**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product

doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 18 in Defendant's Rule 30(b)(6) notice. Palantir objects to the definition of "PATENT APPLICATIONS," and adopts the definition of "Patent Applications" as set forth in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

Although certain of Abramowitz's patent applications derive from and disclose portions of Trade Secrets 18, 20, 21, and 22, Palantir does not contend or assert that the entirety of Trade Secrets 18, 20, 21, and 22 were published in the patent applications.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 27**:

IDENTIFY AND DESCRIBE ALL facts supporting YOUR allegation that Marc Abramowitz disclosed or otherwise misused Trade Secret Nos. 5, 7, and 10 listed in the TRADE SECRET DISCLOSURE.

**RESPONSE TO INTERROGATORY NO. 27**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 19 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

As explained in Palantir's response to KT4's Interrogatory 2, Abramowitz obtained Palantir's cybersecurity and cyberinsurance trade secrets, including Trade Secret Nos. 5, 7, and 10, from Palantir. Without Palantir's knowledge and consent, Abramowitz then filed cybersecurity and cyberinsurance patent applications based on those trade secrets. Abramowitz's cybersecurity application seeks to patent, among other things, data integration concepts and methods for sharing data, including historic data, between participants in a cybersecurity consortium in a manner that would allow each participant to understand and integrate data from other participants and to create protocols based on various types of cyberattack data for preventing future cyberattacks. Abramowitz's cyberinsurance application seeks to patent, among other things, concepts and methods pertaining to assessing the risk of a particular network based on the network's vulnerabilities. As such, these applications derive at least in part from Trade Secrets 5, 7, and 10.

Further, after filing the patent applications, Abramowitz began working on commercializing the inventions in his patent applications with the apparent intent to create data integration platforms based on those inventions to compete with Palantir. Abramowitz appears to have discussed the inventions in his patent applications and Palantir's trade secrets with at least some of the individuals and entities identified in Abramowitz's response to Palantir's Interrogatory 1 and Palantir's response to Abramowitz's Interrogatory 5.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 28**:

IDENTIFY the date, even if it was after September 1, 2016, that MD Anderson became YOUR customer, the date that MD Anderson ceased being YOUR customer, and the product(s) that MD Anderson used when it was YOUR customer.

**RESPONSE TO INTERROGATORY NO. 28**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 28 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

MD Anderson was a customer of Palantir's Foundry product, intended to be used for purposes of research and patient care, between around February 2018 and July 2020.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 29**:

IDENTIFY the date, even if it was after September 1, 2016, that [redacted] became YOUR customer, the date [redacted] ceased being YOUR customer, and the product(s) that [redacted] used when it was YOUR customer.

**RESPONSE TO INTERROGATORY NO. 29**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product

doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 29 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

[redacted] was a customer of Palantir's Gotham, Slate, Radar, and Phoenix products, intended to be used for various purposes, including customer analytics, cyber security, and supply chain and logistics, between around June 2014 and July 2018.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**<u>INTERROGATORY NO. 30</u>**:

IDENTIFY the date YOU first began working on the [redacted].

**<u>RESPONSE TO INTERROGATORY NO. 30</u>**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir incorporates its general objection to the definition of [redacted]." Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 31 in Defendant's Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

Palantir first began working on the [redacted] data breach in or around September 2014.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 31**:

IDENTIFY the date YOU first learned of the [redacted]

**RESPONSE TO INTERROGATORY NO. 31**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir incorporates its general objection to the definition of [redacted].” Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 32 in Defendant’s Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

Palantir first learned of the [redacted] in or around September 2014.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

**INTERROGATORY NO. 32**:

IDENTIFY the date of the [redacted].

**RESPONSE TO INTERROGATORY NO. 32**:

In addition to its General Objections and Objections to Definitions and Instructions, Palantir objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this Action nor reasonably calculated to lead to the discovery of admissible evidence. Palantir objects to this Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Palantir further objects to this Interrogatory as compound, conjunctive, or disjunctive and containing improper subparts. Palantir incorporates its general objection to the definition of [redacted].” Palantir also objects to this interrogatory to the extent it exceeds the scope of Topic 33 in Defendant’s Rule 30(b)(6) notice.

Subject to and without waiving the foregoing objections, Palantir responds as follows:

According to publicly available documents, the [redacted] occurred between April 2014 and September 2014.

This response sets forth with reasonable specificity responsive information that Palantir located after a reasonably diligent search. Defendant has not revealed the full extent and scope of his misconduct. Discovery in this action is still ongoing, and Palantir reserves the right to supplement, modify, revise or amend this response (but does not assume the obligation, except as required by the applicable rules).

Dated: December 9, 2021 HUESTON HENNIGAN LLP

By: *__/s/ Yahor Fursevich__________________*
Yahor Fursevich
Attorneys for Plaintiff
Palantir Technologies Inc.

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 523 West 6th Street, Suite 400, Los Angeles, California 90014.

On December 9, 2021, I served the foregoing document(s) described as:

**PLAINTIFF PALANTIR TECHNOLOGIES INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT MARC ABRAMOWITZ'S FOURTH SET OF INTERROGATORIES**

on the person(s) below, as follows:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Allen Ruby
Jack P. DiCanio
William J. Casey
Niels Melius
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4660
allen.ruby@skadden.com
jack.dicanio@skadden.com
william.casey@skadden.com
niels.melius@skadden.com

WILLIAMS & CONNOLLY LLP
Barry S. Simon
Jonathan B. Pitt
Stephen L. Wohlgemuth
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
bsimon@wc.com
jpitt@wc.com
swohlgemuth@wc.com

☒ (BY EMAIL) By transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth above.

☐ (BY MAIL) By placing a true copy of the foregoing document(s) in a sealed envelope addressed as set forth above. I placed each such envelope for collection and mailing following ordinary business practices. I am readily familiar with this Firm's practice for collection and processing of correspondence for mailing. Under that practice, the correspondence would be deposited with the United States Postal Service on that same day, with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed December 9, 2021, at Los Angeles, California.

/s/ *Yahor Fursevich*

# EXHIBIT 5

FILED UNDER SEAL

# EXHIBIT 6

FILED UNDER SEAL

# EXHIBIT 7
FILED UNDER SEAL

# EXHIBIT 8

FILED UNDER SEAL

# EXHIBIT 9

FILED UNDER SEAL

# EXHIBIT 10

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

KT4 PARTNERS LLC, and :
SANDRA MARTIN CLARK, as : Civil Action No.:
Trustee for the MARC : N17C-12-212-EMD-CCLD
ABRAMOWITZ IRREVOCABLE TRUST :
NUMBER 7, :
Plaintiffs, :
vs. :
PALANTIR TECHNOLOGIES, INC., :
and DISRUPTIVE TECHNOLOGY :
ADVISERS LLC, :
Defendants. :
------------------------------*
Caption continued on page 2 :
------------------------------*

HIGHLY CONFIDENTIAL
STENOGRAPHIC AND VIDEO-RECORDED
VIRTUAL REMOTE DEPOSITION OF
LAURA PERSONICK
Friday, November 13, 2020
11:09 a.m. EST

Taken by and before:
Josephine H. Fassett, CCR, RPR

BTIG, LLC, :
Plaintiff, : Civil Action No.:
vs. : N19-08-314-EMD-CCLD
PALANTIR TECHNOLOGIES, INC., :
and DISRUPTIVE TECHNOLOGY :
ADVISERS LLC, :
Defendants. :
------------------------------*

Friday, November 13, 2020
11:09 a.m. EST

T R A N S C R I P T of the stenographic and video-recorded virtual remote deposition of LAURA PERSONICK, held on Friday, November 13, 2020, commencing at approximately 11:09 a.m. EST, before Josephine H. Fassett, a Certified Court Reporter, Registered Professional Reporter, and Notary Public of the State of New Jersey and New York.

REMOTE APPEARANCES OF COUNSEL:
COUNSEL FOR PLAINTIFFS KT4 PARTNERS LLC, and SANDRA MARTIN CLARK, as Trustee for the MARC ABRAMOWITZ IRREVOCABLE TRUST NUMBER 7:

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
202.434.5000
BY: STEPHEN WOHLGEMUTH, ESQ.
swohlgemuth@wc.com
BARRY S. SIMON, ESQ.
bsimon@wc.com

-and-

DALTON & ASSOCIATES, P.A.
Cool Spring Meeting House
1106 West Tenth Street
Wilmington, Delaware 19806
302.652.2050
BY: MICHAEL C. DALTON, ESQ.
mdalton@bdaltonlaw.com

REMOTE APPEARANCES OF COUNSEL (cont'd.):

COUNSEL FOR DEFENDANTS PALANTIR TECHNOLOGIES, INC., and DISRUPTIVE TECHNOLOGY ADVISERS LLC:

CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
212.474.1000
BY: CAITLIN N. FITZPATRICK, ESQ.
cfitzpatrick@cravath.com

-and-

RICHARDS LAYTON FINGER
920 North King Street
Wilmington, Delaware 19801
302.651.7700
BY: KELLY E. FARNAN, ESQ.
farnan@rlf.com
BLAKE ROHRBACHER, ESQ.
rohrbacher@rlf.com

REMOTE APPEARANCES OF COUNSEL (cont'd.):
COUNSEL FOR DEFENDANTS PALANTIR TECHNOLOGIES, INC., and DISRUPTIVE TECHNOLOGY ADVISERS LLC:
HUESTON HENNIGAN
523 West 6th Street
Suite 400
Los Angeles, California 90014
213.788.4340
BY: RAJAN TREHAN, ESQ.
rtrehan@hueston.com
YEGOR FURSEVICH, ESQ.
yfursevich@hueston.com
PHILIP A. MAYER, ESQ.
pmayer@hueston.com
COUNSEL FOR DEFENDANTS DISRUPTIVE TECHNOLOGY ADVISERS LLC and ALEXANDER DAVIS:
MAYNARD COOPER GALE
1901 Sixth Avenue North
Regions Herbert Plaza
Suite 2400
Birmingham, Alabama 35203
205.254.1000
BY: JOHN DOUGLAS BETHAY III, ESQ.
jbethay@maynardcooper.com

HIGHLY CONFIDENTIAL - PERSONICK

(Whereupon, off the record.)

(Whereupon, resumed.)

THE VIDEOGRAPHER: This is the beginning of Media No. 4. We're going back on the record at approximately 2:21 p.m.

BY MR. WOHLGEMUTH:

Q. Ms. Personick, you understand that I'm focusing your attention on the time period from May of 2015, which is the time period of Mr. Sankar's email chain, and August of 2016, which is shortly before Palantir commenced its lawsuit against Mr. Abramowitz, correct?

A. Correct.

Q. Okay. Now, in that time period, you have testified that Palantir periodically ran searches for Mr. Abramowitz's patent applications and that it had a conversation with Prasanna concerning Mr. Abramowitz's activities, correct?

A. With one clarification. We ran searches to see if there were any applications by Mr. Abramowitz. I don't know that we knew of anything besides the cyber insurance application, but yes.

Q. Okay. So other than those searches and

HIGHLY CONFIDENTIAL - PERSONICK

that conversation with Prasanna, did Palantir do anything else to learn the contents of Mr. Abramowitz's patent applications or otherwise protect its trade secrets?

A. Yes.

Q. What?

A. During that time period, Palantir continued to protect its trade secrets with confidentiality agreements and obligations and limit disclosure of its trade secrets.

I'm sorry, did I misunderstand the question?

Q. No, I asked a bad question and I realized it.

With respect to Mr. Abramowitz specifically.

A. Okay.

Q. Other than the searches you've described and the conversation with Prasanna that you've described, did Mr. -- did Palantir take any steps to protect its trade secrets with respect to Mr. Abramowitz specifically?

MR. TREHAN: Object to form.

A. So Palantir's legal team considered the

HIGHLY CONFIDENTIAL - PERSONICK

information that was available to it during that -- throughout that time period.

Q. Okay. So other than considering the information available to the legal team, conducting searches and having a conversation with Prasanna, did Palantir take any other steps with respect to Mr. Abramowitz's activities in the cyber insurance space or Mr. Abramowitz's patent application or applications?

A. From the evidence I've seen, Palantir ceased communications with Mr. Abramowitz. Conducted periodic searches. I think I said conducted -- the legal team conducted an analysis of information that was available. And then, of course, there's the conversation with Prasanna. That is -- that is what I've seen in the evidence in terms of what was done specific to Mr. Abramowitz during that time period.

Q. So during that May of 2015 to August of 2016 time period, you as Palantir corporate representative, do not have any knowledge of Palantir demanding that Mr. Abramowitz return any trade secret information or confidential information that he may have?

HIGHLY CONFIDENTIAL - PERSONICK

A. The evidence that I've seen is that Palantir sought to investigate what information Mr. Abramowitz had patented through the measures that I've set forth, and that is the evidence that I've seen in terms of steps that Palantir has taken.

Q. And those efforts that you've set forth, those measures that you've set forth, do not include requesting the information, any information from Mr. Abramowitz, correct?

A. The measures that I've set forth include the periodic reviews, the legal team review and analysis, and the conversation with Prasanna during the specific time period. That is the knowledge that I have.

Q. Okay. So they do not include any requests for information from Mr. Abramowitz?

MR. TREHAN: Object to form.

A. From the evidence that I've reviewed, they include the periodic reviews, the communication with Prasanna, and the legal analysis.

MR. WOHLGEMUTH: Move to strike the answer as nonresponsive.

Q. It's a yes-or-no question.

As Palantir's 30(b)(6) representative, are you aware of any requests for information from Mr. Abramowitz regarding his patent applications or any confidential information in his possession in between May of 2015 and August of 2016?

MR. TREHAN: Asked and answered.

A. What I am aware of is what I have told you, which is the evidence related to the searches, the legal team's analysis, and communications with Prasanna.

MR. WOHLGEMUTH: All right. We're going to reserve the right to go to the Court for the witness's refusal to answer, and we're going to consider moving to reopen the deposition.

This is a simple yes-or-no answer. The Court has already instructed Palantir and Palantir's witnesses with respect to answering questions with a yes or no, and we believe that it's being violated. So --

MR. TREHAN: The witness has provided a complete answer multiple times and --

MR. WOHLGEMUTH: Raj, the record

HIGHLY CONFIDENTIAL - PERSONICK

speaks for itself. I'm making my record and that's what's going to happen.

MR. TREHAN: As am I. And your decision to badger the witness doesn't mean that you're entitled to just complain on the record when you have no entitlement. The witness has provided a complete answer multiple times. I'd ask that you move on at this point.

MR. WOHLGEMUTH: Raj, your statement's false.

BY MR. WOHLGEMUTH:

Q. After May of 2015 up until August of 2016, did Palantir ever ask Mr. Abramowitz to stop any activities he may have been engaging in in the cyber insurance space?

MR. TREHAN: Object to form.

A. Is your question, did Palantir directly communicate with Mr. Abramowitz and ask him to stop?

Q. The court reporter can read back my question.

A. Okay.

(Whereupon, the requested portion was

read back by the Reporter:

"QUESTION: After May of 2015 up until August of 2016, did Palantir ever ask Mr. Abramowitz to stop any activities he may have been engaging in in the cyber insurance space?")

MR. TREHAN: Same objection.

A. My question for clarification was, did Palantir directly communicate with Marc Abramowitz to ask him to do this? Is that the question or is it -- is it -- I'm not sure I understand it if that's not the question.

Q. Directly or indirectly.

Let's start with direct.

A. Okay. Thank you.

Q. Did Palantir have any direct communications with Mr. Abramowitz in that time period in which it asked him to cease any activities he may have been engaging in in the cyber insurance space?

A. So I haven't seen any evidence that during that time period Palantir communicated with Mr. Abramowitz. I guess I'm not -- I'm not sure how close -- I have not seen any evidence during

HIGHLY CONFIDENTIAL

C E R T I F I C A T E

I, JOSEPHINE H. FASSETT, a Certified Court Reporter, Registered Professional Reporter, and Notary Public within and for the State of New Jersey and New York, do hereby certify that the witness, whose virtual remote deposition is hereinbefore set forth, was first duly sworn by me on the date indicated, and that the foregoing virtual remote deposition is a true and accurate record of the testimony given by such witness.

I FURTHER CERTIFY that I am not employed by nor related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have subscribed my hand this 17th day of November 2020.

JOSEPHINE H. FASSETT, CCR, RPR
CCR License No. 30XI00098400
NCRA License No. 32148
New Jersey Notary Public
New York Notary Public

# EXHIBIT 11

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

KT4 PARTNERS LLC, AND SANDRA MARTIN CLARK, AS TRUSTEE FOR THE MARC ABRAMOWITZ IRREVOCABLE TRUST NUMBER 7,

PLAINTIFFS,

VS.

PALANTIR TECHNOLOGIES, INC., AND DISRUPTIVE TECHNOLOGY ADVISERS LLC,

DEFENDANTS.

C.A. NO. N17C-12-212 EMD CCLD

BTIG, LLC,

PLAINTIFFS,

VS.

PALANTIR TECHNOLOGIES, INC., AND DISRUPTIVE TECHNOLOGY ADVISERS LLC,

DEFENDANTS.

C.A. NO. N19C-08-314 EMD CCLD

CONFIDENTIAL

REMOTE PROCEEDINGS OF THE

VIDEOTAPED DEPOSITION OF ALEXANDER KARP, Ph.D.

MONDAY, AUGUST 10, 2020

REPORTED BY KIMBERLY EDELEN, CSR. NO. 9042, CRR, RPR.

REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF ALEXANDER KARP, Ph.D., TAKEN ON BEHALF OF THE PLAINTIFFS, AT 3:05 P.M. CEST, MONDAY, AUGUST 10, 2020, BEFORE KIMBERLY A. EDELEN, C.S.R. NO. 9042, CRR, RPR.

REMOTE APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS KT4 PARTNERS LLC AND SANDRA MARTIN CLARK, AS TRUSTEE FOR THE MARC ABRAMOWITZ IRREVOCABLE TRUST NUMBER 7:

WILLIAMS & CONNOLLY, LLP
BY: STEPHEN L. WOHLGEMUTH, ESQ.
BARRY S. SIMON, ESQ.
ANNA K. TSIOTSIAS, ESQ.
ANDREW C. WATTS, ESQ.
725 TWELFTH STREET N.W.
WASHINGTON, D.C. 20005
202.434.5341
SWOHLGEMUTH@WC.COM
BSIMON@WC.COM

---AND---

DALTON & ASSOCIATES, P.A.
BY: MICHAEL C. DALTON, ESQ.
COOL SPRING MEETING HOUSE
1106 WEST TENTH STREET
WILMINGTON, DELAWARE 19806
302.652.2050
MDALTON@BDALTONLAW.COM

(REMOTE APPEARANCES CONTINUED ON FOLLOWING PAGE)

REMOTE APPEARANCES OF COUNSEL (CONTINUED)
FOR THE PLAINTIFF BTIG, LLC:
ARNOLD & PORTER
BY: SEAN CALLAGY, ESQ.
70 WEST MADISON STREET
SUITE 4200
CHICAGO, ILLINOIS 60602
312.583.2435
SEAN.CALLAGY@ARNOLDPORTER.COM

FOR THE DEFENDANTS PALANTIR TECHNOLOGIES, INC. AND DISRUPTIVE TECHNOLOGY ADVISERS LLC:

CRAVATH, SWAINE & MOORE, LLP
BY: KEVIN ORSINI, ESQ.
825 EIGHTH AVENUE
NEW YORK, NEW YORK 10019
212.474.1257
KORSINI@CRAVATH.COM
---AND---
RICHARDS, LAYTON & FINGER
BY: KATHARINE MOWERY, ESQ.
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
302.651.7623
MOWERY@RLF.COM
---AND---
HUESTON HENNIGAN
BY: JOHN C. HUESTON, ESQ.
RAJAN TREHAN, ESQ.
523 WEST 6TH STREET
SUITE 400
LOS ANGELES, CALIFORNIA 90014
213.788.4381
JHUESTON@HUESTON.COM
RTREHAN@HUESTON.COM

(REMOTE APPEARANCES CONTINUED ON FOLLOWING PAGE)

REMOTE APPEARANCES OF COUNSEL (CONTINUED)
FOR THE DEFENDANT DISRUPTIVE TECHNOLOGY ADVISERS LLC AND ALEXANDER DAVIS:

MAYNARD COOPER GALE
BY: JOHN DOUGLAS BETHAY, ESQ.
1901 SIXTH AVENUE NORTH
REGIONS HARBERT PLAZA
SUITE 2400
BIRMINGHAM, ALABAMA 35203
205.254.1000
JBETHAY@MAYNARDCOOPER.COM

ALSO PRESENT: DINA MARTIN, CONCIERGE
SCOTT SLATER, VIDEOGRAPHER
CHRIS MATES
ALEX DAVIS
DANIEL COHEN
RYAN TAYLOR
JONATHAN PITT
MARC ABRAMOWITZ

them about Palantir's capabilities in the areas that he was discussing with them?

A I was making two points. That at every step Marc repped to me and others that he would explain things to people without divulging our secrets. That's, Point 1.

Point 2, you seem to be leading me to a statement whereby the fact that he interacted with anyone in the outside world meant he could violate the reps that he made to me and many other people. I fundamentally reject that as an argument and as a moral proposition. I believe the courts will reject that as well.

Q So you didn't provide any guidelines about what he could actually say to third parties; is that correct?

A It's correct that Marc numerous -- in numerous context explained to me and others that he would help explain Palantir without explaining our crown jewels. I accepted those reps -- representations because I had a high degree of faith in him as did many others.

Q I'm sorry. Did you explain what these supposed crown jewels were?

A I did, many times.

Q Okay. Give me one occasion that you explained what the circumstances were, what you said to Mr. Abramowitz, what he said to you.

A You continually use the term occasion. I assume by that you mean a time period. I mean by that a time period by the time he invested until the time we -- he was discovered for his treachery.

If that's what you mean by an occasion, there were many, many occasions.

Q Again, I'm asking you to provide one specific occasion. You claim not to remember anything about the CDH transaction, nothing about the Highbridge transaction.

I'm asking you about supposed representations, what they were, when they supposedly happened and what the scope of those representations were.

Can you give me any specifics whatsoever?

MR. HUESTON: Object to form.

THE WITNESS: I am very happy to respond. I understand occasion to mean a time period. I assume you mean the time period in which he was intimately involved with me both professionally and in business.

Marc -- I'm sorry. I was answering your

question.

BY MR. SIMON:

Q Continue. But you know I've said multiple times I'm not asking you for supposed conversations over a 12-year time period. I'm asking for any specific conversation in terms of what was said by you, what was said by Mr. Abramowitz, and what the specifics were.

A The specifics were Marc saying I'm very interested in learning about Palantir, and I will guard those secrets as if I was a -- I'm a true and loyal member of the Palantir community.

Q Okay. When did he say that to you specifically?

A Okay. I can only say it because it was said so many times, and although you really don't -- you're only talking to me, I think you'll find this was said to numerous other people. It's not just something I'm making up. This is a fact that I'm telling you about that other people witnessed, many people.

So, you know, you can dismiss it, but it -- unfortunately this is something that is proven to be the case. He told me on numerous occasions, so many occasions it would be impossible to forget, and

numerous other people, and I'm sure they'll be happy to tell you about that, too, on the occasion of you talking to them.

Q Well, actually we just deposed Ms. DeMeuse and she said she just assumed that somebody else had -- had a confidentiality agreement. That's why she didn't ask about, you know, any nondisclosure agreement or anything else. She didn't say that Mr. Abramowitz made statements to her about promises of confidentiality or anything else.

A I don't know your -- about your conversations with this person. I'm not claiming that the innumerable people Marc came in contact that he, at every interaction, made a rep. I am claiming that he made those reps to me. I am affirmatively claiming he made it to other people.

I am, moreover, claiming that the other people met with him because they presumed that those reps were made and I view that as also a violation of trust. And you lawyers will decide the legality of it. But I am claiming he made the rep to me and numerous others, and that people only met him at Palantir under the assumption that he had made these reps and at my direct behest and the other people in senior leadership.

Maybe that's not enough for you. It is enough for me and I believe that common sense and the law will upheld -- uphold my belief and the belief of nearly everyone at Palantir.

Q Okay. In terms of these other third parties, you weren't personally present when they met with Mr. Abramowitz, correct?

A Of course I was not present in every -- at every discussion. Obviously in a company of our size, I'm not present at every conversation.

Q You didn't give Mr. Abramowitz specific directions as to what he should do in dealing with third parties, did you?

MR. HUESTON: Object to form.

THE WITNESS: Mr. Abramowitz represented affirmatively and in correspondence with every common sense notion known to humanity that he would not steal or violate our trust.

Given that, I do not see any reason I would have to ask Marc or anyone else to affirm that they would not steal our IP before having a meeting.

BY MR. SIMON:

Q My question, sir, was actually you didn't direct Mr. Abramowitz with respect to his meetings with third parties, correct?

A No. In most cases I did not.
Q Okay. Mr. Abramowitz had no authority to bind the company legally in his dealings with third parties, correct?
MR. HUESTON: Object to form.
THE WITNESS: Mr. Abramowitz was a senior advisor, and in that role had a high degree of trust. The typical definition of a senior advisor is one of high trust and low ability to dominate one contractually.
So the answer to your question was high trust, low ability to bind. I don't believe he had that authority which I guess was -- sounds great in foresight from my perspective and others. I don't know.
MR. SIMON: Let me just get another document. I want to go off the record for two or three minutes.
MR. HUESTON: No. We're not going off the record.
MR. SIMON: Okay. Fine. The record can continue. I'm just going to mute my screen.
MR. HUESTON: Okay.
BY MR. SIMON:
Q Mr. Karp, how did you become aware of

with Mr. Hood and Mr. Taylor, correct?
MR. HUESTON: Object to form.
THE WITNESS: Well, you -- you asserted communications to which I was not a party, and therefore would not have recollection. And therefore I can -- I can't answer your question as I've rejected the assertions numerous times.
BY MR. SIMON:
Q The company didn't even contact outside attorneys for advice about the situation, did you?
A I'm sorry. If you could please clarify the situation.
Q The fact that Mr. Abramowitz put the company on notice that he was filing patent applications.
A Well --
MR. HUESTON: Object to form.
THE WITNESS: As I've said already, I have no knowledge or recollection of that. I don't believe anyone else would have had knowledge or recollection of that or they would have taken legal action.
MR. SIMON: Tab 145. Exhibit 240.
(Deposition Exhibit 240 was marked for identification.)

BY MR. SIMON:
Q Mr. Karp, have you had a chance to review Exhibit 240?
A I have had a chance to review Exhibit 240.
Q And Mr. Abramowitz sent it to you and you received it, correct?
A Well, I have no recollection of Mr. Abramowitz sending it to me or receiving it. I am capable of reading the plain language presented in front of me.
Q Okay. You don't have any doubt that it was sent to you and you received it, whether or not you read it?
A No. I do not recollect getting it. My only indication that I would have gotten it is because you're presenting it as evidence.
Q Well, also the fact that it's addressed to you.
MR. HUESTON: Objection. Can we have a question, please.
THE WITNESS: An assertion I've already rejected.
BY MR. SIMON:
Q Mr. Karp, Mr. Abramowitz is saying let's get on the calendar to discuss with you and your

guys and my guys, early January, progress in insurance and healthcare, et cetera.

That's what he said to you, correct?

A A -- well, A, I have no recollection of it. B, you're asserting I have recollection of it after I've told you I have no recollection of it.

And I believe deeply you're making the case that he was a trusted part of Palantir, and when I read the plain English of it what I see is a trusted person at Palantir, a trusted senior advisor with deep experience that we would have every reason to trust based on his actions, a trust which he violated. And I would view this as evidence of my assertions, although I -- based on the plain language of what you're putting in front of me.

Q Mr. Abramowitz, in Exhibit 240, actually said that he wanted you to have an early look at what he was doing, correct?

MR. HUESTON: Mr. Simon, are you asking -- I want to address this because you said you're going to go to the court for more time. He's already told you he doesn't -- he doesn't recall this and then you complain when he's interpreted it when you've summarized it. So are you asking for him to interpret your summary of this e-mail that he said

he doesn't recall. If so you're not going to have any basis for objecting to his explanation in terms of using time.

MR. SIMON: Actually, Mr. Hueston, I can play this testimony for the jury so I have the right to ask him about something that is put forward in an e-mail directly sent to him.

MR. HUESTON: He's already answered you. So he's going to interpret it and I don't want to hear complaints about it. If you want him to read the document, he'll read it. Give him -- give him an express instruction.

MR. SIMON: Introduce 18.

THE WITNESS: I'm sorry. Did you ask a question?

MR. SIMON: No. I was just -- I'm marking another exhibit. I'm going to show you what's being marked as Exhibit 241.

(Deposition Exhibit 241 was marked for identification.)

THE WITNESS: This is a long document. I'll need a couple minutes to review it.

I've reviewed it.

BY MR. SIMON:

Q Okay. And do you have a recollection of

receiving this?
A No, I do not.
Q This lays out for you what has been going on with respect to Mr. Abramowitz, correct?
MR. HUESTON: Object to form.
THE WITNESS: I mean, as I've mentioned I don't recollect what's in it. I would be happy to provide -- either read it to you or provide my interpretation of it if you'd like.
BY MR. SIMON:
Q You don't recall this document?
A Well, by the way, there's no date on this document. I believe this must be one of the documents from almost six years ago.
Q It would be in January of 2015.
A Yes. I -- as you've correctly noted many times, that's five and a half years ago and it would be very hard to recollect this document.
I am reading it now if you'd like. I don't want to use anymore of your valuable time. I'm happy to provide my interpretations of it.
Q No. You don't remember receiving it, though, right?
A I do not recall receiving this document.
Q Tab 150.

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) ss.

I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 12th day of August, 2020.

KIMBERLY A. EDELEN, C.S.R. NO. 9042

# EXHIBIT 12

FILED UNDER SEAL

# EXHIBIT 13

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

PALANTIR TECHNOLOGIES INC., )
)
Plaintiff, )
)
vs. ) Case No.
) 5:19-CV-06879-BLF
MARC L. ABRAMOWITZ, )
)
Defendant. )

** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER **

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF:
LAUREN DEMEUSE
FRIDAY, FEBRUARY 4, 2022
11:04 A.M. CENTRAL STANDARD TIME

Reported by: PAULA A. PYBURN
CSR 7304, RPR, CLR

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF LAUREN DEMEUSE, the witness, taken on behalf of DEFENDANTS, on Friday, February 4, 2022, at 11:04 a.m. Central Standard Time, before PAULA A. PYBURN, CSR 7304, RPR, CLR.

APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:

FOR PLAINTIFF AND THE WITNESS:

HUESTON HENNIGAN, L.L.P.
BY:  YAHOR FURSEVICH, ESQ.
523 West 6th Street
Suite 400
Los Angeles, California 90014
213.788.4340
yfursevich@hueston.com

APPEARANCES: (CONTINUED)

FOR DEFENDANT:

WILLIAMS & CONNOLLY, L.L.P.
BY: STEPHEN L. WOHLGEMUTH, ESQ.
BY: BARRY S. SIMON, ESQ.
725 Twelfth Street, N.W.
Washington, D.C. 20005
202.434.5000
swohlgemuth@wc.com
bsimon@wc.com

ALSO PRESENT:

Kimberlee Decker, Videographer
Matt Helton, Palantir In-house Counsel
Neil Martin, Concierge
Maria Slobodchikova, Palantir In-house Counsel

answer.

A Sorry, I don't know why it's being this bad an echo chamber. I'm trying to be clear --

THE VIDEOGRAPHER: When you sit back, we can't hear you. You have to stay forward or move your speaker.

THE WITNESS: I was just trying to have, like, a comfortable seat for the day.

Okay. So, yes, I met frequently with Marc Abramowitz over the time that we discussed while I was on the health care team.

BY MR. WOHLGEMUTH:

Q And during your interactions with Mr. Abramowitz, did you ever tell him that Palantir had the right to control his conduct?

MR. FURSEVICH: Objection. Vague.

THE WITNESS: When I was introduced to Marc Abramowitz, I was under the impression he was a senior leader, a representative of the leadership team, a trusted advisor; so I definitely would not have felt like I should or need to tell him how to control his conduct.

BY MR. WOHLGEMUTH:

Q So I just want to make sure -- clear your testimony.

You said -- I wasn't asking about what you felt; just did you ever tell him that Palantir had the right to control his conduct?

MR. FURSEVICH: Objection. Asked and answered.

THE WITNESS: I was just saying, I did not feel -- or, excuse me -- it would have been very unusual to tell a senior member of my leadership team, who I considered part of the company and part of the team, how to conduct themselves.

BY MR. WOHLGEMUTH:

Q Are you aware of anyone at Palantir giving Mr. Abramowitz any instructions or direction about how he -- he should conduct himself?

A No, I don't recall or -- having any awareness of directives.

I would have assumed that, again, as a senior member, he would have that sort of internal awareness about how one conducts themselves with a -- with a company.

Q Where do you think he would have gotten this internal awareness from?

MR. FURSEVICH: Objection. Calls for speculation.

THE WITNESS: My -- I was just saying, as a

mature -- as a, you know, senior leader of the team, I would -- I'd assume he'd have to use judgment and that he would have judgment about how to conduct himself.

BY MR. WOHLGEMUTH:

Q What -- what team was he the senior leader of?

A I -- I thought him as being introduced as a member of -- as trusted advisor and someone who would be part -- and close to the leadership at Palantir. And so I saw him as essentially an extension of the team, the leadership team to help us find new customers.

Q Who introduced you to him as a trusted advisor?

A To the best of my recollection, it was the -- it came through Dr. Karp's office. So Dr. Karp, Gavin Hood, that those folks had given me that impression.

Q And anyone other than Dr. Karp or Gavin Hood?

A It's very pos- -- yeah, it's -- it's very possible there were others; I just don't recall.

Q What do you recall Dr. Karp or Gavin Hood telling you?

A I don't recall any kind of specifics around what they told me. I just recalled that that was the vector of the introduction.

Q And when was this introduction vector made?

A I -- I would -- my best recollection would be around the time of our first meeting.

Q Which was?

A I believe our first meeting was in the beginning of 2013.

Q You don't recall meeting with Mr. Abramowitz in connection with Dr. Esserman in 2012?

A I -- to the best of my recollection, yes, I remember a meeting with Dr. Esserman; I just wasn't -- I can't remember today whether that was 2012 or 2000- -- the very beginning of 2013. That was a long time ago.

Q Did you ever tell Mr. Abramowitz what he should say to potential customers that Palantir was attempting to obtain?

A I do recall during our deep dive meeting that was in 2013 expressly mentioning that I could provide him customer-safe materials or, like, materials that would be shareable to customers so that he would have language that would be

acceptable.

Q Did you tell Mr. Abramowitz that he couldn't say anything beyond the customer-safe materials?

A To the best of my recollection, no. I would assume that he, again, had that judgment as, you know, an executive and seasoned, you know, businessman. That, no, I did not -- I did not express that. It would have felt uncomfortable to say that to someone senior.

Q And did you provide Mr. Abramowitz any information beyond what was in that customer-shareable document?

A So I -- just to answer your question, I regularly met with Mr. Abramowitz from that meeting on, and would share proprietary updates, information about the work we were doing as it was evolving.

So, yes, I would share a lot of material verbally with him about what we were doing beyond what was shareable with customers.

Q You mean beyond what was in the shareable document?

A Yes.

Q And when were these meetings with Mr. Abramowitz when you gave these updates?

A I really can't recall when these meetings took place specifically, but generally, I would try to meet him and brief him on the evolving work we were doing, whether that was with [redacted], [redacted] and later times our [redacted] work; so [redacted]

We would work and -- you know, work with more and more customers; I can't remember them all. But my goal was to give him an update so he can know what -- the latest and greatest work we would do so that he could be inspired, what other customers he could introduce us to.

Q And what did you specifically tell him in these update meetings?

A So, again, I don't have a specific memory of a meeting, but over that course of our meetings my goal would be to share, I guess, the details of what we were working on with customers.

So, for instance, at [redacted], as we started working in -- beyond the R & D space and moved into the site selection space, I would have been telling him about the data sources, the work flows we were enabling, the types of -- the types of kind of use cases that we could enable, such that he could then go and talk to other pharmaceutical

companies and at a high level understand their issues and, you know, make the connection for us.

Q And when did this -- well, strike that.

You said you don't have a specific meeting -- or you don't have a specific memory, but -- strike that.

Do you have a specific recollection of telling Mr. Abramowitz -- talking to Mr. Abramowitz about GlaxoSmithKline?

A I do not have, like, a specific memory or, like, the specific words I would have used, but GlaxoSmithKline was occupying almost -- a significant amount of my attention. I'm most certain that I would have talked to him about that work over the course of our conversations. I'm confident in that.

Q Okay. What did you tell him?

MR. FURSEVICH: Objection. Asked and answered.

BY MR. WOHLGEMUTH:

Q And I don't -- and, to be clear, I don't want your assumption about what you would have told him; I want your recollection, your best recollection about what you actually told Mr. Abramowitz about GlaxoSmithKline.

A To the best of my recollection, I would have told him about, you know, the use cases that we are working on. And that at the time kept evolving.

And I know that, given the -- you know, the focus and time I was spending on clinical trials, I would have been talking about clinical trial site selection.

I would have been talking about the data sources that we had kind of uncovered and how novel [redacted].

That's something that I definitely would have, you know, spoken to him about.

Q Ma'am, my question was not about what you think you would have told him.

What did you tell him? Do you have a specific recollection of talking about those use cases to Mr. Abramowitz?

MR. FURSEVICH: Objection. Asked and answered.

THE WITNESS: I'm confident I had covered that content; I just don't have a specific recollection or a specific meeting that I can point

to with -- with the specific words I had used.

BY MR. WOHLGEMUTH:

Q And when would this meeting have occurred?

A I don't have -- I know I met with him frequently, but I don't have a specific date to offer.

Q How about the year?

A I'm -- I know that I met with him in 2013 and 2014; so one of those years.

Q You can't tell me which of those two years this -- this conversation about [redacted] would have occurred?

A I would -- again, I don't recall specific meetings, but I would have continued to update him, and that work evolved over those two years. So I would assume it covered both of those years.

Q And did you have multiple conversations about GlaxoSmithKline or just the one?

A To the best of my recollection, we would have -- I would have discussed it multiple times. I just don't have a specific memory of a specific meeting; so I can't point to a number or one.

Q You also mentioned that you think you -- well, you mentioned "the Blues."

What are "the Blues"?

A [redacted] is the way that I would describe the [redacted] networks in multiple states, 'cause there's a different [redacted] in every state.

And so I recall we worked with [redacted], but there were also other conversations with other [redacted] during my time at Palantir that I just don't remember all of those conversations.

Q And do you have a specific recollection of discussing the [redacted] with Mr. Abramowitz?

A Again, I remember covering our health insurance assessment work with Mr. Abramowitz over the course of those meetings as they evolved, but I don't remember a specific meeting or the content of that -- a specific time.

Q So, Ms. DeMeuse, last time we spoke, you only had a specific recollection of a single meeting in 2013 with Mr. Abramowitz.

I take it you now recall more conversations with Mr. Abramowitz?

MR. FURSEVICH: Objection. Lacks foundation. Asked and answered. Form.

THE WITNESS: I don't recall the last testimony; so I'm happy to take a look at that

testimony.

I do not recall specific meetings today, but I know that I regularly was updating him with the intention of helping to drive our business development efforts.

BY MR. WOHLGEMUTH:

Q So you said, "I do not recall specific meetings today"?

MR. FURSEVICH: Objection. Asked and answered. Misstates testimony.

BY MR. WOHLGEMUTH:

Q I just want to -- I didn't hear you. I'm sorry.

You said that you do not recall any specific meetings today?

A I do not recall specific --

MR. FURSEVICH: Same objections.

I apologize. Go ahead.

THE WITNESS: I just don't recall, like, specific meetings, aside from the one we've already talked about, which was a February meeting.

But, you know, if there's materials you'd like me to look at to refresh my memory about something specific, I'm happy to look at those. I just know that we were regularly meeting to update.

BY MR. WOHLGEMUTH:
Q Sure. Let's introduce Exhibit --
A Still just see 69.
Q Yeah. The first one that's newly marked can take a -- take a second.
(Whereupon, Exhibit 277 was marked for identification by the Court Reporter.)
THE WITNESS: It just arrived. I have the document open.
BY MR. WOHLGEMUTH:
Q Okay. You can see that Exhibit 277 is a transcript of the remote proceedings of the videotaped deposition of Lauren DeMeuse on Thursday, August 6, 2020?
A Yes.
Q I'm going to direct you to page 210 of that document.
A Bear with me, I'm scrolling to get there.
Catherine, is that you?
Okay. Once we review this, would it be possible to take five minutes to feed my child?
MR. WOHLGEMUTH: Yeah. Why don't --
MR. FURSEVICH: Why don't we take a break now.

MR. WOHLGEMUTH: That -- that makes sense.
MR. FURSEVICH: Okay, thank you.
THE VIDEOGRAPHER: Off the record at 11:43 a.m.
(A recess was taken from 11:43 a.m. to 11:56 a.m.)
THE VIDEOGRAPHER: We are on the record at 11:56 a.m.
BY MR. WOHLGEMUTH:
Q Ms. DeMeuse, did you have any discussions with your counsel during the break?
A Yes, we talked while we were on the break, yes.
Q Did you discuss anything about today's deposition or your testimony?
A We didn't discuss the testimony.
MR. FURSEVICH: And, Ms. DeMeuse, I instruct you not to reveal -- you may answer "yes" or "no," but do not reveal any attorney-client communications.
BY MR. WOHLGEMUTH:
Q Did you discuss the deposition?
A No.
Q Ms. DeMeuse, I think -- I just want to understand your testimony that you gave before the

break.

You said you have -- well, strike that.

You mentioned [redacted]
correct? Those were the three entities you mentioned?

A Yes, among other clients that I -- you know, there is other clients as well; I don't recall all of them.

Q Okay. Well, what do you recall?

MR. FURSEVICH: Objection. Vague. I don't -- recall what?

MR. WOHLGEMUTH: Be quiet, Yahor.

MR. FURSEVICH: Don't tell me to be quiet, Steve.

MR. WOHLGEMUTH: You can object to the form.

MR. FURSEVICH: I'm objecting because --

MR. WOHLGEMUTH: You can object to the form or you can stop talking. You can object to the form.

MR. FURSEVICH: -- your question is simply "What do you recall?" I don't understand what is this referencing.

MR. WOHLGEMUTH: It's not a question for you.

THE WITNESS: It would help me to clarify what you would like me to answer.

BY MR. WOHLGEMUTH:

Q You said, "Yes, among other clients. There are other clients as well. I don't recall all of them."

What clients do you recall?

A So, yeah, if you're asking me what clients do I recall working with while I was at Palantir, I can try to list those. There are a lot of health care customers.

Is that what you would like me to list?

Q I believe -- do you recall -- is your testimony that you believe you assume that you provided updates regarding [redacted] to Mr. Abramowitz?

A Yes. I am saying I believe that during the course of our conversations, I would have covered those -- I'm confident that I covered those customers in those discussions.

Q So my question is, are there any other customers, aside from [redacted]?

A I -- to the best of my recollection, yes, there would have been other customers as well. I don't recall details of those today.

Q And you keep saying in your testimony "I would have covered."

I take it you're using the phrase "I would have covered" because you don't have a specific recollection of actually covering them with Mr. Abramowitz?

A I'm -- I'm saying that I don't have a specific meeting, I don't have a specific -- the specific time when that conversation explicitly happened.

I am confident I would have -- I talked about those customers.

Q And what is your confidence based on?

MR. FURSEVICH: Objection. Form.

THE WITNESS: My intention when I met with Mr. Abramowitz was always to give him the latest -- what was up to date, what kind of powerful new workflows we were working on. And I spent a lot of time on [redacted], as well as, you know, worked on and understood the [redacted] work and the [redacted] work, such that I -- I -- I would -- I would have told him about those things. They were at the forefront of my mind.

BY MR. WOHLGEMUTH:

Q When you -- when you say you spent a lot of

time on [redacted], you're talking about your responsibilities at Palantir included a lot of time spent on GSK?

A Yes. I'm saying my time, I worked very closely on that project. Among other projects as well, but, yes, I spent a lot of time on [redacted].

Q And did these meetings with Mr. Abramowitz occur after the February of 2013 meeting or before?

MR. FURSEVICH: Objection. Asked and answered.

THE WITNESS: I -- I don't remember specific meetings, but there were many and frequent briefings that we would give -- that I would give, excuse me, to Mr. Abramowitz.

And -- I believe, you know, the Dr. Esserman meeting was before that February meeting that you were talking about; so there were -- so there's at least one that was before. I think one meeting before. But I -- I just don't recall the specific.

BY MR. WOHLGEMUTH:

Q Okay. So let's go to Exhibit 277.

A I'm there.

Q And you're at page 210?

A Yes, I am.

Q And do you see at line 9, where I ask the
question (as read):
Okay. Before we get to that --
before we get to that, we've
mentioned a meeting that you had at
Phil's. We've mentioned a meeting
that you had at Coupa Cafe. We've
mentioned this meeting in February
of 2013. We've mentioned the
meeting with Dr. Esserman. We've
mentioned a meeting that you had at
least once in connection with ORIX.
Are those all the meetings that
you recall discussing with me today
with Mr. Abramowitz?
Answer: Yes. Those are the
meetings that I believe we have
discussed today together.
Question: Do you recall any
other meetings with Mr. Abramowitz?
Answer: Not specifically. I
feel like I would run into him or
have, like -- there's definitely a
potential for other meetings; I just
don't recall them specifically.

Cases." And the first one is "Site Selection Optimization."

Do you see that?

A Yes, I see that.

Q It says -- and in the description column, it states (as read):

Using internal and external DBs, harness Palantir to generate and share investigation site lists for study teams to use at outset of trial.

Do you see that?

A Yes, I do.

Q "DBs" is databases?

A Yes, that's correct.

Q And was that a description of the use case that Palantir ultimately -- ultimately ended up implementing with [redacted]?

MR. FURSEVICH: Objection. Form.

THE WITNESS: We ended up implementing a few different types of use cases within clinical operations, and this was one of them.

BY MR. WOHLGEMUTH:

Q During the pilot or during the entirety of the relationship with [redacted]?

A My understanding -- my recollection is that we had multiple work flows during the pilot and multiple work flows during the production work.

Q Prior to [redacted] beginning its pilot, was there an NDA between [redacted] and Palantir covering its discussions?

A I don't recall a -- being involved with an NDA. I don't recall the specifics.

My best recollection is that there had been an NDA before I had joined, because there were conversations with [redacted] before I joined Palantir.

Q Would that have been a two-way NDA, such that [redacted] couldn't disclose something Palantir gave and Palantir couldn't disclose something that GSK gave?

A I don't recall --

MR. FURSEVICH: Objection. Calls for -- calls for speculation.

BY MR. WOHLGEMUTH:

Q Do you recall receiving any instruction with respect to handling of [redacted] material or information that you received in the course of these discussions?

A I recall ensuring that we had -- we had a confidentiality agreement, but I don't recall what

the nature of that agreement was or any details about it.

Q Would it have been typical for you to share information about concerns or challenges faced by a prospective customer with people who were not employees of Palantir?

MR. FURSEVICH: Objection. Form.

THE WITNESS: I would treat any kind of customer information as very confidential and only share it with, you know, trusted Palantir -- like, trusted -- like, essentially Palantir teammates, and I did see Mr. Abramowitz as one of those trusted teammates.

BY MR. WOHLGEMUTH:

Q To your knowledge, had Mr. Abramowitz gone through any sort of onboarding process at Palantir?

A I don't have any information about that.

Q To your knowledge, had Mr. Abramowitz underwent any -- undergone any kind of training at Palantir?

A I don't have any information about that.

Q Do you have any idea about what Mr. Abramowitz -- well, strike that.

Do you have any idea as to what Mr. Abramowitz was working on at Palantir, if

anything, aside from the discussions that you had with him?

A My recollection is that he was trying to help other verticals as well find customers as one of our, you know, again, kind of senior leaders, part of our team.

Q How do you know that?

A I don't recall a specific conversation, but I just -- I had the awareness that he was not just working on health care; I really don't recall how.

Q What verticals did you understand him to be working on?

A I really don't know all, but the one that sticks out in my mind is cyber. But that's the only -- I really don't know the breadth of what he was working on. It was just more generic that he was helping our company generally.

Q All right. I'm going to upload the next document to your "Marked Exhibits" folder. Exhibit 280 should be in your "Marked Exhibits" folder.

(Whereupon, Exhibit 280 was marked for identification by the Court Reporter.)

///

BY MR. WOHLGEMUTH:
Q Might take a second because it's a large file.
A I can see this.
Q And you can see that Exhibit 280 is an email with a series of attachments from [redacted] to yourself and a number of other folks in June of 2014?
A Yes.
Q Who is [redacted]?
A Marti Head was an employee of [redacted] who technically was a computational chemist.
Q And did he have -- strike that.
You can see in [redacted] email signature, he's identified as "Director, [redacted]-Palantir Collaboration."
Do you see that?
A Yes. And [redacted] is a woman.
Q Oh, apologies, apologies.
What does -- do you have any understanding of what [redacted] role was vis-à-vis the [redacted]-Palantir collaboration?
A I don't have the specifics about her role or how it was defined, but I do know that she changed her LinkedIn to reflect Palantir

STATE OF CALIFORNIA )
COUNTY OF RIVERSIDE ) ss.

I, Paula A. Pyburn, CSR No. 7304, RPR, CLR, in and for the State of California, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given.

Before completion of the deposition, review of the transcript [ ] was [xx] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated: February 9, 2022.

________________________________

Paula A. Pyburn, RPR, CLR
CSR No. 7304
Certified Shorthand
Reporter for the
State of California

# EXHIBIT 14

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

PALANTIR TECHNOLOGIES INC., )
)
Plaintiff, )
)
vs. ) Case No.
) 5:19-CV-06879-BLF
MARC L. ABRAMOWITZ, )
)
Defendant. )

*CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER*

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF:
CASEY KETTERLING
THURSDAY, DECEMBER 2, 2021
10:05 A.M. CENTRAL TIME

Reported by: PAULA A. PYBURN
CSR 7304, RPR, CLR

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF CASEY KETTERLING, the witness, taken on behalf of DEFENDANTS, on Thursday, December 2, 2021, at 10:05 a.m. Central Time, before PAULA A. PYBURN, CSR 7304, RPR, CLR.

APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:

FOR PLAINTIFF AND THE WITNESS:

HUESTON HENNIGAN, L.L.P.
BY:  YEGOR FURSEVICH, ESQ.
523 West 6th Street
Suite 400
Los Angeles, California 90014
213.788.4340
yfursevich@hueston.com

APPEARANCES: (CONTINUED)

FOR DEFENDANT:

WILLIAMS & CONNOLLY, L.L.P.
BY: STEPHEN L. WOHLGEMUTH, ESQ.
BY: BARRY S. SIMON, ESQ.
(Where Indicated)
725 Twelfth Street, N.W.
Washington, D.C. 20005
202.434.5000
swohlgemuth@wc.com
bsimon@wc.com

ALSO PRESENT:

Maria Slobodchikova, Palantir
Grant Cihlar, Videographer

Q Are you aware that Mr. Abramowitz is a technology investor?

MR. FURSEVICH: Objection. Form. Lacks foundation.

BY MR. WOHLGEMUTH:

Q So you can answer, Mr. Ketterling, unless Mr. Fursevich instructs you not to answer. Those objections to form, you can still answer the question.

A Okay.

I don't remember if we were -- I knew at the time if he was a technology investor or not.

Q Are you aware that Mr. Abramowitz was working with someone named Laura Esserman at the time that you met him?

MR. FURSEVICH: Objection. Lacks foundation.

MR. WOHLGEMUTH: Strike that.

Q Were you aware that Mr. Abramowitz was working with someone named Laura Esserman at the time that you met him?

A I don't remember if I was aware of that or not.

Q Do you know who Laura Esserman is?

A I -- no, I don't.

Q I'm going to put an exhibit in your "Marked Exhibits" folder.

All right. Exhibit 159 should be in your marked folder. You just click it, it should refresh and appear.

(Whereupon, Exhibit 159 was marked for identification by the Court Reporter.)

THE WITNESS: Okay, I can see the exhibit.

BY MR. WOHLGEMUTH:

Q You see that it is a meeting invitation with the subject "UCSF/Quantum Leap/Palantir Onsite"?

A That's correct.

Q And the date for the meeting invite is December 17th, 2012?

A That's correct.

Q And then you see the required attendees -- there's a few of them or a number of them. They include Laura Esserman, Marc Abramowitz, yourself, and a couple other colleagues at Palantir, among others?

A That's correct.

Q Did you attend this meeting with Dr. Esserman?

A I don't recall if I attended or not. I do -- I remember a brief description of the meeting afterwards that was circulated within the Palantir health team, but I don't have any specific memories of attending this meeting.

Q What was the description of the meeting that you recall?

A The -- the only detail I can really recall there was that we were exploring work with UCSF.

Q What type of work was that?

A I -- I can't recall exactly the specific nature of the work.

Q How many times have you met Mr. Abramowitz?

A To my best recollection, just the one meeting we had at -- at Palantir headquarters.

Q Did you ever provide Mr. Abramowitz any of Palantir's trade secrets?

A I don't specifically remember the -- the details of -- of the meeting where we met. But I do remember that we gave him a top-to-bottom briefing on everything the Palantir health team was working on at the time, which undoubtedly contained trade secrets, but as to the specifics of exactly which trade secrets we shared, I can't really recall that.

Q What does that mean, "top-to-bottom

briefing"?
A It means we -- the Palantir health team at the -- at the time was -- was expanding. We had a -- you know, many potential use cases and early use cases that we were engaged in with early customers.
We were -- we -- we would have gone through each -- each of these projects and use cases and explained how our technology could apply to that, and as well as the tactics that we were using to -- to achieve that use case.
Q What -- what use cases did you walk through with Mr. Abramowitz?
A Based -- again, I don't remember the specifics of exactly what we covered in that meeting. But under the -- the premise of -- of Lauren Chaparro and I giving a briefing on the Palantir health team, we would have covered our work in disease surveillance; pharmaceutical applications, including target identification; and clinical trial management.
Q So do you know whether you talked about each of those issues with Mr. Abramowitz?
A I don't -- I don't specifically recall, you know, briefing him on -- on each specific use case,

but I do recall that we -- we gave him, again, a top-to-bottom look at everything we're working on in the hopes that he could connect us with potential clients that could benefit from the work we were doing.

And, in addition, that he was -- knowing he was associated with senior leadership, we were excited about sharing -- sharing our early progress as a team within Palantir, given the internally competitive environment at Palantir. And so we hoped that we would possibly demonstrate what we're working on and with the interest of gaining more excitement within the senior leadership at Palantir for the -- the problems we were tackling and the work that we were doing.

Q Fair to say that Palantir's health care work at this time was in its early stages?

MR. FURSEVICH: Objection. Form. Vague.

BY MR. WOHLGEMUTH:

Q You can answer.

A At this point we were roughly three years in to exploring how Palantir could be used within various health care applications. So, depending on the application, it was combination of early versus intermediate. I'd say we were more in the

intermediate stage in terms of disease surveillance.
Q Do you recall exactly where Palantir was in the course of its health care work in February of 2013?
A It's been a long time. I would have to review materials on exactly where we were. My recollection is probably -- I could describe it probably by year, but certainly not by month.
Q Why don't you describe it starting with 2012.
A Starting with 2012? We were progressing with our work at the -- at the CDC. We had been developing kind of -- you know, more elaborate plans for all of the potential things we could do within pharma, as well as, you know, brainstorming a lot of other aspects of -- of health care, trying to get an early insurance company as a customer.
And -- and in 2013 we were finally engaging in our first pilots with insurance companies, which was exciting, as well as with pharmaceutical companies, beyond a small pilot we did in 2010 with [redacted], within pharma.
Q In 2012 what was your work at the CDC?
A We were actively assisting the foodborne disease outbreak investigation team.

Q And in 20- --
A And we were meeting with other -- other groups inside the CDC to try to expand -- influenza and emergency health preparedness and responses were our two top focus areas there.
Q And in 2012 you were just -- I think you said brainstorming plans within pharmaceuticals or within pharma?
MR. FURSEVICH: Objection. Misstates testimony.
BY MR. WOHLGEMUTH:
Q Okay. You stated in 2012, quote (as read):
We have been -- we had been developing kind of, you know, more elaborate plans for all of the potential things we could do within pharma.
What were the plans that you were developing?
A Yeah. I -- I'd characterize it that, you know, brainstorming was definitely an activity that occurred at every phase of our development. We were always looking for new, creative ways to apply the product and the data.
The work, we had spent a lot of time

MR. FURSEVICH: No. We can maybe restate the question and then go from there.

BY MR. WOHLGEMUTH:

Q My question was not about what [redacted] was exploring.

What products or offerings did they use?

A They used the -- the Palantir Gotham platform, along with custom integrations that our team prepared, as well as custom applications built on top of the Palantir Gotham platform to explore their data.

And, to my recollection on what I was briefed on, it definitely addressed each of these subject matters that I previously mentioned, including target selection and each phase of clinical trial development of a drug.

Q That's your testimony? Your testimony is that you recall being told that [redacted] worked on all -- or utilized Palantir for all aspects of clinical trials?

A I think "all" is probably too an extreme a term. But definitely the phases that I mentioned.

Q And that's based on a briefing you received?

A Regular briefings that we would receive

as -- as a part of weekly meetings with the Palantir health team.

Q And who briefed you about [redacted]?

A I remember Lauren Chaparro briefing me on this, as well as Andrew Girvin.

Q Your recollection that you gave Mr. Abramowitz a top-to-bottom presentation is based on what? Your recollection or your review of documents?

A My recollection.

MR. FURSEVICH: Objection -- objection. Form.

Go ahead, Mr. Ketterling.

THE WITNESS: It was -- it was based on my recollection.

BY MR. WOHLGEMUTH:

Q But you can't remember what you discussed specifically?

A No.

Q Did you ask Mr. Abramowitz to sign an NDA or a confidentiality agreement before the meeting?

A I -- I can't remember if we did or did not. Given how he was introduced to the team, I don't think that's something we normally would have done.

Q Because he was an associate of senior

leadership?
A Because he was an associate of senior leadership.
Q So, if someone was introduced to you as an associate of senior leadership, you did not think that you needed to obtain an NDA or a confidentiality agreement?
MR. FURSEVICH: Objection. Form.
THE WITNESS: Yeah. I can't remember how -- how we exactly thought about the -- the meeting with Mr. Abramowitz, but that would have been customary, to -- to likely not pursue one of those documents.
And -- and I would add that, given that the meeting happened at Palantir headquarters, gave us an additional belief that the -- the proceedings and what we discussed about would be kept confidential.
BY MR. WOHLGEMUTH:
Q You had -- you remember thinking this in 2013?
A That's -- yes. In -- in 2013, most definitely. I mean, Palantir headquarters were swept regularly for listening devices. We had numerous security personnel. Your driver's license was scanned at the -- at the lobby.

So there was -- there was definitely a culture and actual practices that reinforced secrecy and confidentiality, especially at Palantir headquarters.

MR. WOHLGEMUTH: So, Mr. Ketterling, you're breaking up a little bit.

I don't know if he's breaking up for other people.

MR. FURSEVICH: Fine for me.

MR. WOHLGEMUTH: Paula, is he breaking up for you, or is he fine?

THE REPORTER: A little bit.

MR. WOHLGEMUTH: A little bit? Okay. We can keep going. I don't know if -- maybe at the break you could see if there's a better spot for Wi-Fi purposes.

THE REPORTER: It could be the virtual background. They take up a lot of bandwidth.

THE WITNESS: I can just take care of that.

Yeah. My internet does suddenly seem to be slower than normal.

MR. FURSEVICH: Well, let's just proceed, and if we have issues, we can take a break and figure them out.

MR. WOHLGEMUTH: Yeah. Well, we've

certainly had issues, but let's see if it -- if it resolves with the virtual background change.

Q So you stated that you did not ask Mr. Abramowitz whether -- or you cannot recall whether you asked him to sign an NDA or a confidentiality agreement before the meeting.

Did you check with anyone internally at Palantir to see if there was an NDA or a confidentiality agreement already in place?

A Yeah, I can't remember if we did that or not.

Q What was the purpose of the meeting as far as you understood it?

A The -- the two purposes that I remember was to share our early work -- or share our work to date, rather, within the Palantir health team with -- with an associate of senior leadership to hopefully build excitement and share our excitement for the work we were conducting.

Palantir was relatively internally competitive. So any -- any positive, you know, goodwill we could build for the team could mean that we could get more resources and more stability inside the organization as we pursued these use cases that we were very passionate about as a team.

Secondly and more importantly, we were -- we were told that Mr. Abramowitz -- one, that we should meet with him; two, that he could help make introductions to pertinent customers that could benefit from our work.

Q Who told you that?

A I don't specifically remember who -- who told me that. But that was -- that was my understanding of -- of the premise of the meeting.

Q And why did Mr. Abramowitz need to hear about Palantir's capabilities in order to connect you and your team to potential customers?

A We --

MR. FURSEVICH: Objection. Calls for speculation.

Go ahead, Mr. Ketterling.

THE WITNESS: Okay.

We -- we wanted to show him -- we were working on a disparate set of use cases; we weren't entirely sure which ones would resonate with him or which ones would -- which ones would make Mr. Abramowitz think of a customer or a relationship that would be advantageous for us to engage with to -- to deploy our software.

///

insuring them going forward.

Q And was Palantir in fact doing that work in March of 2013 for the purpose of calculating the cost of insurance?

A No, I don't think we were -- that was part of our early health insurance pilots.

Q And the last item on this one-pager is entitled "Pharma"; correct?

A That's correct.

Q There is a mention of clinical trial management under the "Pharma" bullet or under the "Pharma" heading; correct?

A That's correct.

Q And the document states, next to "Clinical trial management" (as read):

> Palantir can help accelerate the production of trial summaries by providing a unified environment for understanding all relevant clinical trial data.

Correct?

A That's correct.

Q What is a clinical trial summary?

A I'm not -- I'm not sure I can provide a precise definition.

My understanding would be various representation of this -- of the trial to interested parties within a pharma organization and intermediate production of -- of trial summary data that would -- that would flow to folks like the FDA for final approval.

I know at one time we discussed a capability to automatically generate a trial summary and that -- that problem was inherently complex, but we -- we thought we could possibly contribute to that and work on it over time.

Q No mention of local clinical suitability in this one-pager; correct?

(Reporter interruption for clarification.)

MR. WOHLGEMUTH: Clinical trial.

THE WITNESS: It's not specifically mentioned, but I believe it's implied by "clinical trial management."

BY MR. WOHLGEMUTH:

Q What part of the sentence following "clinical trial management" refers to suitability?

A The sentence following doesn't refer to suitability.

Q But just the general -- because the three words "clinical trial management" are in this

document, you believe that encompasses clinical trial suitability as well?

A I think that if a third party wanted to pursue that problem with Palantir, "clinical trial management" would signal that we could -- we could help with that problem.

Q Mr. Ketterling, you said -- well, earlier you said the fact that Mr. Abramowitz was an associate of senior leadership meant that, from your perspective, it implied that he could be trusted in keeping the right things confidential.

Do you remember giving that testimony?

A I do.

Q What do you mean by "the right things confidential"? Did you direct Mr. Abramowitz to what the right things were?

A The -- what I meant by that is, again, the -- the training and direction that we had received as -- as Palantir employees was to be extremely judicious in what we shared and what we didn't share and the systems that we used to keep data secret.

And also just the -- the peril of ever disclosing any of our clients' data, which we also never kept on site.

And the assumption that Mr. Abramowitz would keep the right things confidential was the assumption that he would act in accordance with -- with how we act -- acted and how most of our customers acted as well, as well as the reputation in the company.

It -- it wasn't our place to instruct Mr. Abramowitz, given that we -- you know, his association with senior leadership, we -- we deferred to him as more senior to us, and it wasn't our place to really instruct him in that -- in that manner.

Q You mentioned something about the training that you had received as a Palantir employee.

Did your training cover protection of Palantir's confidential information?

A I don't remember the specific training that specifically instructed us to do that, but I certainly remember generally that we retrieved -- we received training to do that.

Q Did Mr. Abramowitz, to your knowledge, ever receive any similar training from Palantir?

A I don't know. No, I don't know.

Q Who is Michael Winlo? What was his role at Palantir?

A He was a -- he came to Palantir as a -- an Echo, was the internal nomenclature, which meant he was responsible for managing pilots and customer engagements, as well as performing analysis and assisting our clients with analysis when we integrated data for clients and developed custom software on top of the Palantir platforms for the benefit of a client.

His training was -- he had a medical degree from Australia; so he was uniquely suited to provide a clinical perspective on the -- the data that we were helping our clients analyze.

Q Jumping back to something you said about Palantir's work on clinical trial suitability and access to public databases, would the database -- how often would those databases be updated, as far as you were aware?

A During -- for use outside of a client context, it would be as needed. If we felt the data would be perceived as stale or not relevant anymore, we would update it.

In -- client situations would vary on the data source and kind of what the client expected. Many times our public datasets would be updated, you know, daily or weekly.

Some might only be published annually; so they could be only updated after they were published and we scheduled time to perform the update.

Q For Palantir's health insurance risk assessment work, what sources of data did it -- what sources of data -- what sorts of data were used for that work?

A Sorry, can you just repeat the question one more time?

Q So, for Palantir's health risk assessment work, what sources of data were used?

A I don't remember all of the sets of data, but, I mean, one set of data we maintained were -- was census data that would -- could be relevant in risk assessment.

As far as other open -- open-source datasets or public datasets, I -- I can't remember the specific ones.

Q All right. I'm going to upload another document.

A I'm waiting -- I'll be back in five seconds.

Q So I'm actually going to reintroduce the document as Exhibit 167, because I forgot to stamp it before I did it, but I'm doing that right now.

STATE OF CALIFORNIA )
COUNTY OF RIVERSIDE ) ss.

I, Paula A. Pyburn, CSR No. 7304, RPR, CLR, in and for the State of California, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given.

Before completion of the deposition, review of the transcript [ ] was [xx] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated: December 7, 2021

________________________________

Paula A. Pyburn, RPR, CLR
CSR No. 7304
Certified Shorthand
Reporter for the
State of California

# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

---

PALANTIR TECHNOLOGIES INC., a Delaware corporation,

Plaintiff,

-against-

MARC L. ABRAMOWITZ, in his individual capacity and as trustee of the MARC ABRAMOWITZ CHARITABLE TRUST NO. 2, KT4 PARTNERS LLC, a Delaware limited liability company, and DOES 1 through 50, inclusive,

Defendants.

Case No. 5:19-cv-06879-BLF

---

November 30, 2021
12:06 p.m.

VIDEOCONFERENCE DEPOSITION of JOHN AMOS, taken by Plaintiff, pursuant to Notice, held at 804 Lexington Terrace, Southlake, Texas before Wayne Hock, a Notary Public of the State of New York.

A P P E A R A N C E S:

HUESTON HENNIGAN LLP
Attorneys for Plaintiff
523 West 6th Street
Los Angeles, California 90014
BY: YEGOR FURSEVICH, ESQ.
yfursevich@hueston.com
(via videoconference)
JOSH BURK, ESQ.
jburk@hueston.com
(via videoconference)

WILLIAMS & CONNOLLY LLP
Attorneys for Defendants
725 12th Street, NW
Washington, D.C. 20005
BY: STEPHEN L. WOHLGEMUTH, ESQ.
swohlgemuth@wc.com
(via videoconference)
BARRY SIMON, ESQ.
bsimon@wc.com
(via videoconference)

ALSO PRESENT:
PETER COOPER, Videographer
(via videoconference)

* * *

J. Amos

just a second.

I want to focus on your relationship with Mr. Abramowitz and how that relationship sort of fizzled away.

A. Yeah.

Q. The -- so you said that Mr. Abramowitz was upset that the deal with Palantir did not go through.

Did he express that sentiment do you directly?

MR. WOHLGEMUTH: I object to the form.

THE WITNESS: So am I supposed to answer?

Q. Yes, please.

A. Yeah, I think we had a phone call about it. You know, he was kind of pissed. And I spent a fair amount of time on it. I was kind of bummed myself, no doubt. I'm very much about solving things for patients and I thought it was a great solution for patients, and capitalism got in the way, which is fine. And Alex certainly had the right and privilege to

J. Amos

do what he did. So yeah, I was bummed, but Marc was bummed and willing to do something about it, which I didn't want to be a party of.

Q. What do you recall Mr. Abramowitz telling you exactly on that phone call?

A. Man, I've got to tell you, that call was a long time ago. My general viewpoint was he was upset, a little bummed out, but I don't -- I couldn't tell you specific words. I literally have thirty of these types of phone calls, deal phone calls a day, and Marc was just one guy in that entire mix.

Q. And when did he first indicate to you that he wanted to sue Palantir?

A. I mean, you know, I can't remember when the deal with MD Anderson kind of fell apart, 2015, '16, maybe '16. I think he was kind of bummed like right after. And the firm that I worked for at the time, ORIX, I was with them for five plus years, it's a Japanese firm, very,

J. Amos

you know, white cufflink and very buttoned down firm, and I was like dude, don't involve me in this. That ends my investing life with ORIX, and I had a very, very successful time with them and I didn't want to carry any baggage out of that with me.

Q. So Mr. Abramowitz indicated to you that he wanted to sue Palantir shortly after the deal fell through with Palantir; correct?

A. Yeah, I'm not sure what the definition of "shortly" is, but it was after that happened. I don't know how to define shortly.

Q. Was it less than five months after?

A. Yeah, I think five to six months would be the right answer. But again, it's a long time ago.

MR. WOHLGEMUTH: Can I just have a form objection to the question two questions ago. I just want to make sure that was noted for the record.

J. Amos

Q. Mr. Amos, you stated that you did not want to associate either yourself or ORIX with Mr. Abramowitz's contemplated litigation against Palantir; correct?

A. No. No, no, no.

Q. No meaning not correct or no meaning you did not want to --

A. No, I didn't want to be involved in this at all.

Q. Thank you. I just want to make sure that --

A. Yeah.

Q. Okay.

Mr. Amos, I know we've covered quite a few topics, but I'd like to get a little more focused and get back to the document that I introduced as Exhibit 118.

A. Yeah.

Q. Do you still have that document up on your screen?

A. I can pull it back up.

There we go.

Q. So after you tell Mr. Abramowitz, "hey there, we still haven't

J. Amos

finalized the schedule with Pablo," he replies, "may be iffy for me with this that. Just amazing."

What did you understand Mr. Abramowitz to mean by "may be iffy for me with this?"

MR. WOHLGEMUTH: I object to the form.

THE WITNESS: I tell you, I don't know, you know, looking at this e-mail and given the time frame when this e-mail was written over five years ago, I'd just be speculating.

Q. Okay.

And then you respond to that e-mail with, "holy crap, I just read the article. Well, if you need to depose me, let me know."

Do you see that?

A. Yeah, sure.

Q. What do you mean by that? Why did you offer to be deposed to Mr. Abramowitz?

MR. WOHLGEMUTH: I object to the

J. Amos

form.

THE WITNESS: Yeah, I don't view that as an offer. I view that if you need to depose me in the context of this case, let me know, because I was working for ORIX at the time and I needed to inform ORIX of that deposition related to that deal.

Q. Do you think that you had any relevant testimony to provide?

MR. WOHLGEMUTH: I object to the form.

THE WITNESS: You know, I don't know. Marc's -- what Marc had contemplated at least for me from my recollection, the best of my recollection, was that he was talking about a cybersecurity patent related to insurance and that I didn't understand that there was anything related to MD Anderson specifically or the MD Anderson deal specifically. So, you know, but they might have been like -- he was pissed -- I didn't know

J. Amos

Anderson. Everything that Marc told me about his relationship with Palantir certainly held water.

Q. What did Mr. Abramowitz tell you about his relationship with Palantir at that time?

A. He told me that he was a shareholder and a relatively large shareholder in the company and that he wanted, you know, the company to be wildly successful and he wanted them to do more in healthcare and he thought I would be able to help them in healthcare, which I was certainly -- I thought I could build a profitable business on the back of Palantir technology, particularly in the area of cancer genetics, and that was my interest in it.

Q. But you understood Mr. Abramowitz's interest to be wanting to help develop Palantir's business relating to healthcare so he could increase his own -- the value of his own involvement in the company?

J. Amos

MR. WOHLGEMUTH: I object to the form.

THE WITNESS: Yeah, I think loosely that's -- and I know Marc was talking to Palantir about other things, but whatever. They weren't of interest. The only thing that was of interest to me was the cancer genetics platform.

Q. Do you remember any of those other things that he was talking to Palantir about?

A. Yeah, I think the cyber insurance, cybersecurity insurance platform. But I wasn't party to any of those conversations. I didn't talk to them. I didn't talk to Palantir about it, and it was just more in passing with Marc.

Q. Understood, understood.

What did Mr. Abramowitz tell you about his dealings with Palantir pertaining to cybersecurity or cyber insurance?

A. I think it was hey, I'm thinking

J. Amos

about doing something in cybersecurity with Palantir. I was like okay, great, it sounds cool. It was nothing more than that, man. So you think this is a good idea? Yeah, I guess. It sounds great. Cyber insurance wasn't really a big product, now it is, so it's turned into something.

Q. What was your understanding of Mr. Abramowitz's relationship with Palantir's CEO Alex Karp?

A. I think it was just they talked. He had -- you know, he positioned it that he had Alex's ear and that Alex would occasionally seek his advice and counsel on things related to the business. That felt like a little bit of an overstatement. When you talked to Marc, that's what Marc said. When you talked to Alex, Alex was like, yeah, Marc's a guy that owns some Palantir shares, and we talked to him and we appreciate his business development opportunities. So I don't know that -- there felt to me some

J. Amos

level of disconnect between what the relationship in Marc's vision was and what Alex's version of it was. But that happens all the time, so I didn't really make hide nor hair of that.

Q. But from Mr. Abramowitz's perspective, he was an advisor and counselor to Palantir; is that right?

MR. WOHLGEMUTH: I object to the form.

THE WITNESS: Yeah, and I think that was true. I don't think that that was a mischaracterization on Marc's part. I think, to clarify, I think there's hey, I'm helping Palantir out and there's a completely separate matter, which is I'm really buddies with Alex Karp. And counsel means I'm his advisor. It's like okay, I get what Marc told me that he's working with Palantir to help grow the business. That was a hundred percent true in my eyes. He's super tight and close buddies with Alex

J. Amos

Karp, that didn't hold as much water. I felt that that was an overstatement based on what Alex -- the impression that I got from Alex. And Alex never said anything derogatory about Marc at all. I just -- it's like, yeah, he's an advisor to us. It wasn't like, hey, he's my best friend or anything like that.

Q. Got it. That helps.

So just to help clarify, you were differentiating between Mr. Abramowitz's relationship with the company and Mr. Abramowitz's personal relationship with the CEO of the company; is that right?

A. You've got it.

Q. And both sides of the relationship --

MR. FURSEVICH: Scratch that.

Q. But both Mr. Abramowitz and Palantir viewed Mr. Abramowitz as an advisor to the company; right?

MR. WOHLGEMUTH: I object to the

J. Amos

form.

THE WITNESS: Yeah, I think on business development matters. You know, "advisor" is a very big term, so I think specifically there was a couple of things that Marc was working on with Palantir, and those couple of things, as I understand it, and there might have been more, but there was the thing with me around cancer genetics and something to do with cybersecurity and insurance.

MR. FURSEVICH: We've been going for about an hour. I think we should take a five-minute break, if that's okay with you, Mr. Amos, and with you, Steve.

THE WITNESS: It sounds good, man.

THE VIDEOGRAPHER: The time is approximately 1:06 p.m.

This is the end of media number one, and we are going off the record.

(Whereupon a break was taken)

J. Amos

THE VIDEOGRAPHER: The time is approximately 1:24 p.m.

This is the beginning of media number two, and we are on the record.

Q. Okay.

Mr. Amos, I want to go back to your testimony earlier.

You mentioned patent trolls.

Do you remember that testimony?

A. Say that again?

Q. You mentioned that -- you said something along the lines of there's patent trolls and I know some of those guys and deal with them a lot.

A. Yeah.

Q. What do you mean by "patent trolls?"

A. Just somebody who files a patent. So in my industry, they're called paragraph IV challengers, so they're people who -- companies who typically will file a paragraph IV challenge against a patent you own on a particular pharmaceutical, and what they're

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of December, 2021.

Wayne Hock

# EXHIBIT 16

FILED UNDER SEAL

# **EXHIBIT 17**

FILED UNDER SEAL

# EXHIBIT 18

FILED UNDER SEAL

# EXHIBIT 19

FILED UNDER SEAL

# EXHIBIT 20

FILED UNDER SEAL